EXHIBIT
13A

1    Q    And did you in fact intercept a package?

2    A    Put together a make-shift package, similar to

3    the one that was --

4         MR. NERO:  I'll object to that, Your Honor.

5    That's not the question that was asked.

6         JUSTICE KESSLER:  I'll sustain the objection.

7    Do you want to rephrase the question?

8    BY MS. ADAMS:

9    Q    What did you do after confirming that mailbox

10   was indeed the mailbox that the agent --

11   A    Put together a make-shift parcel to simulate

12   the one that was intercepted in California.  And addressed

13   it as was addressed in California and --

14   Q    How was it addressed?

15   A    It was addressed to Expressions Express -- I

16   don't remember the exact address -- on Eastern Boulevard,

17   but it was the numerical address for Mailboxes Etc. and

18   Suite 164.  And it was placed at that location by me.

19   Q    Okay.  At any time did you in fact receive a

20   package from Agent Sipes?

21   A    Yes, I did.

22   Q    And what did you do with that package?

23   A    That package was received by me, opened by me,

24   field tested by me, tested positive for marijuana.  Again,

25   secured by me in our evidence room until it was turned

Bridget A. Marchio, Official Court Reporter, RF

1    over to drug enforcement administration for transportation

2    to the New York Crime Lab for further analysis.

3         Q    And was that package addressed in a similar

4    manner to how you addressed the make-shift package?

5         A    Yes, it was.

6         Q    What did you do with the make-shift package?

7         A    It was placed at the location at Mailboxes Etc.

8    on Eastern Boulevard and left for it to be picked up.

9         Q    Do you recall the date?

10         A    January 10th, I believe.

11         Q    And what happened after that?

12         A    I did a follow-up investigation on the renter

13    or lessee of that particular box and learned that it was

14    leased or rented by the defendant, who's seated to

15    counsel's left, in the orange jumpsuit, identified as

16    Tyrone James.  And that was confirmed by the workers of

17    Mailboxes Etc., and we then set up surveillance on that

18    location.

19         Q    Did anyone arrive?

20         A    Yes.

21         Q    What did you see happen?

22         A    The defendant arrived, parked in the lot.  He

23    was observed by surveillance units walking into the

24    establishment.  He was observed exiting the establishment

25    with the parcel that was placed there by me and was

1    eventually --

2             MR. NERO:  Your Honor, I'll object at this

3    point unless he specifically observed my client park and

4    walking in.

5             JUSTICE KESSLER:  I think that was his

6    testimony, was it not?

7             THE WITNESS:  Yes.

8             MR. NERO:  He said the surveillance unit --

9             JUSTICE KESSLER:  Were you part of surveillance

10   unit?

11            THE WITNESS:  Yes, I was.

12            JUSTICE KESSLER:  You observed this?

13            THE WITNESS:  Yes, I did.

14            JUSTICE KESSLER:  Continue.

15            THE WITNESS:  He exited the establishment with

16   the parcel in his hands.  He was approached by Agent Wes

17   Morlin (phonetic) who identified himself.  The defendant

18   threw the package and proceeded to run from that location.

19        BY MS. ADAMS:

20        Q    Was he taken into custody?

21        A    Yes, he was.

22        Q    Was he Mirandized?

23        A    Yes, he was.

24        Q    Did he appear to understand his rights?

25        A    He stated he did.

Bridget A. Marchio, Official Court Reporter, RPR

9

Q    What, if any, statements did he make?

A    He stated that he thought the parcel was beauty supplies and that he didn't know anything about any marijuana.

Q    Did he indicate his whereabouts on the previous day?

A    He stated that he was in California, that he had just flown in, Harrisburg International Airport, rented a vehicle and drove down to Mailboxes Etc. to retrieve this parcel.

Q    And the evidence will be available for trial in the Court of Common Pleas?

A    Yes.

Q    You filed criminal attempt to possess with intent to deliver?

A    Charges were filed by Officer Craul of Springettsburry Township Police Department, their jurisdiction.

Q    Can you explain to the Court why possession with intent was filed rather than simple possession?

A    Because the quantity, the amount of drugs that were to be seized at that particular time, were beyond that of normal possession and did show possession with intent to deliver.

