EXHIBIT 14A

**Page 145**

1  This is your statement, you signed it, you
2  read it. Come on.
3     A. If Mr. James was in a cooperative mode, then,
4  yeah, it would have been done.
5     Q. Wasn't cooperating?
6     A. No, he wasn't cooperating.
7     Q. I thought you said you read him his Miranda.
8     A. That doesn't mean he was being truthful and
9  cooperative.
10           * * *
11           ATTORNEY NERO: Okay. I have no further
12  questions.
13           ATTORNEY SINNETT: I have no further
14  questions.
15           THE COURT: You may step down. Members
16  of the jury, we are going to take our mid-afternoon
17  break now. We will be in recess until 3:30.
18           * * *
19           (Recess)
20           * * *
21           ATTORNEY SINNETT: Call Agent
22  Westmoreland.
23           * * *
24           BRIAN WESTMORELAND,
25  called as a witness on behalf of the Commonwealth,

**Page 146**

1  having been duly sworn according to law,
2  testified as follows:
3           * * *
4  DIRECT EXAMINATION
5  BY ATTORNEY SINNETT:
6     Q. Sir, can you give us your full name and
7  occupation, please?
8     A. My name is Agent Brian Keith Westmoreland. I
9  work for the Pennsylvania State Attorney General's
10  Office, Bureau of Narcotics and Drug Control.
11    Q. And how long have you worked there?
12    A. Approximately 15 years, sir.
13    Q. And what specifically are your assignments in
14  that agency in that capacity?
15    A. I am a narcotics agent.
16    Q. And have you been doing that for 15 years?
17    A. Yes, sir.
18    Q. And were you employed and working in that
19  capacity back on January 10th of this year?
20    A. Yes, sir, I was.
21    Q. And specifically, were you assigned to work
22  an investigation concerning the Defendant, Mr. James?
23    A. Yes, sir, I was.
24    Q. And what was your assignment or --
25    A. My assignment on this particular date was to

**Page 147**

1  conduct surveillance and to participate in any arrests
2  of the Defendant, Mr. James.
3     Q. Now, were you present at the Mailboxes Etc.
4  location out on Eastern Boulevard in York?
5     A. Yes, sir, I was.
6     Q. And is that where you were conducting your
7  surveillance from?
8     A. Yes, sir.
9     Q. And with whom were you conducting
10  surveillance?
11    A. On this particular day, I was assigned with
12  Agent Morgan.
13    Q. And particularly what do you recall taking
14  place, if anything, at that Mailboxes Etc.?
15    A. Yes, sir.
16       On this particular date in question, myself
17  and Agent Morgan was parked just east of the Mailbox
18  Etc. conducting surveillance waiting for Mr. James to
19  arrive to pick up a box that contained marijuana at
20  Mailbox Etc.
21       Subsequently, Mr. James arrived. He parked
22  just west of Mailbox Etc., approximately 55 yards from
23  the Mailbox Etc. building and proceeded into Mailbox
24  Etc.
25       Within five to ten minutes, he exited; at

**Page 148**

1  which time I got out the vehicle, circled around
2  towards his vehicle, and approached him.
3       As I approached him, I said, excuse me, sir,
4  can I talk to you, and I had my -- my badge on my
5  chest, and I said, I'm Agent West -- no sooner I said
6  that, he threw the box towards me, and he ran
7  southbound towards the store area.
8     Q. Now, when you say you saw him arrive and go
9  in, did you personally observe him pull in the parking
10  lot?
11    A. Yes, sir.
12    Q. And did you personally observe him walk into
13  the store?
14    A. Yes, sir, I did.
15    Q. At what point did you decide to leave the car
16  you were in to confront the Defendant?
17    A. I believe Agent Morgan gave the signal to
18  take him down.
19    Q. And did you walk by yourself to approach the
20  Defendant?
21    A. Yes. We all had specific locations we were
22  to go once he exited the store.
23    Q. And was your responsibility of your job to
24  confront him or what?
25    A. My job was to get to his vehicle and confront

**Page 149**

1 him.
2   Q. Okay.
3       And you indicate that you had a badge hanging
4 around your neck when you confronted the Defendant?
5   A. Yes, I did.
6   Q. Did he have anything in his hands?
7   A. He had a box in his hand.
8   Q. Okay.
9           * * *
10      ATTORNEY SINNETT: May I approach this
11 witness, Your Honor?
12      THE COURT: You may.
13          * * *
14 BY ATTORNEY SINNETT:
15  Q. Agent Westmoreland, I want to show you what's
16 been previously marked as Commonwealth's Exhibit No. 2
17 for identification purposes.
18      First, can you take a look at that, and then
19 I want to ask you if you recognize that box.
20  A. Yes.
21      This is the box we used that Mr. James picked
22 up at Mailbox Etc. on the date in question.
23  Q. And does that appear to be in the same or
24 similar condition as when you last saw it?
25  A. Yep.

