TYRONE P. JAMES V. YORK COUNTY POLICE DEPARTMENT, ET. AL.,

CASE ACTION NO. 01:01-CV-1015

EXHIBIT "1"

1   cut into and had been pulled back, and I could see
2   marijuana underneath the duct tape.
3      Q. Did you have to do anything to this box in order
4   to see the marijuana that was inside there?
5      A. No.
6      Q. Had you asked anybody to open that box prior to
7   you arriving there?
8      A. No.
9      Q. Did you ask anybody to open the box for you
10  while you were there?
11     A. No.
12     Q. Now, you said you identified it as marijuana.
13  Is this based on just how it looked or what did you base
14  that decision on?
15     A. Based on the numerous times I've seen marijuana,
16  marijuana packaged in a similar fashion, and my training
17  and experience over the years.
18     Q. And what did you do at that point?
19     A. I seized the parcel and gave a receipt to Mike
20  Baker and took the parcel back to my office.
21     Q. Okay. At any point, did you field test what you
22  thought to be marijuana in that package?
23     A. Just prior to placing it in temporary evidence,
24  yes.
25     Q. And did it indicate a positive or a negative

8

response for marijuana?

A. The field test tested positive for marijuana.

Q. Now, at some point then did you have contact with Agent Morgan from the Attorney General's Office in Pennsylvania?

A. Yes, I did.

Q. And without going into the specifics of your conversation with him, did you relate to him the information that you had gathered from the Mail Boxes, Etc.?

A. Yes.

Q. Did you describe for him what you had found?

A. Yes, I did.

Q. And did you describe for him the parcel; in particular, what it looked like and things of that nature?

A. Yes.

ATTORNEY SINNETT: I don't have any further questions of this witness at this time, Your Honor.

ATTORNEY NERO: May I, Your Honor?

THE COURT: Yes.

* * *

CROSS EXAMINATION

BY ATTORNEY NERO:

Q. Good afternoon, Agent Sipes.

9

1    A.    Good afternoon.
2    Q.    Now, you said you got a call from Mike Baker, correct?
3
4    A.    Yes, sir.
5    Q.    Where did he call you?
6    A.    Excuse me.
7    Q.    Where did he call you?
8    A.    At my office.
9    Q.    Did you know the gentleman before?
10   A.    No.
11   Q.    Never knew him?
12   A.    No.
13   Q.    Had you been to that facility before?
14   A.    Yes.
15   Q.    How many times in the past?
16   A.    Once.
17   Q.    And would it be fair to say that you went there in connection with some sort of drug activity?
18
19   A.    No.
20   Q.    When you went to the facility before, did you meet Mike Baker?
21
22   A.    I don't believe so. I don't recall. I wasn't there that long.
23
24   Q.    How about any of the employees? Did you meet any employees before when you went there?
25

1  A. The one person I spoke to, but I don't recall
2  who it was.
3  Q. Was it a male or female?
4  A. I believe it was a female. It was about a year
5  prior.
6  Q. And your number at work is a direct number, your
7  telephone number?
8  A. To the office, yes, not to me.
9  Q. To the office?
10 A. Yes.
11 Q. And when you got on the line is it fair to say
12 that Mike Baker was on the line?
13 A. Yes.
14 Q. Okay. So in other words it wasn't a third
15 person or somebody else putting through Mike Baker to
16 you?
17 A. No.
18 Q. Okay. And would it be fair to say that he knew
19 what you did?
20 A. Yes.
21 Q. Yeah. And you base that on the fact that he
22 contacted you?
23 A. Yes.
24 Q. Do you know whether or not your number was
25 supplied to Mr. Mike Baker to contact you or your office