Q    Did you testify to the weight already?

1    A    No, I didn't.

2    Q    What was the weight of the package?

3    A    It was estimated to be approximately nine, nine

4  and a half pounds.

5              MS. ADAMS:  That's all.

6              JUSTICE KESSLER:  Prior to cross-examination,

7  you indicated that you had received the package that was

8  originally from California?

9              THE WITNESS:  Yes.  Eventually, yes.

10             JUSTICE KESSLER:  From Mailboxes Etc.?

11             THE WITNESS:  Yes; they received.

12             JUSTICE KESSLER:  You say you tested that

13  package?

14             THE WITNESS:  That's correct, sir.

15             JUSTICE KESSLER:  And what were the results of

16  that test?

17             THE WITNESS:  Tested positive for marijuana.

18             JUSTICE KESSLER:  For marijuana?

19             THE WITNESS:  Yes.

20             JUSTICE KESSLER:  Cross-examine.

21             MR. NERO:  Thanks, Your Honor.

22                      CROSS EXAMINATION

23    BY MR. NERO:

24    Q    Now, Agent Morgan, when was it you had the

25  conversation with Agent Snipes or Sipes?

A       I spoke --

Q       What date was that?

A       I spoke with him the evening of the 8th, I believe, which would have been, I believe, that Monday.

Q       When you say the evening, could you be more specific of time?  Was it 5:00?

A       It was late.  It would have been, I'm thinking, about 8, 8-ish at night, Monday night.

Q       Did he call you?

A       Yes.

Q       Where were you when he called you?

A       I was off duty.

Q       So he called you off duty at home?

A       He called me on my cell phone.

Q       Do you know Agent Sipes?                    FIRST TIME
                                                    CONVERSATION

A       No, just from corresponding through the phone.

Q       Was that the first time you had a conversation with him?

A       That's correct.

Q       Okay.  And he called you and said, I was -- I'm Agent Sipes.  And he got a phone number from where?  Can you tell me?

A       An agent from our Allentown Office, Ron Perry, who conducts a lot of interdictions in the State of Pennsylvania and is successful in his interdictions, was

Bridget A. Marchio, Official Court Reporter, RPR

1    A    I prepared the package myself and Detective
2    Kessler and Detective --
3    Q    I'm not talking about the package you prepared.
4    I'm talking about the package that was shipped from
5    California that actually controlled what you tested to be
6    marijuana.
7    A    I received that from California.
8    Q    It came -- it was sent directly to you?
9    A    Right.
10   Q    Okay.  And who delivered it to you?
11   A    I believe it was delivered UPS.
12   Q    And --
13   A    To my office.
14   Q    Okay.  So let me be clear, this package then,
15   never was delivered to Mailboxes Etc.?
16   A    That's correct.
17   Q    And as I understand it, you now, having control
18   of the package, made up a package that looked like the
19   package you received?
20   A    You lost me.
21   Q    You received the original package, correct?
22   A    At a later date, yes.
23   Q    At a later date?
24   A    Yes.
25   Q    When did you receive that package?

Bridget A. Marchio, Official Court Reporter, RPR

1      A    I believe it arrived at my office on the 10th.

2      Q    So did you make up the similar package?

3      A    I made that up on the 9th.

4      Q    So that it appears you had no idea what the package looked like when you made up this make-shift package on the 9th?  You had not yet seen the package that was sent to you?

8      A    I had been given a description of the package.

9      Q    I understand.  But you had not seen it?

10     A    No, I hadn't seen it.

11     Q    What did you use to write the address on the package that you made up?

13     A    A pen.

14     Q    What color pen?

15     A    It was written -- I think Detective Kessler wrote the address on it.  It was either a pen or a marker, I mean.

18     Q    You don't recall?

19     A    Yeah.  I don't remember if it was a pen or a marker, but it was --

21     Q    Did you write the return address on the package?

23     A    Did I write it on there personally?

24     Q    Or Detective Kessler.

25     A    Right.

Q       Did you write the return address?  Do you know?

A       I don't recall if he did or not.

Q       Now, when you made up this package, you took it to Mailboxes Etc.  Did you put it in the mailbox or did you give it to an employee?  What did you do with it?