**Page 150**

1       The only thing different is the case number
2 and the markings on it from Agent Morgan placed on here
3 once we secured it.
4   Q. Okay.
5       And when was it last you saw that box?
6   A. The day of the arrest.
7   Q. Okay.
8       Now, when you identified or attempted to
9 identify yourself, you say the Defendant threw the box?
10  A. Threw the box at me.
11  Q. How far away were you to -- how far separated
12 were you?
13  A. Within three to four feet.
14  Q. And you indicated he threw the box at you and
15 turned and ran?
16  A. Yes, sir.
17  Q. Would that have been in the opposite
18 direction?
19  A. Yes.
20  Q. And what happened after that?
21  A. Subsequently it was -- he was detained and
22 arrested.
23  Q. Did you actually participate in taking him
24 into custody?
25  A. Yes, I did.

**Page 151**

1   Q. And how far was he able to run after he threw
2 the box at you?
3   A. I estimate about 40 yards, if that.
4   Q. So, maybe only a few seconds?
5   A. Yes.
6   Q. Now, do you see the person in the courtroom
7 who you previously identified as Mr. James who threw
8 the box at you that day?
9   A. Yes, sir, I do.
10  Q. Would you identify him, please?
11  A. He is sitting next to defense counsel in the
12 gray shirt and tie.
13          * * *
14      ATTORNEY SINNETT: That's all the
15 questions I have of this witness, Your Honor.
16      THE COURT: Cross-examine.
17      ATTORNEY NERO: Thanks, Your Honor.
18          * * *
19          CROSS EXAMINATION
20 BY ATTORNEY NERO:
21  Q. Now, Agent Westmoreland, you testified just
22 now that you were assigned to work this investigation
23 with Agent Morgan, correct?
24  A. Yes, sir.
25  Q. In fact, you are Agent Morgan's supervisor,