11

```
 1      at any time?
 2          A.   Yes.
 3          Q.   It was?
 4          A.   Yes.
 5          Q.   Okay.  And in addition to the number being
 6      supplied, do you know whether or not there was a memo of
 7      some kind supplied to the agency, a memo saying contact
 8      us if X, Y, Z or what have you?
 9          A.   Yes.
10          Q.   There was?
11          A.   Yes.
12          Q.   So I am correct in saying that your agency had
13      notified Mail Boxes, Etc., to contact you if anything
14      suspicious is observed?
15          A.   No.
16          Q.   Well, you just told us there was a memorandum
17      there stating to call you.  What did the memorandum say?
18          A.   I had about a year prior contacted several Mail
19      Boxes, Etc., in the area that my office is in and left a
20      business card and basically a sheet of paper saying that
21      if you suspect a drug parcel you can contact me at this
22      number.
23          Q.   That's precisely what I was asking.  So you did
24      do that?
25          A.   Yes.
```

1  Q. Do you have a copy of the information you left
2  with you?
3  A. No, I don't.
4  Q. But it basically said if you suspect a drug
5  parcel call us?
6  A. Yes.
7  Q. And I would be right, would I not, that you had
8  received calls from other facilities before?
9  A. Yes, one other time.
10 Q. And so when you said you did not know Mike Baker
11 personally, you did not know him but his facility was
12 known to you because you had left your card to be
13 contacted?
14 A. Yes.
15 Q. How many cards did you leave?
16 A. One.
17 Q. Do you know whether or not you asked him to post
18 the card and/or the memo in his facility?
19 A. I believe he put the card in a card holder.
20 Q. And would I be correct in stating that since you
21 received a call it meant that the visit you paid earlier
22 had paid off for you?
23 A. Yes, sir.
24 Q. And so having directed them to call you if they
25 saw any suspicious packages you were called and you went?

13

```
 1        A.    I didn't direct them to call me, no.
 2        Q.    I'm lost.  Did you not tell us then earlier that
 3  you left your card and you left instructions to call you
 4  if they saw any suspicious package?
 5        A.    Yes.
 6        Q.    Okay.  That's what I'm saying.  You did do that?
 7        A.    Yes, I did that, yes.
 8        Q.    And on the date in question they called you and
 9  said to you we saw a package that looks suspicious?
10        A.    Yes.
11        Q.    Okay.  You then went and saw the package?
12        A.    Yes.
13        Q.    Did you weigh the package when you got there?
14        A.    No.
15        Q.    And are you -- You are aware, are you not, that
16  many substances could be compressed to look like
17  marijuana?
18        A.    Possibly.
19        Q.    In fact, the reason that you field tested the
20  items found was because you wanted to make sure that the
21  substance was marijuana?
22        A.    Yes.
23        Q.    Now, you saw, I believe you described, an open
24  package on the floor?
25        A.    Yes.
```

```
 1        Q.   Who directed you to that package?
 2        A.   Mike Baker.
 3        Q.   And you said inside that open package was
 4   another package?
 5        A.   Correct.
 6        Q.   And inside that package I believe you described
 7   duct tape and various other items?
 8        A.   Yes.
 9        Q.   So would it be all of these items then that the
10   marijuana was --
11        A.   Yes.
12        Q.   Okay.  Would I be correct in stating that you
13   had to then move aside the duct tape and other items to
14   see the marijuana?
15        A.   No.
16        Q.   What portion of the alleged marijuana did you
17   see?
18        A.   The duct taped object inside the inner box
19   had -- a triangle had been cut into the duct tape and the
20   duct tape had been folded back so it was on top of that
21   duct taped object inside the box.
22        Q.   And this was what, one brick?
23        A.   Yes.
24        Q.   How large was the brick?
25        A.   I would guess maybe 8 inches by 12 inches across
```

```
1    the top.
2         Q.   And you could see the entire 8 by 12 inches?
3         A.   Yes.
4         Q.   I believe you testified that you then called
5    Agent Morgan?
6         A.   No.
7         Q.   You didn't call him?
8         A.   No.
9         Q.   He called you?
10        A.   Yes.
11        Q.   Did you call anybody in Pennsylvania?
12        A.   Yes, I did.
13        Q.   What time did you receive the call from Mike
14   Baker?
15        A.   It was about 2:15 in the afternoon.
16        Q.   What time did you arrive at the facility?
17        A.   About 2:30.
18        Q.   What time did you do the field test?
19        A.   About 3:00 o'clock.
20        Q.   And what time did you make the call to
21   Pennsylvania?
22        A.   The first call I made was around 3:00 o'clock.
23   I made it from the store.
24        Q.   From the store?
25        A.   Yes, from my cell phone at the store.
```

```
 1      Q.   What type of field test did you do?
 2      A.   It's a -- a color test.
 3      Q.   Color test?
 4      A.   Yeah, chemical color test.
 5      Q.   And the color changed and told you that
 6   substance was marijuana?
 7      A.   Yes.
 8      Q.   Do you recall what day this was?  Day of the
 9   week I mean.
10      A.   No.  No.
11      Q.   You don't recall.
12           Was it a weekday, weekend?
13      A.   It was a weekday.
14      Q.   And I am correct in that you never got a
15   warrant, search warrant?
16      A.   Correct.
17      Q.   Now, you prepared a property receipt?
18      A.   Yes.
19      Q.   Okay.  And the property receipt you prepared,
20   what was the weight of the box that you opened?
21      A.   The total weight was approximately 14 pounds.
22      Q.   And the box that you shipped, what was the
23   weight of that?
24      A.   I believe it was 15 pounds.
25      Q.   15 pounds --
```

```
 1        A.   Yes.
 2        Q.   -- that you shipped?
 3             So according to what you're telling us the
 4   package you shipped was heavier than the package that you
 5   received?
 6        A.   Correct.
 7        Q.   Did you discard any items from the 14 pounds,
 8   from the package or did you package it as it was
 9   initially?
10        A.   Discard items?  No.
11        Q.   So you sent the original package?
12        A.   Yes.
13        Q.   You sent the duct tape?
14        A.   Yes.
15        Q.   You sent everything?
16        A.   Yes.
17        Q.   I'd like to show you then what was supplied to
18   me as a property receipt that you prepared.
19             ATTORNEY NERO:  And if I could have it
20   marked as D-1.
21                          *   *   *
22             (Whereupon, Defendant's Exhibit No. 1 was
23   produced and marked for identification.)
24                          *   *   *
25   BY ATTORNEY NERO:
```