A       We sat it where parcels are normally set in the Mailboxes Etc.  The mailboxes are too small for parcels. They're letter-size boxes.

Q       I take it there were other boxes there in the same area?

A       I don't recall if there were or not.

Q       Do you know whether or not that was the only box there when you placed it there?

A       I don't recall if there were other boxes there.

Q       Who placed the box there?  Was it you or another officer?

A       I did.

Q       You did?

A       Yeah.

Q       And what time was that?

A       Well, which day are you talking about?

Q       The date you placed the box there.

A       It was placed there on the 10th.  It was in the morning.  I don't recall the exact time.  It was in the morning.

1      Q      And you remembered yourself placing the box or

2  did you have --

3      A      No, I had other officers with me.

4      Q      Would I be correct in saying then that you --

5  from the time you placed it there, whatever the time of

6  the morning, until the 10th until you testified my client

7  got there?

8      A      You're saying -- can you repeat?

9      Q      From the time you took the box there on the

10 10th in the morning, you said --

11     A      Okay.

12     Q      My question to you is, would I be correct in

13 saying that you or other officers stayed at the location

14 from that time until my client arrived?

15     A      Yes, we did.

16     Q      Okay.  You personally?

17     A      I was a part of this surveillance, yes.

18     Q      I'm asking, did you stay there the entire time

19 or did you leave and come back?

20     A      We stayed.  We were there.

21     Q      And when you came back, my client came alone

22 when he came to the location?

23     A      That's correct.

24     Q      You saw him enter the location?

25     A      That's correct.

Bridget A. Marchio, Official Court Reporter, RPR

1    Q    And you don't know how many people were inside

2  the building at the same time?

3    A    No.

4    Q    Okay.  When he came out of the building, what

5  did he do?  Walk to his car?

6    A    Walked to his car.

7    Q    That's when he was approached?

8    A    He was approached.

9    Q    Who approached him?

10    A    We all exited our vehicle and Agent Wes Morlin

11  was closest to him and identified himself with his badge

12  and he fled.

13    Q    Did you guys have on plain clothes?

14    A    No.

15    Q    You were --

16    A    We were in plain clothes, but we had our police

17  identification.

18    Q    I understand.  I'm going to get to that.  You

19  did not have on uniforms?

20    A    No, I don't wear a uniform.

21    Q    So you were all dressed in civilian clothing?

22    A    That's correct.

23    Q    And what did you say to him specifically?  Do

24  you recall?

25    A    I don't remember specifically.

1    Q    Do you remember what anybody said specifically?

2    A    No.

3    Q    How many people approached him?

4    A    On foot, maybe four.

5    Q    Was he approached other than by foot?

6    A    Well, there were vehicles in the area that were

7    beginning to drive into that location.

8    Q    How many vehicles?

9    A    I don't recall.

10    Q    So would it be fair to say then that he's

11    walking towards his car and that people are approaching

12    him on foot and people are coming to him?

13    A    It's not like we all approached him and were

14    surrounding him.  Agent Wes Morlin was closest to him and

15    identified himself.

16    Q    My question was, as he was walking towards his

17    vehicle, would it be fair to say that you and your other

18    officers approached him both on foot and in vehicles.  Is

19    that correct or not?

20    A    No.

21    Q    That's not correct?

22    A    No.

23    Q    How did you approach him?

24    A    Approached him on foot.

25    Q    How many others approached him on foot?

1    A    I believe it was about four of us.

2    Q    And at the same time, vehicles were approaching

3  him at the same time?

4    A    Not at the same time.  They arrived shortly

5  thereafter.

6    Q    How much time after?

7    A    I don't know.  It was after.  It was while he

8  was fleeing.  I wasn't paying attention when the vehicles

9  arrived.

10    Q    Interesting you use the word fleeing.  How far

11  did he flee?

12    A    Excuse me?

13    Q    How far did he run?

14    A    Right about -- he was successful in running

15  about 10, 15 yards.

16    Q    Ten or 15 yards?

17    A    Yes.

18    Q    And at this time as he's running, vehicles are

19  coming towards him and you four guys are running after

20  him?

21    A    No.  The vehicles didn't arrive until he fled

22  on foot and then they realized what was going on and

23  started coming towards our location.