**Page 152**

1 are you not?
2   A. On this particular date I was, yes, sir.
3   Q. Now, you also testified that you were waiting
4 for him to arrive to pick up a box that contained
5 marijuana?
6   A. Yes, sir.
7   Q. So, your understanding while you were there
8 on the surveillance was he was coming to pick up a box
9 that contained marijuana?
10  A. Could you repeat your question, please?
11 I'm --
12  Q. You testified just now.
13  A. I understand what you're saying, but your
14 English is a little broken up and --
15  Q. Your understanding is that he was coming to
16 pick up a box that contained marijuana?
17  A. Yes, sir.
18  Q. That was told to you by Officer Morgan?
19  A. Yes. Agent Morgan told me and I also knew
20 the box contained marijuana.
21  Q. What date was this?
22  A. I don't have the report. I can't tell you a
23 date right now.
24  Q. But it was the date that he was arrested?
25  A. No.

```
 1      It was the previous date that I knew the box
 2  contained marijuana.
 3      Q. I'm talking about the date when you were in
 4  the parking lot under surveillance, the date that you
 5  said you approached him.
 6      Do you understand?
 7      A. Yes, sir, I do.
 8      Q. Is it my accent?
 9      A. Yes, sir.
10      Q. Should I slow down?
11      A. No. Continue on. If I have a question, I'll
12  ask it.
13      Q. Thanks.
14      But you understand me clearly what I'm
15  talking about the date you were in the lot waiting for
16  him, Mr. James that is, to come and pick up a box that
17  you said contained marijuana?
18      A. Yes, sir.
19      Q. And my question after that was, was it told
20  to you by Officer Morgan or Agent Morgan, that is, that
21  the box contained marijuana?
22      A. Yes, sir.
23      Q. You also said that when you got there, you
24  had a particular assignment, correct?
25      A. Yes, sir.
                        153
```

```
 1      Q. Were you the operator or the passenger?
 2      A. I believe I was the passenger.
 3      Q. Not sure?
 4      A. I'm pretty sure I was the passenger.
 5      Q. So, my question was when you exited the
 6  vehicle that you were in with Agent Morgan, who else
 7  was with you when you approached my client?
 8      A. I was by myself as I approached your client.
 9      Q. Where was Agent Morgan?
10      A. I believe he was still in the car operating
11  the vehicle.
12      Q. So, if Agent Morgan testified that he was
13  right behind you, that's not true?
14      A. Like I said, I believe he was in the state
15  vehicle. I'm not sure. I believe.
16      Q. So, you testified right now that you don't
17  know where Agent Morgan was, is that fair?
18      A. That's correct.
19      Q. Now, where was it that you first observed Mr.
20  James?
21      A. When he first got out of his vehicle and
22  walked towards the Mailbox Etc.
23      Q. What time is that?
24      A. I don't have the report with me, sir.
25      Q. You made a report.
                        155
```

```
 1      Q. Your assignment was to approach the car and
 2  take him down I believe were your words?
 3      A. My assignment was to approach him and
 4  identify myself and speak to him and participate in the
 5  takedown, yes.
 6      Q. When you came out of your vehicle, who was
 7  with you?
 8      A. Could you repeat the first part of your
 9  question?
10      Q. When you came out of your vehicle, who was
11  with you?
12      A. I circled around. I was by myself. Agents
13  were scattered throughout the parking lot.
14      Q. So, you were in the car by yourself?
15      A. I didn't go in his car, sir.
16      Q. No, no, you were in a vehicle by yourself?
17      A. I was with Agent Morgan as I testified
18  earlier.
19      Q. That's what I'm trying to get. That's what I
20  asked earlier.
21      A. I misunderstood.
22      Q. Were you alone or with Agent Morgan?
23      A. I was with Agent Morgan.
24      Q. Were you in the vehicle?
25      A. Yes.
                        154
```

```
 1      A. No, I'd have to refer to Agent Morgan's
 2  report.
 3      Q. You never prepared a report?
 4      A. No, I did not.
 5      Q. So, if you were to look at any report, it
 6  would be what Agent Morgan said happened?
 7      A. Yes, sir. He was the case agent.
 8      Q. How long, if you remember, was Mr. James
 9  inside the store?
10      A. I'd estimate anywhere from five to ten
11  minutes. I'm not really sure, but I would estimate
12  five to ten minutes.
13      Q. So, he drove up, parked, went inside the
14  store, stayed anywhere between five and ten minutes
15  before he exited with the box?
16      A. That's correct.
17      Q. Did you see him when he was inside?
18      A. No.
19      Q. Do you know what was on the box?
20      Do you know what was written on the box?
21      A. No, I do not.
22      Q. You didn't see the box?
23      A. I seen the box, but I can't recall what was
24  actually written on it.
25      Q. You already told us you knew it was marijuana
                        156
```

**Page 157**

1  inside the box?
2  A. Yes, sir.
3  Q. When was it that you became involved in this
4  investigation?
5  A. The previous day.
6  Q. The previous day. Do you know what date that
7  was?
8  A. Like I said, sir, I don't have the reports.
9  Q. Well, let me ask you something. On all of
10 these reports that Agent Morgan appeared, you signed
11 them as approved by you?
12 A. That's correct.
13 Q. Are you telling us then that you relied only
14 on what he said? You have no independent knowledge of
15 any of this?
16 A. I approve Agent Morgan's report. Agent
17 Morgan is the case agent; therefore, he is responsible
18 for preparing the report in reference to the incident.
19 Q. What do you look for when you look at a
20 report for approval?
21     What is it you look for?
22 A. What I look for is grammar, the accuracy of
23 the report, the fullness of the report.
24 Q. How would you know if a report is accurate if
25 you have no knowledge of it?

**Page 158**

1  A. I was there at that particular time. I was
2  there. so I pretty much had knowledge of what had
3  happened, and, excuse me, we all take field notes of
4  different times, and when an agent is preparing a
5  report, we actually go over that -- the times and dates
6  and things like that.
7  Q. Do you have a copy of your field notes?
8  A. No. We destroy them or throw them out after
9  we prepare a report.
10 Q. Now, you reviewed a supplemental report
11 prepared by Agent Morgan on April 11th, do you know
12 that --
13 A. I review hundreds of reports, sir. I'd have
14 to look at that report.
15 Q. Let me see if I understand the process. Help
16 me out.
17     The report is prepared by Agent Morgan or
18 another agent under your control, and it is given to
19 you, and you review it for grammar, completeness,
20 accuracy, and you sign it.
21 A. That's correct.
22 Q. You don't see it before that date?
23 A. That's correct.
24 Q. So, would it be fair to say that if you
25 signed the report April 11th, 2001, and you review it