Q. Can you look at this, please?

A. Okay.

Q. What does it say?

A. It says one brown cardboard box with approximately 14 pounds of marijuana.

Q. Okay.

ATTORNEY NERO: Can you mark this D-2?

*  *  *

(Whereupon, Defendant's Exhibit No. 2 was produced and marked for identification.)

*  *  *

ATTORNEY NERO: Do you have this as well?

*  *  *

BY ATTORNEY NERO:

Q. This is a property receipt from California as well. Could you tell us what's on it?

A. It says Item No. 1, 9.72 pounds approximate weight of marijuana including packaging and shipping boxes.

Q. Including packaging and shipping boxes?

A. Correct.

Q. And you just told us, I believe, that you shipped a package that was 15 pounds.

A. Yes.

Q. Okay. So you would agree that this property

19

```
 1    receipt does not reflect the package that you shipped?
 2        A.   Yes, it does.
 3        Q.   9.72 pounds?
 4        A.   That was the weight of the marijuana.
 5        Q.   It does not say including packaging and shipping
 6    boxes on it?
 7        A.   Yes.
 8        Q.   And I'm correct in that if it says including
 9    that it means a total weight of everything?
10        A.   No, that's not correct.
11        Q.   Well, could you read it for us again?
12        A.   Sure.
13             ATTORNEY SINNETT:  Your Honor, at this
14    point I just want to lodge an objection.  What the weight
15    of the box has to do with whether or not -- Just hold on
16    a second -- whether the officer had probable cause at the
17    time he was at the Mail Boxes in California, that's what
18    we're dealing with, not the weight of the boxes.
19             ATTORNEY NERO:  The question, too, Judge,
20    could be whether we're talking about the same box.  He's
21    saying he shipped a box weighing 15 pounds, and this
22    officer with the California receipt is saying 9.7 pounds
23    including packaging and shipping boxes.  I think it's
24    probative as to whether or not the same box was shipped.
25    Clearly we're talking about 4 point something pounds in
```

1  weight.