24    Q    Before he fled?

25    A    It was just approaching on foot.

Bridget A. Marchio, Official Court Reporter, RPR

1      Q    That's four of you?

2      A    There were about four of us, but it wasn't like

3  four of us together, you know, like the OK Corral.  Wasn't

4  four of us walking together.  It was four of us at

5  different locations.

6      Q    Four of you coming from different directions

7  approaching him?

8      A    Right.

9      Q    Is that correct?

10     A    Right.

11     Q    And you don't know what was said when he ran 10

12 to 15 yards?

13     A    I know Agent Wes Morlin identified himself.  He

14 threw the parcel at him and ran.

15     Q    You're saying my client threw the package?

16     A    Towards Agent Wes Morlin and fled.

17     Q    Let me ask you something:  What was the weight

18 of the make-shift parcel?

19     A    Oh, I don't know.

20     Q    You made it up.

21     A    I didn't weigh it.

22     Q    You didn't weigh it?

23     A    No.  There was no need to weigh it.

24     Q    There was no need to weigh it?

25     A    Right.

1       Q     When you spoke with Agent Sipes, did he tell

2  you what the proximate weight of the package was?

3       A    Not that I recall.

4       Q    Did he tell you what the package was made of?

5       A    No.  From my experience in dealing with parcels

6  like this, I was familiar with what they were made of,

7  so--

8       Q    Did he tell you what the dimensions of the

9  parcel was?

10      A    No.

11      Q    He didn't really give you any information

12  except a parcel was coming?

13      A    Right.

14      Q    Didn't tell you what the color of the parcel

15  would have been?

16      A    No; it was a cardboard box.

17      Q    Did he say cardboard box or you assumed that

18  because of your experience?

19      A    I don't recall if he said specifically, but the

20  box I put together was to simulate what was arriving, so

21  he may have told me it was a cardboard box, you know.  I

22  don't remember specifically.  I mean, if you're asking for

23  specifics, I don't recall specifically.

24      Q    So that we are clear then, the only thing you

25  recall he said at the time was that it may have been a

1    cardboard box, he didn't give you no dimensions?

2        A    I don't recall.

3        Q    No color, no weight, nothing at all?

4        A    I don't recall.

5        Q    When you put your box together, you didn't

6    weigh it because it wasn't necessary?

7        A    Right.

8        Q    And you didn't care what color it was because

9    it wasn't necessary?

10        A    I didn't say that.

11        Q    Well, I'm asking.  Was it?

12        A    I knew there was a box.  The box comes -- boxes

13    through UPS, I've experienced, come in one of two colors

14    and I chose the cardboard box.

15        Q    Okay.  When my client threw the box, you all

16    then pushed him on the ground?

17        A    Excuse me?

18        Q    You pushed him on the ground after the box was

19    thrown by him?

20        A    When he ran, he was taken into custody.

21        Q    Okay.

22        A    If that meant him going to the ground to be

23    secured, then --

24        Q    I'm asking --

25        A    -- that's what occurred.  No one pushed him to

1    the ground.  He was grabbed and taken into custody.

2        Q      Grabbed and taken into custody?

3        A      Right.

4        Q      Was it there that you Mirandized him?

5        A      He was Mirandized once he was secured in the

6    vehicle.  I read him his Miranda rights.

7        Q      How much time passed between the time that you

8    took him into custody and the time you got him into your

9    vehicle?

10       A      When he was taken into custody and everyone got

11   situated, maybe a few minutes.

12       Q      And he indicated he wanted to talk to you?

13       A      I just read him his rights, asked him if he

14   understood his rights.  He stated he did.  He was

15   transported to the City Hall and that's where I sat down

16   and talked to him.

17       Q      Did he tell you that he wanted to see a lawyer?

18       A      The next day he did.

19       Q      He didn't tell you that?

20       A      No.

21       Q      Okay.  So when you read him his rights, you

22   didn't care what his response was, you just said these are

23   your rights and you decided to talk to him?

24       A      No.  I asked him if he understood his rights.

25   He stated he understood.  I asked how far he went in

1    school and he told me.

2         Q    Now, you testified that he told you that he

3    thought the parcel contained beauty supplies?