**Page 159**

1  for completeness and an alleged statement was made, you
2  would want to see the statement that was prepared?
3  A. The statement that was prepared by who?
4  Q. By the agent.
5  A. A statement he received from your client?
6  Q. Yes.
7  A. I would want that in the report, yes, sir.
8  Q. Not just -- you would want to see it because
9  you are checking for completeness?
10 A. No. I would want that in the report.
11 Q. Well, how would you know if a statement
12 allegedly made by anybody, my client, is accurate if
13 you don't see the actual statement?
14 A. Usually, we have another agent in with the
15 agent who is conducting an interview to review that
16 statement and to go over different things with that
17 agent who is preparing the statement.
18 Q. All right. Who was with Agent Morgan when he
19 got the statement?
20 A. On this particular date, I don't know. It
21 could have been anybody.
22 Q. So, my question to you is how would you know
23 what the accuracy of the report is if you have no field
24 notes, if you are not given anything in writing taken
25 down by Agent Morgan?

**Page 160**

1  How would you know the accuracy?
2  A. I would have to rely on Agent Morgan's
3  professionalism and experience.
4  Q. And whatever he says, you would accept what
5  happened?
6  A. Concerning the statement, that's correct.
7  Q. Now, you participated in this case. You said
8  you got involved in it the day before the arrest.
9  A. That's correct.
10 Q. And by the way, was my client arrested by
11 warrant or site arrest?
12 A. Your client was taken into custody.
13 Q. Was there a warrant at the time?
14 A. No, sir.
15 Q. So, if you signed a report that stated that
16 he was arrested by warrant, that's something that would
17 have slipped through?
18 A. It was further arrested once Morgan filed
19 charges that he was taken into custody.
20 Q. He was further arrested by warrant?
21 A. He was arrested -- once we took him into
22 custody, Agent Morgan prepared a warrant for his
23 arrest.
24 Q. Do you have a copy of that warrant?
25 A. I'm not the case agent.

```
                            * * *
        ATTORNEY SINNETT: It has been provided
to defense counsel, been provided to his client.
                            * * *
BY ATTORNEY NERO:
   Q. When that warrant was prepared?
   A. The --
   Q. I am asking. I don't have a copy of the
warrant for his arrest. I wouldn't ask for it if I had
it.
                            * * *
        ATTORNEY SINNETT: Your Honor, he was
given it when he was arrested. He was given another
copy in discovery. I don't have another copy of it
now.
                            * * *
BY ATTORNEY NERO:
   Q. Do you know if the -- you saw the warrant?
   A. It should have been attached to his report.
   Q. So, if I tell you I have the entire report
and there's no warrant --
   A. That's just the agent's copy in our file. At
the region, an original copy is attached and is placed
within the region three office. That's not the
original copy of Agent Morgan's report.
                            161
```

```
   Q. So, the warrant is with the original copy?
   A. Of the report, yes, sir.
   Q. Would I be correct in saying that you saw the
warrant at some point?
   A. Yes, sir.
   Q. And do you know when the warrant was
prepared?
                            * * *
        ATTORNEY SINNETT: Your Honor, I am
going to object to relevance now.
        ATTORNEY NERO: If he remembers, Judge.
        ATTORNEY SINNETT: Why is it relevant?
        ATTORNEY NERO: It is relevant because
he signed off on a document when he was confronted with
dates and times. I want to know if he saw this.
        THE COURT: What does the warrant have
to do with the report?
        ATTORNEY NERO: Because he signed here
that Agent Westmoreland signed this document stating
that my client was arrested by a warrant when he was
arrested on the date, January 9th.
        THE COURT: Okay.
        ATTORNEY NERO: So, I'd like to know if
he signed a warrant. When was the warrant done? I
have never seen a warrant.
                            162
```

```
        THE COURT: I believe the evidence at
least at this point established that your client was
taken into custody without a warrant.
        ATTORNEY NERO: Fine.
        THE COURT: All right.
        ATTORNEY NERO: That's fine.
                            * * *
BY ATTORNEY NERO:
   Q. There is a personal history arrest report
prepared for my client. Have you ever seen this?
   A. Yes, sir. It is attached to the report.
   Q. Okay.
        And you know that -- well, do you know it
said he was arrested by a warrant?
   A. Yes, he was arrested by a warrant.
   Q. And this was on January 10th?
   A. I don't have the report to refer to dates,
sir.
   Q. I can show you.
                            * * *
        ATTORNEY NERO: May I approach, Judge?
        THE COURT: You may.
        THE WITNESS: Yes. It is signed January
10th. Date and time of arrest, 1/10/01, 10:30 a.m.
                            * * *
                            163
```

```
BY ATTORNEY NERO:
   Q. At 10:30 a.m. on January 10th, you're saying
there was a warrant?
   A. After Agent Morgan's investigation, a warrant
was prepared for your client, so, therefore, by our
procedures, your client was arrested with a warrant.
That's our procedures. We arrested him, and we had a
warrant for his arrest, so our documents will say
arrest with a warrant.
   Q. I don't mean to belabor the point. Can I
just clarify something?
        When he was taken down in the parking lot,
was a warrant prepared for him at that time?
   A. No, sir, not at that particular time for --
may I finish?
   Q. Sure.
   A. After -- excuse me.
        After Agent Morgan concluded his
investigation on this particular date, he prepared his
warrant, and your client was arrested.
   Q. That's on January 10th?
   A. I'd have to see the report on a specific
date. I believe it was.
   Q. Now, going back to the arrest itself, you
told us that you got out of your vehicle, approached
                            164
```