2              THE COURT: Overruled. I'll allow it.

3                         * * *

4  BY ATTORNEY NERO:

5     Q. Now, the box -- So you agree with me then that

6  9.72 is not what you sent?

7     A. The 9.72 pounds was the weight of the marijuana.

8     Q. So if when it's written down here including

9  packaging and shipping boxes, that's not correct?

10    A. Not in the weight, no. What he was signing a

11 receipt for, that's correct. He was signing the receipt

12 for 9.72 pounds of marijuana and the shipping materials.

13    Q. When did you prepare your report?

14    A. I believe it was three days later.

15    Q. Three days later. And is this the report that

16 you prepared?

17    A. Yes, it is.

18    Q. Do you have a copy of the report you prepared?

19    A. I do. Not in front of me.

20    Q. Would it surprise you if I showed you that this

21 report was signed on January 30th?

22    A. No.

23    Q. Wouldn't surprise you?

24    A. No.

25    Q. Would it surprise you if I told you that nowhere

21

```
 1        on the report does the 11th or 12th or 13th or any date
 2        like that, which would be three days after this, show up?
 3            A.   That would surprise me, yes.
 4            Q.   It would?
 5            A.   Yes.
                   ATTORNEY NERO:  Can I approach, Your Honor?
 6
                   THE COURT:  You may.
 7
                              *   *   *
 8
                   (Whereupon, Defendant's Exhibit No. 3 was
 9
          produced and marked for identification.)
10
                              *   *   *
11
          BY ATTORNEY NERO:
12
              Q.   Could you look at this report marked D-3 and
13
          tell me what date's on it?  You can look at all three
14
          pages.
15
              A.   Do you want to know the date the report was
16
          done?
17
              Q.   Yes.
18
              A.   The 19th.
19
              Q.   And it was signed on the 30th?
20
              A.   Correct.
21
              Q.   So you prepared it and signed it -- Prepared it
22
          the 19th, signed it the 30th?
23
              A.   Correct.  My supervisor signed it and then I
24
          signed it.
25
```

1   Q.   And you would agree that the 19th is eleven days
2   after?
3   A.   Yes.
4   Q.   So when you said three days after you didn't
5   really mean that?
6   A.   I wasn't sure.  I thought it was about three
7   days.
8   Q.   When you shipped the package, would I be correct
9   in saying that you placed your own label on it?  The
10  package you shipped to officer or Agent Morgan that is.
11  A.   Yes.
12  Q.   How did you do that?
13  A.   I took the marijuana and both boxes and the
14  package material, placed all of that inside another box,
15  and then sealed that and shipped that.
16  Q.   Okay.  How did you prepare the label?
17  A.   It was a regular UPS label.
18  Q.   So you prepared the label yourself?
19  A.   We have an account with UPS so we have pre-made
20  labels.
21  Q.   So the label you sent was from your office to
22  Agent Morgan?
23  A.   Correct.
24  Q.   What type of box was it?
25       ATTORNEY SINNETT:  Your Honor, at this

23

```
 1    point, this is well past --
 2                THE COURT:  Now we're getting far afield,
 3    Attorney Nero.
 4                ATTORNEY NERO:  Say it again.
 5                THE COURT:  Now we're getting far afield.
 6                          *  *  *
 7    BY ATTORNEY NERO:
 8        Q.   And again -- this is a final question, Judge --
 9    you never got a warrant in this case?
10        A.   Correct.
11                ATTORNEY NERO:  I have no further
12    questions.
13                ATTORNEY SINNETT:  No redirect of this
14    witness.
15                THE COURT:  Agent Sipes, you may step down.
16                ATTORNEY SINNETT:  Your Honor, with that
17    the Commonwealth wouldn't be offering anymore evidence.
18    I believe -- I don't have a copy of the suppression
19    transcript from before, but I believe the Court obviously
20    was aware of everything that happened then.  Just also I
21    filed a brief, a Commonwealth's brief, in support of the
22    denial of the Defendant's suppression motion.  Did the
23    Court get a copy of that?
24                THE COURT:  I'm looking at it now, Mr.
25    Sinnett.
```