4         A    That's correct.

5         Q    How did he come to tell that you?  Did you ask

6    him or did he volunteer this information?

7         A    I don't recall.

8         Q    Well, after you Mirandized him, what did you

9    say to him?  How did the conversation develop?  I mean,

10   we're talking about January of 2001.

11        A    Yeah.  I don't remember exactly, you know, what

12   was said to him.  I just know that there was conversation

13   between us.

14        Q    Okay.  Is this conversation memorialized in

15   your notes for discovery?

16        A    Maybe a part of my report.  But I don't have my

17   report handy, so --

18        Q    You're not -- are you certain it's there or are

19   you not certain it's memorialized?

20        A    No.

21        Q    I didn't hear.

22        A    I'm not positive everything that's in the

23   report.  But the statement that he made to me, I know it's

24   in the report.

25        Q    Okay.  And you say -- you also said that he did

                Bridget A. Marchio, Official Court Reporter, RPR

1    not know anything about any marijuana.  That's what you

2    testified to?

3            A    Yes.

4            Q    How did that answer come?  Did you ask him or

5    did he just volunteer?

6            A    I remember him making that statement.

7            Q    Just blurted it out?

8            A    I just remember him making that statement.  I

9    don't know how it came about.  I just remember that

10   statement being made.

11           Q    Who was present at the time he's making this

12   statement besides you, if anybody?

13           A    Officers were in and out, you know, the room

14   where he was secured.  They were in and out of that room.

15           Q    Who was some of these officers?

16           A    Everyone that was involved in the investigation

17   and the surveillance.  Agent Bonseck (phonetic) of the

18   FBI, Detective Kessler of the York County Drug Task Force,

19   Detective Peddicord.  Different officers were.

20           Q    And this conversation took place not in your

21   car but you said at the police station?

22           A    That's correct.

23           Q    How long did it last?

24           A    I don't recall.  There was so much going on at

25   that time, I don't recall.

1      Q      What time did it begin?

2             MS. ADAMS:  Your Honor, I'm going to object to

3      the relevance of all these questions.

4             MR. NERO:  I think it's very relevant.  He's

5      claiming my client made statements and he's the one that

6      knows what he specifically said.  I'm trying to figure out

7      does he remember this or not.

8             JUSTICE KESSLER:  I believe he's answered

9      numerous attempts to.  Try to narrow down the time period

10     here.  He's indicated he doesn't remember.

11            I'll sustain the objection.

12     BY MR. NERO:

13     Q      Was that the only conversation you had with

14     him?

15     A      Other than filling out the arrest form, yeah,

16     that may have been.

17     Q      It may have been.  Did there come a time when

18     he was transported from the station to York County Prison?

19     A      Yes.

20     Q      Did you speak with him there?  Did you

21     interview him there?

22     A      At the prison?

23     Q      Yes.

24     A      The next day, the next morning, yes.

25     Q      Before you did that, did you Mirandize him

1   again?

2        A     Yes.

3        Q     And did he indicate he wanted to talk to you or

4   was it then he wanted to see a lawyer?

5        A     He spoke with us briefly and he said he wanted

6   an attorney.

7        Q     What did he say at that time?

8        A     What did he say?

9        Q     Yeah.

10       A     He claimed he's on disability; that he receives

11  his checks in California; that he lives here in York with

12  his wife; that he's manager of her hair salon; that she

13  pays him, I believe -- I don't remember the amount of

14  money, but she pays him a certain amount.  He helps with

15  various utility bills and stuff at the residence.  That he

16  lives in York, that he doesn't live in California.  And

17  that he goes to Los Angeles to pick up his disability

18  check.

19       Q     Did you memorialize this?

20       A     Yes, that's in my report.

21       Q     That's in your report?

22       A     Yes.

23       Q     Did he tell you that he wanted to make a phone

24  call?

25       A     No.

Bridget A. Marchio, Official Court Reporter, RPR

1      Q      He never told you he wanted to call his wife or

2  a lawyer?

3      A      I think he asked me the night before that he

4  wanted to make -- before the night he was arrested.