**Page 165**

1  him, and said something like, excuse me, sir, can I
2  talk to you?
3      A. That's correct.
4      Q. And that's pretty significant, don't you
5  think?
6      A. Excuse me.
7      Q. That's pretty significant. Do you recall
8  exactly what you said that's significant?
9      A. I believe.
10     Q. Okay.
11         Do you think it is significant enough that it
12 should be written in some report, any report at all?
13     A. I gave him, Agent Morgan, the information.
14 When I approached him, he threw the box at me, and that
15 was it. I did not prepare the report.
16     Q. I am not talking about the box.
17         Do you remember specifically saying that you
18 approached him and you said, excuse me, sir, can I talk
19 to you? That's what you testified to.
20     A. Yes, sir, I did. That's standard.
21     Q. What I'm saying to you, don't you think
22 that's significant enough, and you said yes. Should it
23 be in some report that you said that, you approached
24 him and said that?
25     A. I don't believe so.

**Page 166**

1      Q. Okay. All right.
2         Now, when was it that Agent Morgan gave you
3  the signal to take him down?
4      A. When he exited from the Mailbox Etc. store.
5      Q. Okay.
6      A. And he had a box in his hand.
7      Q. And you said you were three to four feet from
8  him, you said this, he threw it at you, and ran?
9      A. Yes, sir, he ran southbound.
10     Q. Southbound, which direction?
11     A. Southbound, back towards the store.
12     Q. Back towards the store. Did he actually get
13 inside the store?
14     A. No.
15     Q. Do you know if all the vehicles driven by
16 your brother officers converged on him?
17     A. No, I caught him.
18     Q. You caught him?
19     A. Yes.
20     Q. You tackled him?
21     A. No. I had him up against the wall. I had
22 him in an arm lock, and then other agents arrived. We
23 put him on the ground because he was resisting. He was
24 fighting, and he was cuffed.
25     Q. The box he threw at you struck you? Did it

**Page 167**

1  strike you?
2      A. No, caught it and just placed it on the
3  ground and took off after him.
4      Q. He threw it at you, and you caught it?
5      A. Yes.
6      Q. He just lobbed the box at you is what you're
7  saying?
8      A. Yes.
9      Q. When was it you learned what was actually in
10 the box?
11     A. The previous day before the arrest when we
12 took your client into custody.
13     Q. Didn't you just testify that the box
14 contained marijuana?
15     A. Yes, sir.
16         Your question was when did I learn that the
17 box contained marijuana, right?
18     Q. No.
19         When was it you learned that the box did not
20 contain marijuana, because up till now I believe the
21 box does not contain marijuana?
22         Are you under the impression that box has
23 marijuana in it?
24     A. Yes, sir.
25     Q. As of now, you still believe that box is

**Page 168**

1  marijuana?
2      A. I still -- I still believe it contains
3  marijuana, yes, sir.
4      Q. Are you saying you believe that as we speak,
5  right now that box contains marijuana?
6                     * * *
7         ATTORNEY SINNETT: Asked and answered,
8  Your Honor.
9         THE COURT: Sustained.
10                    * * *
11 BY ATTORNEY NERO:
12     Q. Well, you read these reports?
13     A. I read those reports months ago, sir.
14     Q. And the reports never gave you an indication
15 that this box was made up by Agent Morgan and don't
16 contain marijuana?
17     A. They may have -- like I said, I review
18 hundreds of reports.
19     Q. So, you are saying when you sign these
20 reports, it is a perfunctory duty to sign whatever is
21 placed before you?
22     A. No, sir.
23         Like on this particular day before I came
24 into court, I did not review his reports. I have
25 hundreds of cases before me.