5      Q      What day are we talking about?

6      A      The 10th.

7      Q      He asked on the 10th to make a phone call?

8      A      Yes.

9      Q      When did he ask you this?

10     A      I think after I had -- after he had been --

11 after we processed him and were moved to arraigning him, I

12 think he asked to make a phone call.

13     Q      That's when?

14     A      That's correct.

15     Q      You say the following day on the 11th he never

16 asked to make a phone call or you don't recall?

17             MS. ADAMS:  I'm going to object to this entire

18 line of questioning.  At this point he's getting to

19 discovery materials.  If he wishes to file a motion for

20 discovery, he can do so at that time.

21             JUSTICE KESSLER:  Response.

22             MR. NERO:  This is very relevant information.

23 This was already testified --

24             MS. ADAMS:  Not for this purpose.

25             MR. NERO:  It could have been.  This was

1   testified to by Agent Morgan yesterday and before.  I'm

2   simply asking the same thing I asked him yesterday, which

3   he answered.

4                MS. ADAMS:  Then you don't need to hear it

5   today.

6                MR. NERO:  I did need to hear it today, of

7   course.

8                JUSTICE KESSLER:  The Court's listened to the

9   objection and the responses that have been made.  This is

10  indeed a preliminary hearing; it's not a discovery

11  hearing.  There is a process by which to arrange for

12  discovery.

13               I believe that the witness has answered the

14  question at least once, if not twice.  I'm going to

15  sustain the objection and ask counsel to move along,

16  please.

17  BY MR. NERO:

18       Q    Do you recall ever saying to him that you are

19  not -- besides the 9th, besides that first time, do you

20  recall denying him access to the phone?

21       A    The only time that I would have had the power

22  or control of allowing him a phone call would have been

23  in--when he was in my custody.  Once he was in custody of

24  York County Prison, I have no control over him using the

25  phone.

                  Bridget A. Marchio, Official Court Reporter, RPR

1    Q    Did you leave any information with the York

2    County Prison not to allow him a phone call?

3    A    I asked that he not be permitted phone calls

4    until the next day.

5    Q    Who did you give that instruction to?

6    A    I believe the guards at the intake.

7    Q    This was what date, on the 11th?

8    A    On the 10th, when he was incarcerated.

9         MR. NERO:  I have no further questions at this

10   time.

11        JUSTICE KESSLER:  Redirect?

12                   REDIRECT EXAMINATION

13   BY MS. ADAMS:

14   Q    Are you aware of when the package was due in

15   York?

16   A    We initially thought that it was gonna be an

17   overnight package, but we learned it was due in on the

18   10th.

19        MS. ADAMS:  That's all.

20        JUSTICE KESSLER:  Recross?

21        MR. NERO:  No.

22        JUSTICE KESSLER:  Very well.  You may step

23   down.  Thank you.

24        MS. ADAMS:  That's our case, Your Honor.

25   Officer Craul is the affiant and would be able to testify

1    that he filed the charges.  I'm sure Mr. Nero would

2    stipulate to that.

3                MR. NERO:  That's correct.

4                JUSTICE KESSLER:  Very well.

5                MS. ADAMS:  That's all.

6                JUSTICE KESSLER:  Commonwealth rests.

7                Counselor, do you have anything for the defense

8    or any statements?

9                MR. NERO:  No, Your Honor.

10                JUSTICE KESSLER:  Very well.  Based upon the

11    information that's been presented at this preliminary

12    hearing, the testimony, I do find that there is sufficient

13    evidence to establish a prima facie case and, therefore,

14    will hold the charge over to the Court of Common Pleas for

15    further disposition.

16                This court is adjourned.

17                (The hearing concluded at 1:35 p.m.)

18

19

20

21

22

23

24

25

Bridget A. Marchio, Official Court Reporter, RPR

```
 1                      REPORTER'S CERTIFICATE

 2           I HEREBY CERTIFY that I was present upon the

 3    hearing of the above-entitled matter and there reported

 4    stenographically the proceedings had and the testimony

 5    produced; and I further certify that the following is a

 6    true and correct transcript of my said stenographic notes.

 7

 8

 9

10                        _Bridget A. Marchio_____
                          Bridget A. Marchio, RPR
11                        Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Bridget A. Marchio, Official Court Reporter, RPR