## Page 169

1  Q. Did you before testifying now speak to Agent
2 Morgan earlier today?
3  A. No, sir, I did not, other than to say hi, how
4 are you doing.
5  Q. So, it was never brought to your attention
6 from January 10th to now that that box never contained
7 marijuana?
8  A. Other than what's in the report, and it may
9 have -- usually what we do when we do interdictions, we
10 switch the controlled substance with anything that has
11 the weight of it and just place it in the box. On this
12 particular date for some reason, I think we still had
13 the marijuana.
14  Q. You thought that when you went out on January
15 10th, the marijuana already come to you, and you
16 switched it, or you still think that marijuana was in
17 the box?
18  A. I still think there's marijuana in the box.
19        * * *
20  ATTORNEY NERO: I have no further
21 questions.
22  THE COURT: Redirect?
23  ATTORNEY SINNETT: Very briefly, Your
24 Honor.
25        * * *

## Page 170

1  REDIRECT EXAMINATION
2 BY ATTORNEY SINNETT:
3  Q. Agent Westmoreland, were you there when that
4 box was prepared, when it was assembled?
5  A. No, sir, I wasn't.
6        * * *
7  ATTORNEY SINNETT: No further questions.
8  THE COURT: You may step down.
9  ATTORNEY SINNETT: Your Honor, may he be
10 excused?
11  THE COURT: Is there an objection?
12  ATTORNEY NERO: No objection.
13  THE COURT: Witness may be excused.
14  THE WITNESS: Thank you, Your Honor.
15  ATTORNEY SINNETT: We're going to call
16 Jan Metzler next.
17  ATTORNEY NERO: Your Honor, if necessary
18 for rebuttal, maybe not today, may he be available?
19  THE COURT: Mr. Westmoreland, agent,
20 it's been requested that you remain available subject
21 to recall by the defense. You don't have to stay
22 physically, but you may have to come back.
23  ATTORNEY SINNETT: May we have Jan
24 Metzler, please? She is out in the hall.
25        * * *

## Page 171

1        JAN METZLER,
2  called as a witness on behalf of the Commonwealth,
3        having been duly sworn according to law,
4              testified as follows:
5                    * * *
6        DIRECT EXAMINATION
7 BY ATTORNEY SINNETT:
8  Q. Ma'am, could you tell us your name, please?
9  A. Jan Metzler.
10  Q. And where do you work?
11  A. I own actually the Mailboxes Etc. store on
12 Eastern Boulevard in York.
13  Q. What's the address of that particular store?
14  A. It's 2536 Eastern Boulevard.
15  Q. And is that Springettsbury Township?
16  A. Yes.
17  Q. York County?
18  A. Yes.
19  Q. And how long have you owned that?
20  A. Since April of 1999.
21  Q. Okay.
22    And specifically in your role as owner, I am
23 assuming then the people who work in that store are
24 under your direction and control?
25  A. Yes, yes, that's right.

## Page 172

1  Q. And the paperwork that's generated, I'm sure
2 there's a lot of paperwork generated as a result of
3 these different rental agreements and everything. Is
4 that kept under your control?
5  A. Yes, yes, it is.
6  Q. And do you review those documents?
7  A. Yes.
8  Q. Do you store those documents somewhere in the
9 business or in your home or somewhere like that?
10  A. At the business, yes, we do.
11  Q. Specifically included with those documents,
12 are their rental agreements -- or I'm not sure what you
13 call them, when somebody comes in and says I would like
14 to get a box here for mail to be delivered, what do you
15 call that?
16  A. It is a rental agreement.
17  Q. Okay.
18  A. And there is a specific United States postal
19 form that's also required.
20  Q. And what all type of information do you ask
21 of someone when they come in?
22  A. It's pretty general; name, address, phone
23 number.
24    The one important thing also is we do require
25 two forms of identification. One must be a photo I.D.,