TYRONE P. JAMES V. YORK COUNTY POLICE DEPARTMENT, ET. AL.,

CASE ACTION NO. 01:01-CV-1015

EXHIBIT "4"

**Page 77**

I look at all of you, and what I see is a collection of people with varying experiences and backgrounds, and so that tells me that you have all lived life, and you all have common sense.

Please do not leave it at home. Bring your common sense to bear when you hear this case as well.

Now, the Commonwealth has said to you that theory of their case is my client had these mailbox business he said, a mail order drug business he called it, and he says that he is going to present witnesses to tell you why this was so.

But as you sit here, the first thing I ask you to focus on which he has placed is that box, and miraculously that box is a box that he said to you never had any drugs in it, but he doesn't have next to it a box that was sent that had drugs in it that would tell you that these boxes had some sort of comparison. You don't see that box. I suggest you probably wouldn't see it.

Understand something as well, that it is important to listen to all of the witnesses and not only what they say when they answer the District Attorney, which would be direct examination, but pay also close attention to the answers they give when I

**Page 78**

ask them questions, which is cross examination. Listen for any inconsistencies. After all, if you are to believe what's being said, this whole thing was staged, and if it was, then you really should have no inconsistencies, because you set the stage. It is a play, you wrote it, so listen carefully for that.

Listen also to whether or not there is a ring of truth to what's being said from the witness stand. Do you believe what you are hearing? Does it make sense? It is important that you listen to that.

Now, the District Attorney told you that this is not a mere coincidence that all these drugs came to my client in all but two days or three days with drugs in these Mailbox Etc. boxes.

He has not told you who put the drugs there. He hasn't told you that my client told him anything about drugs coming there. He told you about one incident that my client went to a location and picked up a box. That box had no drugs in it.

Pay careful attention as the case unfolds. You were asked by the Judge to keep an open mind. Do not make your mind up until all of the evidence is concluded.

I submit to you that if you do that, if you keep an open mind, if you keep true to your promise

**Page 79**

to be fair and impartial, at the end of the case, at the conclusion of testimony that is, you will all come to the unmistakable conclusion that my client is not guilty.

Thank you.

ATTORNEY SINNETT: Call Agent Morgan.
* * *
JAMES MORGAN,
called as a witness on behalf of the Commonwealth,
having been duly sworn according to law,
testified as follows:
* * *
DIRECT EXAMINATION
BY ATTORNEY SINNETT:
Q. Sir, can you give us your full name and tell us how you are employed?
A. James H. Morgan, narcotics agent, Pennsylvania Office of Attorney General, Bureau of Narcotics Investigations and Drug Control.
Q. And how long have you worked there?
A. Eleven years.
Q. Prior to working with the Office of Attorney General, where did you work?
A. Five years with the York City Police Department as a patrolman.

**Page 80**

Q. Now, specifically, with the Office of Attorney General where you indicate you work now, what are your responsibilities or duties, if you will?
A. I'm responsible for the enforcement, investigation of the Drug Act, Act 64, in the Commonwealth of Pennsylvania.
Q. And is that precisely what you do?
I mean, are you a patrol officer or anything like that?
A. No, strictly on narcotics investigations.
Q. And you work in and around the York County area?
A. That's correct.
Q. How long have you been around York County?
A. Fifteen years.
Q. Now, specifically did you become involved in a case in which the Defendant, Tyrone James, was being investigated?
A. Yes, I did.
Q. And how did you become involved in that case?
A. I received a call late night on I believe it was the 8th of January of this year from an investigator in California -- no, from an agent from our Allentown office who relayed some information to me from California.

**Page 81**

1　Q. Okay.
2　And basically what did you do as a result of
3　that information that you received?
4　A. I was given the name and number of an
5　investigator in California.
6　　　　　* * *
7　ATTORNEY NERO: I would object.
8　THE COURT: Basis?
9　ATTORNEY NERO: Basis is what was said
10　to him, what was given to him.
11　ATTORNEY SINNETT: Your Honor, we are
12　offering it not for the truth, but to explain his
13　course of conduct. I am not getting into specifics of
14　the information.
15　THE COURT: He received some
16　information, and as a result, he did something. Let's
17　pick it up where he did something.
18　　　　　* * *
19　BY ATTORNEY SINNETT:
20　Q. What did you do as a result of the
21　information you received?
22　A. Made a phone call to the number that was
23　supplied to me and spoke with an investigator in
24　California, who at the time that I called gave me a
25　brief --

**Page 82**

1　Q. --
2　ATTORNEY NERO: Objection, hearsay as
3　well.
4　ATTORNEY SINNETT: Well, Your Honor,
5　first response to that is it is not necessarily
6　hearsay. It is not an out-of-court statement because
7　he was here and testified to it previously.
8　THE COURT: He is not here now.
9　ATTORNEY SINNETT: Second, we are not
10　using it to explain the course -- only to explain the
11　course, not for the truth necessarily.
12　I think the jury needs to have some kind
13　of background why Agent Morgan did what he did.
14　THE COURT: Well, we will give you a
15　little leeway, Mr. Sinnett.
16　Overruled at this point.
17　　　　　* * *
18　BY ATTORNEY SINNETT:
19　Q. Agent Morgan, basically tell us what the sum
20　of the information was you received and what you did as
21　a result of receiving that information.
22　A. Well, after talking to him briefly and
23　because he was busy, he stated that he would call me
24　back later, which he did, supplied me with an address
25　that a particular package was to be en route from

**Page 83**

1　California, and I then took that information and
2　contacted officers from Springettsbury Township to find
3　that particular location.
4　Q. Now, specifically the information you got
5　from out in California, was it involving a package or
6　something, or what was the --
7　A. Yes. It was involving a parcel that was
8　intercepted by --
9　　　　　* * *
10　ATTORNEY NERO: I object.
11　THE COURT: That's sustained.
12　　　　　* * *
13　BY ATTORNEY SINNETT:
14　Q. Then, Agent Morgan, after you received the
15　information from him, what did you do in reference to
16　this investigation?
17　A. I confirmed the address to where the parcel
18　was to arrive.
19　The next morning, I contacted agents from my
20　office and Detective Kessler and Detective Peddicord
21　from the York County Drug Task Force.
22　Q. Specifically, you indicated you tried to
23　verify an address that was given to you?
24　A. That's correct.
25　Q. Where did that address come back to?

**Page 84**

1　A. Mailbox Etc.s on Eastern Boulevard in
2　Springettsbury Township.
3　Q. And specifically was there an individual
4　address at Mailboxes Etc. or --
5　A. Yeah. It was listed as Suite 164. It was
6　determined that it was Box 164.
7　Q. And what did you do after you found that
8　location?
9　A. Myself and Detective Kessler and Detective
10　Peddicord responded to United Parcels in York and met
11　with the manager there at United Parcels and were
12　permitted to put together a fake parcel containing rock
13　salt.
14　Q. And what did you do after you made contact
15　with that manager? What was the plan?
16　A. We were going to put together this fake
17　parcel with the receiving address being Eastern
18　Boulevard address.
19　We were going to put the parcel together and
20　have it delivered to that particular Mailbox Etc. and
21　have it sit there waiting the arrival of the individual
22　who was going to retrieve it.
23　Q. And did you, in fact, do that?
24　A. Yes, we did.
25　Q. And when did you first take the parcel to

**Page 85**

1 Mailboxes Etc.?
2   A. On the 9th.
3   Q. Of January?
4   A. Yes.
5   Q. And what happened when you took it there on
6 the 9th of January?
7   A. We met with the driver of the UPS truck in
8 the parking lot of the shopping center, gave the parcel
9 to him, and he drove up and delivered the parcel as he
10 would any other parcel.
11   Q. And what happened after that?
12   A. I then entered the establishment, saw that
13 the package was signed in, and began to check records
14 for that particular mailbox.
15   Q. How did you come and check the records? Did
16 you ask to see them or --
17   A. Yes, I spoke with one of the sales clerks.
18                    * * *
19       (Whereupon, documents were produced and
20 marked for identification as Commonwealth's Exhibit No.
21 1.)
22                    * * *
23       ATTORNEY SINNETT: May I approach the
24 witness, Your Honor?
25       THE COURT: You may.

**Page 86**

1
2 BY ATTORNEY SINNETT:
3   Q. Agent Morgan, I want to show you what's
4 marked collectively as Commonwealth's Exhibit 1 for
5 identification purposes.
6       First look at that and tell me if you
7 recognize that.
8   A. Yes.
9   Q. And what is that?
10   A. This is a contract agreement entered into by
11 Tyrone James and Mailbox Etc.s.
12   Q. And that was provided to you by somebody at
13 Mailboxes Etc.?
14   A. That's correct.
15   Q. And that's for the Eastern Boulevard
16 location?
17   A. Yes.
18   Q. And who does that identify as the person
19 taking out the contract?
20   A. Tyrone James.
21   Q. And what does it list as the business or
22 reason for the leasing of the rental space or of the
23 mailbox space, I should say?
24   A. Reality Fashions Express.
25   Q. And then accompanying that, is there a --

**Page 87**

1 looks like about a four-page rental agreement, is that
2 accurate, or three-page, and then copies of some
3 identification that were used?
4   A. That's correct.
5   Q. And then also included with that, what are
6 some of the other documents you were given?
7   A. There is a document here that has Expressions
8 Express, Reality Fashions Express, A. S. Fashion, and
9 looks like J. B. S. Supplies, and there is a photocopy
10 of a California driver's license and photocopy of a
11 Triple A plus automobile club card, and then a series
12 of records.
13                    * * *
14       ATTORNEY NERO: Your Honor, those --
15 what he is about to get into will be objected to.
16       THE COURT: The basis being?
17       ATTORNEY NERO: The basis being there is
18 no relevance at this point.
19       This is something that has nothing to do
20 with January 9th, 10th, 11th, something that occurred a
21 year ago.
22       We are not talk about a contractual
23 arrangement. He is talking about a series of
24 arrangements that do not have just information
25 concerning Mailbox Etc., but a whole list of different

**Page 88**

1 names on it.
2       ATTORNEY SINNETT: Your Honor, I didn't
3 want him to tell the jury what that is. There will be
4 somebody from Mailboxes Etc. to explain the documents,
5 if he can tell them what it is basically.
6       THE COURT: Rephrase your question.
7                    * * *
8 BY ATTORNEY SINNETT:
9   Q. Agent Morgan, appended to those four
10 documents you have talked about, what is the rest of
11 the group of documents?
12   A. Just records of packages received by that
13 particular Mailboxes Etc. dating back to October of
14 2000.
15   Q. And running through when?
16   A. January of 2001.
17   Q. Now, did anybody ever come to pick up that
18 parcel that you created on January 9th of 2001?
19   A. On January 9th, no, they didn't. We learned
20 after contacting Detective Sipes in California because
21 of the time difference that the parcel was intercepted.
22                    * * *
23       ATTORNEY NERO: I would object if he is
24 actually telling us a conversation he had with
25 Detective Sipes, and that's my objection. It is

**Page 89**

1 hearsay.
2 　　ATTORNEY SINNETT: Your Honor, I can
3 rephrase the question if that would make it any easier.
4 　　THE COURT: Please do. You are getting
5 into that hearsay area.
6 　　* * *
7 BY ATTORNEY SINNETT:
8 　　Q. Agent Morgan, without referring to what
9 conversation you may or may not have had with Agent
10 Sipes, what did you do at the end of July 9th with the
11 package?
12 　　A. Removed the package from that particular
13 Mailbox Etc.s and took possession of it to meet again
14 on the 10th and placed the same package at that
15 location and await the arrival of the individual.
16 　　Q. And did you do that on the 10th?
17 　　A. Yes, we did.
18 　　Q. Around what time was that done?
19 　　A. It was in the morning. I'm not sure exactly
20 what time.
21 　　* * *
22 　　(Whereupon, a box was produced and
23 marked for identification as Commonwealth's Exhibit No.
24 2.)
25 　　* * *

**Page 90**

1 　　ATTORNEY SINNETT: May I approach the
2 witness?
3 　　THE COURT: You may.
4 　　* * *
5 BY ATTORNEY SINNETT:
6 　　Q. Agent Morgan, I want to show you what's been
7 marked as Commonwealth's Exhibit No. 2 for
8 identification purposes.
9 　　Tell us what that is.
10 　　A. This is the box that myself, Detective
11 Kessler, and Detective Peddicord put together at UPS.
12 　　Q. And that's the one you talked about earlier
13 after you met with the manager from UPS?
14 　　A. That's correct. It is filled with rock salt.
15 　　Q. And is that the same package you attempted to
16 deliver on the 9th, but was never picked up?
17 　　A. Yes, it is.
18 　　Q. And is that the package that you delivered on
19 the 10th?
20 　　A. That's correct.
21 　　Q. And what happened on the morning of the 10th?
22 　　A. The package -- the parcel was placed there at
23 Mailbox Etc.s by me, and surveillance was set up on the
24 perimeter of the business.
25 　　We observed a silver-colored Mitsubishi

**Page 91**

1 Gallant, four door, with the Defendant operating,
2 driving to the lot, and park into a parking space.
3 　　We observed him exit the vehicle and
4 walk in.
5 　　* * *
6 　　ATTORNEY NERO: Object as to we.
7 Talking about himself is fine.
8 　　THE COURT: Please rephrase.
9 　　THE WITNESS: I observed the Defendant
10 drive into the parking lot driving a silver four-door
11 Mitsubishi Gallant, parked the vehicle, exit the
12 vehicle, and walk into the Mailbox Etc.'s
13 establishment.
14 　　* * *
15 BY ATTORNEY SINNETT:
16 　　Q. All right.
17 　　Now specifically before we get to what
18 happened after that, the address that's referenced on
19 there has to be delivered to, what does that indicate?
20 　　A. 2536 Eastern Boulevard, business name
21 Expressions Express, Suite 164, York, Pa., 17402.
22 　　Q. Okay.
23 　　And what did you use as a return address?
24 　　A. It was from James Morgan at 11921 Southwest
25 29th Street, San Diego, California.

**Page 92**

1 　　Q. How did you come up with that return address?
2 　　A. We knew that the parcel that was intercepted
3 was coming from California, so we created a California
4 address.
5 　　Q. Basically, you put your name on it and made
6 up an address?
7 　　A. That's correct.
8 　　Q. And then when you saw the Defendant leave his
9 car, walk up to the Mailboxes Etc., what happened then?
10 What did you see happen then?
11 　　A. Well, I alerted all the other officers on
12 surveillance that the potential subject had arrived. I
13 received a phone call from inside of Mailbox Etc. that
14 that subject --
15 　　* * *
16 　　ATTORNEY NERO: Objection, Your Honor.
17 　　ATTORNEY SINNETT: I think that's going
18 to be a present sense impression.
19 　　THE COURT: He said he received a phone
20 call.
21 　　Next question.
22 　　* * *
23 BY ATTORNEY SINNETT:
24 　　Q. Okay.
25 　　You received a phone call. What did they say

**Page 93**

1 on the phone call --
2     A. That the subject we were --
3         * * *
4         ATTORNEY NERO: That was the objection,
5 what was said in the phone call. Same question.
6         ATTORNEY SINNETT: That's what I'm
7 offering as a present day situation.
8         THE COURT: No. That's hearsay.
9         ATTORNEY SINNETT: Okay.
10         THE COURT: Objection sustained.
11         * * *
12 BY ATTORNEY SINNETT:
13     Q. As a result of the phone call you received,
14 what happened?
15     A. The phone call corroborated what we already
16 suspected. Moments later we observed the Defendant
17 exiting the Mailbox Etc.s carrying the fake parcel.
18     Q. Was he carrying that box?
19     A. Yes, he was.
20     Q. Did you see him carrying that box?
21     A. Yes, I did.
22     Q. What happened while you saw him -- after you
23 saw him leave with the box?
24     A. We began to exit our vehicles.
25         As he crossed off the sidewalk and onto the

**Page 94**

1 street, Agent Westmoreland, who is assigned to my
2 office, approached the Defendant, identified himself
3 with badge displayed.
4         The Defendant then threw the parcel at Agent
5 Westmoreland and began to flee back towards the Mailbox
6 Etc.s.
7         He was then taken into custody by Agent
8 Westmoreland, myself, and other members of the task
9 force and secured him.
10     Q. And when you say you saw him basically have
11 this confrontation with Agent Westmoreland and he threw
12 the package, what do you mean by that?
13     A. He was carrying in his hands with two hands
14 as he was walking, when Agent Westmoreland confronted
15 him, identified himself, he took the parcel and threw
16 it at him and ran.
17     Q. Okay.
18         You said he ran in a different direction?
19     A. That's correct, back towards Mailbox Etc.s.
20     Q. Did he get very far before he was
21 apprehended?
22     A. No, he didn't.
23     Q. Now, after he was apprehended, taken into
24 custody, I assume, was it you -- well, what was done
25 next?

**Page 95**

1     A. He was taken into custody, placed in the van.
2 I read him his Miranda warnings that the -- which he
3 stated he understood. He was then transported to York
4 City Police Department, where he was read his Miranda
5 warnings again.
6     Q. And when you tell you read Miranda warnings,
7 what are you including as Miranda warnings?
8     A. Explained to him he had the right to remain
9 silent, that anything he said can and will be used
10 against him in a court of law, that he had the right to
11 the presence of an attorney prior to any questioning if
12 he so desired and could not afford an attorney, one
13 would be appointed for him by the Courts free of
14 charge; and if he chose to make a statement, he may
15 stop at any time.
16         I asked him if he understood his rights, and
17 he stated that he did.
18     Q. And at that time he gave you a statement?
19     A. Yes, he did.
20     Q. Okay.
21         What did he provide to you after you gave him
22 those Miranda warnings?
23     A. He stated that he had flown in from
24 California via the Harrisburg International Airport,
25 rented a vehicle, and drove to York and to Mailbox

**Page 96**

1 Etc.s to retrieve his parcel, which he believed was
2 hair supplies.
3     Q. And were there any other questioning done of
4 him at that time?
5     A. He did not want to elaborate on anything
6 else.
7     Q. And then was that the end of your interaction
8 with the Defendant that day?
9     A. That's correct.
10     Q. You personally, okay.
11         On a second or subsequent day, were you --
12 did you interview the Defendant again at the request of
13 Agent Sipes?
14     A. Yes, I did.
15     Q. And was he given the same Miranda warnings as
16 previously?
17     A. Yes, he was.
18     Q. And what did he reveal to you as a result of
19 that interview?
20     A. Stated that he lived in California; actually,
21 well he stated that his wife was here in York and that
22 he was living here with her on West Market Street, that
23 he owned a beauty shop, that he was the manager of her
24 beauty shop, that he was responsible for basically
25 paying utilities at the residence, and that he really

**Page 97**

didn't have any employment, he was on Social Security and that he flies to California to pick up his Social Security. He is on Social Security for disability.

Q. Do you recall if he told you what the amount of his Social Security allotment is per month?

A. I don't remember right offhand.

Q. Okay.

And he indicated to you that he flew to California to pick up his Social Security check?

A. Yes, he did.

Q. Did he indicate with what frequency he did that?

A. I don't recall if he did.

Q. Would, Agent Morgan, taking a look at the report you generated in this case help you to refresh your recollection?

A. Yes, it would.

* * *

ATTORNEY SINNETT: Your Honor, may I approach the witness?

THE COURT: You may.

* * *

BY ATTORNEY SINNETT:

Q. Agent Morgan, I want to show you a -- appears to be a report generated by you. I am not going to

**Page 98**

mark it, but I ask you to take a look at that and ask if that helps you to refresh your recollection about the Defendant's Social Security circumstances.

A. I have to search through to find that particular area in the report.

Q. Take your time.

A. I think it's going to be in the supplemental portion of the report. It should be labeled Supplemental 1.

Q. Same thing with this report. Just take a look at it and tell me if it helps refresh your recollection.

A. Yes.

Q. Now, after taking a look at that -- and not reading from it or anything -- but after taking a look at that, do you now know what the Defendant revealed was the amount of Social Security money he received?

A. Yeah. I have to find it in here where we actually talked to him.

Q. Take your time and read it and tell me if that refreshes your recollection.

A. Okay.

I don't see where he actually states how much he receives in Social Security. Oh, okay. Yeah, he gets disability $600.00 a month.

**Page 99**

Q. Per month?

A. Yes.

Q. And does he indicate how often he goes to pick up those disability payments?

A. Once a month.

Q. Okay.

Now, at the conclusion of that interview with him, I have to ask you, did you receive at any point the box that Agent Sipes had intercepted out in California?

A. Yes, I did.

Q. When did you receive that?

* * *

ATTORNEY NERO: Just for clarification, Your Honor, so that they understand at the conclusion of this interview, you are saying, that's fine? I just want to make sure.

* * *

BY ATTORNEY SINNETT:

Q. When did you receive the box from Agent Sipes?

A. On the 11th.

Q. That would have been the day after this took place down on Eastern Boulevard?

A. Yes.

**Page 100**

Q. And were you able to compare the box you received from Agent Sipes with the one you had participated with in preparing the previous day?

A. Yes.

Q. Were they similar, identical, what?

A. Not very similar, but the same type of box, just I believe the one that we received in the mail was larger, was a larger box, shaped differently.

Q. Were they both brown cardboard boxes?

A. Yes.

Q. Do they both bear the same address as being sent to?

A. Yes.

Q. After you received the box from Agent Sipes, what did you do regarding that box?

A. It was field tested by me, tested positive for marijuana, and was secured in my evidence locker, and then it was eventually turned over to Agent Cunney of DEA.

Q. All right.

And let me ask you this: When you received the box, how did you receive it? Was it in another box?

A. Yes.

Q. Was it --

**101**

1  A. It was packaged in another box.
2  Q. And you opened that. Was it readily apparent
3  what was contained inside that box when you got it or
4  what?
5  A. The outside box?
6  Q. Right.
7  A. Contained the other box with packaging around
8  it.
9  Q. Okay.
10  And were you able to see any marijuana in
11  there when you opened it up or not?
12  A. Not right then. Once I removed the contents
13  of the inner box and opened it up, I was able to see
14  what was in it.
15  Q. Okay.
16  And you indicated that you then took -- did
17  you send the entire box to DEA laboratory or what?
18  A. Yes. It was turned over to Andrew Cunney,
19  and the entire package was sent to his lab.
20  Q. Okay.
21  * * *
22  ATTORNEY SINNETT: I don't have any
23  further questions of this witness at this time, Your
24  Honor.
25  THE COURT: Cross-examine.

**102**

1  ATTORNEY NERO: Thank you.
2  * * *
3  CROSS EXAMINATION
4  BY ATTORNEY NERO:
5  Q. Now, Agent Sipes --
6  A. Morgan.
7  Q. Thanks for the correction.
8  A. Morgan.
9  Q. When did you have this conversation with my
10  client?
11  A. Which conversation?
12  Q. That you had the report from?
13  A. The interview?
14  Q. Yes.
15  A. I believe it was conducted the 11th.
16  Q. Of which month?
17  A. January.
18  Q. Did you take a statement from him?
19  A. I wrote down what he said to me.
20  Q. Okay.
21  Do you have a copy of that statement?
22  A. It's in my report.
23  Q. Can we see it?
24  * * *  report was not given until day of trial
25  ATTORNEY SINNETT: He has it, Judge. I

**103**

1  made sure he had it before I showed it to the witness.
2  THE COURT: Do you have it available?
3  ATTORNEY NERO: Oh, this is the report.
4  I'm talking about the statement you said you took from
5  my client, the statement you said my client -- you said
6  you took a statement. You wrote something down. Do
7  you have a copy of that?
8  THE WITNESS: No, it was memorialized in
9  my report.
10  * * *
11  BY ATTORNEY NERO:
12  Q. When did you prepare your report?
13  A. February 16th.
14  Q. And on February 16th, you have that my client
15  gave you this information?
16  A. That's when I prepared my report, and that
17  information is in there.
18  Q. February 16th, okay.
19  I don't have that February 16 report. I
20  have --
21  A. Supplemental 1; Supplemental Report 1 has the
22  date up in the left corner.
23  Q. Supplemental 1 is the same thing I have here
24  that you signed April 5th, 2001?
25  A. That's correct.

**104**

1  Q. Are you telling us it was done when, February
2  15th?
3  A. Yes.
4  Q. And the interview was done in January?
5  A. Excuse me.
6  Q. The interview was done in January?
7  A. That's correct.
8  Q. You typed this February 15th. You spoke to
9  him in January?
10  A. Right.
11  Q. Did you write down anywhere the conversation
12  you had with him, the interview you had with him, the
13  statement you said he gave you?
14  Do you have that written in your notes
15  anyplace?
16  A. No, I don't. That information was
17  memorialized in my report.
18  Q. Okay.
19  And, this report you signed off on April 5th?
20  A. That's correct.
21  Q. Now, you did a report before this, correct?
22  This wasn't your first report?
23  A. Yeah. There was an initial report completed,
24  yes.
25  Q. And in your initial report, would you agree

```
 1  with me that nowhere in your initial report, not one
 2  word was written about this supposed interview you had
 3  with my client?
 4      A.  No.  It is in the supplemental report.
 5      Q.  Here is my question.  Please answer me yes or
 6  no.
 7          Would you agree that you prepared a report
 8  January 22nd?
 9      A.  Yes, if that's what the date is on that
10  report, yes.  I don't have it before me.
11      Q.  Now, this was ten, eleven days after you
12  supposedly spoke to my client and he gave you the
13  statement?
14      A.  That's correct.
15      Q.  You never included in this report that he
16  said these things to you?
17      A.  That's correct.  It's in the supplemental
18  report.
19      Q.  And then in April, you signed the report and
20  stated he told you those things back in January?
21      A.  In February, when I did the supplemental, I
22  included all that stuff in the supplemental.  All the
23  stuff that happened on the first day and anything
24  involving the interception of the drugs is on the
25  initial report, and the interviews that were conducted
                            105
```

```
 1  were placed on the supplemental report which was done
 2  after the initial report.  That's what you have.
 3      Q.  Okay.
 4          Let me ask you this:  Would you agree that
 5  the initial report was done supposedly after you took a
 6  statement from my client?
 7      A.  Yes.
 8      Q.  Okay.
 9          Do you have -- did you sign something?  You
10  said you gave it back?
11      A.  No.
12      Q.  Did he sign a statement?
13      A.  No.
14      Q.  Did you take notes as he was talking to you?
15  Did you write something down?
16      A.  Yes, I did.
17      Q.  Do you have a copy of those notes you took
18  down?
19      A.  No.  It was memorialized in the supplemental
20  report.
21      Q.  But you prepared the supplemental report from
22  your memory or from something you wrote down?
23      A.  It was from the notes that I had taken.
24      Q.  Well, do you have a copy of those notes?
25      A.  No.
                            106
```

```
 1      Q.  You understand my question?
 2      A.  Excuse me.
 3      Q.  Do you understand my question?
 4      A.  Yes.
 5          The notes that you are looking for are
 6  destroyed.  They were memorialized in the report.
 7      Q.  Oh, you destroyed them?
 8      A.  Yeah.  They no longer exist.
 9      Q.  Oh, okay.
10          When were they destroyed?
11      A.  I don't remember the exact date.
12      Q.  You destroyed them.  I mean, do you remember
13  which month?
14      A.  No.  It would have been once the report was
15  completed.
16      Q.  So, it would be sometime in February?
17      A.  Once I finished the report.
18      Q.  The report that you are referring to was
19  signed by you in April, correct?
20      A.  Right.
                            * * *
22          ATTORNEY SINNETT:  Your Honor, this has
23  all been asked and answered.  This is the third time
24  asking when he signed it.
25          THE COURT:  Is there an objection there?
                            107
```

```
 1          ATTORNEY SINNETT:  There is an
 2  objection, Your Honor.  It is asked and answered.
 3          THE COURT:  Overruled.
 4          ATTORNEY NERO:  And I am going beyond
 5  that.
                            * * *
 7  BY ATTORNEY NERO:
 8      Q.  This report was approved by your supervisor,
 9  correct?
10      A.  That's correct.
11      Q.  And he approved them on April the 11th of
12  2001?
13      A.  Once the report is turned in and it is
14  sufficient to his satisfaction, he signs off on it.
15      Q.  Okay.
16          And then the regional director approved this
17  report on April 13th, 2001?
18      A.  That's correct.  [regional director]
19      Q.  Neither of these gentlemen saw the notes you
20  took?
21      A.  No.
22      Q.  Because you destroyed them before?
23      A.  Right.  It's not customary that they would
24  see them.
25      Q.  Now, let's go back to January 9th.  Was it
                            108
```

**Page 109**

1 January 9th or January 8th, that you received a call
2     A. January 8th.
3     Q. And that was from somebody in Pennsylvania?
4     A. That's correct.
5     Q. As a result of that, you made a call or
6 somebody else called you?
7     A. I made a call.
8     Q. I believe you testified that as a result of
9 conversation you had with the person you called, you
10 made up this makeshift box next to you?
11     A. Yes.
12     Q. On that box, you have your name and an
13 address somewhere in San Diego as a return address?
14     A. That's correct.
15     Q. Was a name and return address supplied to
16 you?
17     A. You are asking if it was supplied to me?
18     Q. Yes.
19     A. No.
20     When this box was made up, it was in the
21 morning, I'm thinking about 8:00, 8:30 in the morning
22 our time, so it would have been 5:00, 5:30 California
23 time.
24     So, no, I didn't have that information at
25 that time.

**Page 110**

1     Q. Did you have any information about the size
2 of the box?
3     A. No.
4     Q. Did you have any information about the type
5 of writing that was on the box?
6     A. No, just where it was addressed to.
7     Q. All you were told is that a box was addressed
8 to a location?
9     A. A business and an address.
10     Q. Nowhere was it told to you that Tyrone --
11 Tyrone James' name was on any box? Am I correct?
12     A. Oh no, no, it wasn't, no.
13     Q. Now, as a result, you testified you went to
14 the location, correct, that the box was addressed to?
15     A. Where are you speaking?
16     Q. January 8th or 9th, you tell us when you went
17 there.
18     A. The 9th.
19     Q. And on the 9th, would it be correct that the
20 box had not yet -- the box that was described to you
21 had not yet left California?
22     A. That's correct. It wasn't going to leave
23 California.
24     Q. It was told to you it was not going to be
25 sent?

[handwritten margin note: package was not going to be sent]

**Page 111**

1     A. That's correct.
2     Q. So, you were told it is not going to be sent,
3 and you decided to make up a box?
4     A. That's correct.
5     Q. But later on you received the box?
6     A. Excuse me?
7     Q. Later on, the box was sent, and you received
8 it?
9     A. Right. It was sent to my office.
10     Q. Directly to you?
11     A. That's correct.
12     Q. You signed for that box?
13     A. No.
14     My regional director, I believe, signed for
15 it. He was informed that it would be coming, and he
16 signed for it.
17     Q. Do you have a copy of the receipt?
18     A. No.
19     Q. Is that destroyed as well?
20     A. No, not that I know of. I just don't have
21 it.
22     Q. Were you there when you -- your regional
23 supervisor signed for it?
24     A. No. I was still in York.
25     Q. This box came, and the box eventually got to

[handwritten margin note: said, the regional director signed for the package]

**Page 112**

1 you?
2     A. You lost me.
3     Q. It was received and signed for you told us by
4 your regional supervisor?
5     A. That's correct.
6     Q. What time was the box given to you?
7     A. Once I arrived in the office that day.
8     Q. What time was that?
9     A. It was already -- it was that afternoon. It
10 was already logged into evidence, and it was already in
11 the evidence room, secured in the evidence locker. It
12 was later that afternoon when I arrived in the office.
13     Q. So, it was never given directly to you?
14     A. Well, it was in the evidence locker.
15     Q. That's not my question.
16     A. And I retrieved it from the evidence locker.
17     Q. So, you testified that you received this box,
18 this box was given to you.
19     I'm asking you do you remember was the box
20 given directly to you, yes or no?
21     A. When you are saying given directly to me,
22 what are you referring to?
23     Q. Well, that box was just handed to you?
24     A. No. I removed it from the evidence locker.
25     Q. That's all we wanted. You found the box in

**Page 113**

1 the evidence locker?
2 A. You are speaking of the box that arrived from
3 California?
4 Q. That's it.
5 A. With the drugs?
6 Q. Yeah.
7 A. Yeah, I retrieved it from the evidence
8 locker.
9 Q. Do you know when that was done?
10 A. On the 11th, later in the afternoon.
11 Q. What time was that?
12 A. I don't remember the exact time.
13 Q. My client was already in custody?
14 A. Oh yeah, he was locked up in York County
15 Prison.
16 Q. Now, you told us that on the 9th, you gave
17 the box to UPS driver, am I correct?
18 A. That's correct.
19 Q. And I'm talking about the box that you made
20 up.
21 A. That's correct.
22 Q. Do you know what time that was?
23 A. No, I don't remember. It was in the morning.
24 I don't remember the exact time.
25 Q. The morning?

**Page 114**

1 A. Uh-huh, the morning of the 9th.
2 Q. And you stayed at the location the entire
3 day?
4 A. No.
5 Q. When did you leave the location?
6 A. Once I was able to confirm that the package
7 which was scheduled to arrive there was not coming
8 until the 10th.
9 Q. Okay.
10 A. It wasn't -- we thought initially it was an
11 overnight package, but we learned that it wasn't. It
12 was, I believe, a two-day package.
13 Q. Thank you.
14 A. That it was going to come on the 10th.
15 Q. Would it be fair to say that since you are
16 telling us that you thought it was an overnight
17 package, it was never told to you that an overnight
18 package was coming?
19 A. I was told that a parcel was --
20 Q. So, here is my question.
21 A. I'm explaining it to you.
22 * * *
23 ATTORNEY SINNETT: He is entitled to
24 answer that question first.
25 THE COURT: Why don't you get an answer

**Page 115**

1 first, Mr. Nero?
2 THE WITNESS: I was told that a parcel
3 was en route to an address in Pennsylvania, the Mailbox
4 Etc.s, and I was given the particulars on that. I
5 didn't find out until the next day that that parcel was
6 actually a two-day parcel and was going to arrive at
7 the 10th.
8 * * *
9 BY ATTORNEY NERO:
10 Q. So, you found out the next day --
11 A. That's correct.
12 Q. -- being the 10th.
13 When was it told to you that the parcel was
14 not going to be sent, that the parcel was never going
15 to be sent?
16 A. I found that out on the 8th.
17 Q. On the 8th?
18 A. That's correct.
19 Q. So, on the 9th, you took the parcel in the
20 morning, you gave it to the UPS driver, and you saw him
21 enter the location?
22 A. That's correct.
23 Q. Did you enter the location to see where the
24 package was placed?
25 A. Yes.

**Page 116**

1 Q. Did you stay at the location until you
2 removed the package?
3 A. Outside.
4 Q. You stayed outside?
5 A. Yes.
6 Q. What time was it that you left with the
7 package on the 9th?
8 A. It would have had to have been somewhere
9 between 10:00 and 12:00 because there is actually a
10 three-hour lapse in time between our time and
11 California, so I had to actually wait till I could get
12 in touch with the individual in California to solid up
13 some information.
14 Q. Is your answer that you don't recall the
15 time?
16 A. Yeah, I don't. It had to be around that time
17 though.
18 Q. Are you saying that because of the difference
19 in time between California?
20 A. Yeah.
21 Q. You have no independent recollection what
22 time it actually was?
23 A. No. It was close to lunchtime for us. I
24 don't know the exact time, but it was close to
25 lunchtime.

**117**

1    Q. On the 10th, you testified that you took the
2 package back.
3    A. No.
4    Q. You did not?
5    A. Oh, took it back where?
6    Q. To Mailboxes Etc.
7    A. Yes, on the 10th, yes.
8    Q. You did do that?
9    A. Yes.
10    Q. What time did you take it back?
11    A. It was in the morning. It would have been
12 closer to the time they opened.
13    Q. Did you also meet the UPS driver or --
14    A. No.
15    Q. So, there was no UPS involved?
16    A. That's correct.
17    Q. So, you took the box there yourself?
18    A. That's correct.
19    Q. And who did you give the box to?
20    A. It was placed in the same spot where I
21 retrieved it from the day before.
22    Q. So, you just walked in and placed this box on
23 the spot --
24    A. Well, walked in, acknowledged the clerks that
25 were there who were familiar with me, and explained to

**118**

1 them that I was placing the package there for the day,
2 and they knew I was coming back.
3    Q. That was sometime in the morning, you're
4 saying?
5    A. Excuse me.
6    Q. That was sometime in the morning?
7    A. In the morning, yes.
8    Q. Now, you just told us that it was told to you
9 that the box was coming by two-day mail, and it would
10 arrive on the 10th.
11    A. That's correct.
12    Q. Did the box, in fact, arrive on the 10th?
13    A. No. The -- the actual parcel, if it had been
14 sent and permitted to go through the mail by
15 California, would have arrived on the 10th, which is
16 why I acted the way I did on the 10th.
17      Once I made contact with the individual I
18 needed to talk to, they forwarded the parcel to me.
19    Q. Now, you said to you directly?
20    A. To my office.
21    Q. And you supplied them with the name and
22 address?
23    A. That's correct.
24    Q. So, the package had your name on it?
25    A. I don't know if it did or not. It was

**119**

1 addressed to the Pennsylvania Office of Attorney
2 General. Whether or not it was addressed to me
3 directly, I don't recall, but I know it was to my
4 office.
5    Q. What happened to the package?
6    A. What happened to it?
7      It was eventually turned over to Andrew
8 Cunney of DEA.
9    Q. So that package was in the possession of
10 Andrew Cunney?
11    A. In possession of the DEA.
12    Q. Did you destroy anything when you opened the
13 package?
14    A. What do you mean?
15    Q. What I mean, if the package was sent and it
16 was in your evidence locker and you had it and you
17 turned it over to Andrew Cunney, is it fair for me to
18 assume that Andrew Cunney got that package as you
19 received it?
20    A. Whether or not it is in the box that I
21 received it in from California, I don't remember, but
22 it may be.
23    Q. So, you are telling us it is possible that
24 you might have destroyed the box?
25    A. I don't recall if I did or not, but it may be

**120**

1 still intact the way I received it from California.
2    Q. So we understand, you received the box, a box
3 inside of a larger box, you said?
4    A. Right.
5    Q. So you received two boxes, correct?
6    A. That's possibly correct.
7    Q. Is it fair to say that at the very least the
8 box that would have your name and the box that would
9 have the address originally would be brought here by
10 Mr. Andrew Cunney?
11    A. If I held onto the packaging that was done by
12 Agent Sipes in California, then yes, it would come like
13 that.
14    Q. So, you are saying that Agent Sipes changed
15 the packaging?
16    A. No. Agent Sipes placed the parcel into a
17 larger box and packaged that for shipment to me.
18    Q. So, at the very least, the box that was
19 originally intended to go, that box is still intact?
20    A. Yes.
21    Q. When you received the box -- well, let me
22 back up a little bit.
23      You already told us what information was
24 provided to you. I believe you told the weight of the
25 box that you were expecting.

```
 1   was told that the contents of the box
 2   weighed about nine and a half pounds.
 3       Q. You remember that?
 4       A. Yes.
 5       Q. The package that was sent to you, the box
 6   that weighed nine and a half pounds, how was that
 7   delivered?
 8                         * * *
 9            ATTORNEY SINNETT: I believe this is
10   answered more than five times. He said it was one box
11   inside of a larger box.
12            ATTORNEY NERO: I'm not talking about
13   the packaging. I'm asking how was it delivered by you.
14            THE COURT: Do you know?
15            THE WITNESS: I don't know.
16            ATTORNEY NERO: You don't know?
17            THE WITNESS: No.
18                         * * *
19   BY ATTORNEY NERO:
20       Q. And you know -- you are pretty certain you
21   don't know --
22       A. What, which company transported?
23       Q. Yeah.
24       A. No, I don't know that offhand.
25       Q. Now, you recall testifying before in this
                              121
```

```
 1   preliminary hearing?
 2       A. Yes.
 3       Q. In fact, you testified about three times,
 4   correct?
 5       A. That's correct.
 6       Q. Okay.
 7            Do you recall -- and I'm on page 14 -- me
 8   asking you how was the box delivered, and you said I
 9   believe it was delivered UPS to my office?
10       A. Well, I don't know.
11       Q. You don't recall that?
12       A. What you have in front of you, I don't have
13   in front of me, so, no, I don't.
14       Q. Do you recall me asking you where the box was
15   sent from?
16            You said, "I received that from California."
17            "It came -- was sent directly to you?" That
18   was my question.
19            And you said, "Right."
20            "And who delivered it to you?"
21            "I believe it was delivered UPS."
22            You don't recall that line of questioning and
23   answer?
24       A. No, I don't.
25       Q. Now, you took my client, you said, to York
                              122
```

```
 1   County Police Station?
 2       A. York City Police.
 3       Q. York City, sorry.
 4            And you read him his Miranda warnings inside
 5   the van, you said?
 6       A. That's correct.
 7       Q. Did he sign anything?
 8       A. No.
 9       Q. Did you take a statement from him inside the
10   van?
11       A. No.
12       Q. So, you read him his Miranda warnings and did
13   not question him?
14       A. Right.
15       Q. Did he agree to speak to you, or did he say I
16   do not want to speak to you at that time?
17       A. No. I just read him his rights, and I went
18   to my vehicle to transport him to the station.
19       Q. So, you didn't wait for his response?
20       A. Well, I asked him if he understood his
21   rights, and he said that he did, but I had no need to
22   question him right there on the scene. I was going to
23   question him in City Hall.
24       Q. Okay.
25            What time is this?
                              123
```

```
 1       A. I'm not sure of the exact time. It should be
 2   reflected in the initial report. It was in the a.m.
 3       Q. What time did you question him at City Hall?
 4       A. Upon arriving at City Hall, probably 45
 5   minutes to an hour later.
 6       Q. When you got there, did you give him his
 7   Miranda rights again?
 8       A. Yes, I did.
 9       Q. So, you read him his Miranda rights three
10   times now?
11       A. No, twice.
12       Q. Oh. Did you not testify before that on
13   January 11th?
14       A. Well, you are saying on that particular day
15   you said three times. I read him his rights twice on
16   that day. You are talking about another day now. Next
17   day I read him his rights again.
18       Q. I am talking about in total. So far, you
19   have read him his rights three times?
20       A. That's correct.
21       Q. Do you have a copy of the statement he made
22   to you when you questioned him in the York City Jail?
23       A. No, I don't.
24       Q. You took notes?
25       A. That's correct.
                              124
```

**125**

1  Q. You destroyed them?
2  A. Excuse me.
3  Q. You destroyed those notes as well?
4  A. Yes.
5  Q. When were the notes destroyed?
6  A. Once the report was written.
7  Q. Did you make any attempt to have Mr. James
8  sign a statement or a report or anything?
9  A. No.
10 Q. So, all we have here is what you are saying
11 Mr. James said to you?
12 A. Yeah, the truth, yes.
13 Q. I don't understand if you even know what the
14 truth is.
15    I'm asking you all we have here is what you
16 are saying Mr. James said to you.
17 A. And that's what Mr. James said to me.
18 Q. I am not asking you if that's what he said to
19 you. I'm asking you that's all we have here?
20 A. Yes.
21 Q. You have no way of -- did not keep any notes
22 at all, any signatures, nothing that he said to you
23 when he supposedly did that?
24    * * *
25    ATTORNEY SINNETT: Your Honor, I believe

**126**

1  that's been asked and answered.
2    THE COURT: It has been. Objection
3  sustained.
4    ATTORNEY NERO: Okay.
5    * * *
6  BY ATTORNEY NERO:
7  Q. Now, when you stopped Mr. James coming
8  outside with a package, how long was he inside the
9  establishment for?
10    Let me rephrase that. By the time he drove
11 up, you saw him drive up, correct?
12 A. That's correct.
13 Q. By the time he entered the establishment and
14 came out, how much time would you say elapsed?
15 A. Not long, a few minutes.
16 Q. Minutes?
17 A. Yes.
18 Q. Would it be fair to say then he stayed inside
19 the establishment for some time?
20 A. It wasn't long at all.
21 Q. I understand, but he just drove up, went
22 inside, came back out, he spent a few minutes, and then
23 he stayed inside for a few minutes?
24 A. Right.
25 Q. Did you see what he did inside for the few

**127**

1  minutes?
2  A. We could see that he was inside, and then we
3  watched him walk out.
4  Q. I'm asking you what you saw, not we.
5  A. Well, I could see that he was inside, but
6  then I saw him come walking out with the parcel.
7  Q. Did you see what he did while he was inside?
8  A. No.
9  Q. But he was inside for a few minutes?
10 A. Right.
11 Q. Now, when you left the parcel same place you
12 had it there before, you then went outside?
13 A. I didn't run outside, no.
14 Q. You stayed inside?
15 A. No. I mean I walked out. I didn't run out.
16 Q. I didn't say run. I said you went outside.
17 A. I thought you said you ran outside. Yes. I
18 did. I exited the establishment and returned to my
19 vehicle.
20 Q. How long were you outside with the package
21 inside before Mr. James came?
22 A. I'm not sure. We were out there awhile.
23 Q. A couple of hours?
24 A. Could have been.
25 Q. You are not sure?

**128**

1  A. No.
2  Q. And I'm correct, am I not, that you never
3  went back inside from the time he -- from the time you
4  came out having delivered the package to the time he
5  came, you never entered the establishment?
6  A. I may have gone back in.
7  Q. Do you remember?
8  A. I don't remember if I did or not, but it was
9  a possibility.
10 Q. Did you see the package inside?
11 A. When I went -- when I'm inside, yes, I could
12 see it.
13 Q. When you came out?
14 A. Oh, you can't see it from the outside.
15 Q. So, you didn't see what happened to the
16 package, so you have no idea what happened to the
17 package from the time you left it till the time you saw
18 Mr. James walk up with it?
19 A. I know that when I placed the parcel in there
20 and he retrieved it, it was in the same condition as it
21 was when I put it there, when I took possession of it
22 from him, and there was nothing altered on it.
23 Q. I never asked about that, never asked about
24 that on the package.
25    My question is do you know what happened to

**Page 129**

1  the package, if anything, from the time you left it
2  until the time you saw Mr. James exit the
3  establishment?
4      A. No.
5      Q. Now, when he came outside, he started going
6  to his vehicle, correct?
7      A. Excuse me.
8      Q. He started going towards his vehicle?
9      A. Yes.
10     Q. Did he have just one package or several
11 packages?
12     A. No, he just had one parcel.
13     Q. And you were all in plain clothes?
14     A. Yes.
15     Q. How many officers?
16     A. I don't know, roughly -- I don't know, maybe
17 seven or eight.
18     Q. Is it fair to say that you all came at him at
19 the same time?
20     A. No.
21        Myself and Agent Westmoreland exited the
22 vehicle, and I was trailing behind as Agent
23 Westmoreland approached him and identified himself and
24 displayed his badge.
25     Q. Now, when you approached him, did you

**Page 130**

1  approach him from the front or the rear?
2      A. We approached from the front where he could
3  see you.
4      Q. So he was walking towards you?
5      A. That's correct.
6      Q. And at that time the establishment would be
7  behind him then?
8      A. Was behind him, yes.
9      Q. And when he came -- when you approached him,
10 he threw the package and went back to the
11 establishment?
12     A. He threw the package at Agent Westmoreland
13 and ran back towards the establishment.
14     Q. Not outside, but back towards the
15 establishment?
16     A. Right, towards the building.
17     Q. Towards the building?
18        And I believe you testified that when you
19 took his statement, he told you that he expected beauty
20 supplies?
21     A. He said he had no idea about any marijuana.
22 He said he thought it was beauty supplies.
23     Q. He thought it was beauty supplies?
24     A. That's correct.
25     Q. Did you weigh the package that you left?

**Page 131**

1      A. Excuse me.
2      Q. Did you weigh the package that you left, that
3  package right there?
4      A. I don't recall if I did or not.
5      Q. Do you know how much it weighs now?
6      A. No.
7      Q. Do you know whether when he went inside he
8  had to sign for the package?
9      A. Excuse me.
10     Q. Do you know whether or not when he went
11 inside he had to sign to receive the package?
12     A. I have to look for the records to see if he
13 did sign for this particular parcel.
14     Q. You don't know?
15     A. I have to check the records. If you want to
16 give me time to check the records, I'll check.
17     Q. I'm asking you, do you know, yes or no?
18     A. No.
19     Q. Now, your testimony is that you took him to
20 the police station and searched him, correct?
21     A. He was transported to the police station, and
22 a search of his person was conducted.
23     Q. Did you search him personally?
24     A. I assisted in the search.
25     Q. And doing your search, you said you found

**Page 132**

1  some business cards on him?
2           * * *
3        ATTORNEY SINNETT: Your Honor, that
4  wasn't Agent Morgan's testimony. That was in my
5  opening.
6        ATTORNEY NERO: That's my recollection.
7        THE COURT: Did you find the cards,
8  Agent Morgan?
9        THE WITNESS: The cards were located in
10 his wallet by Detective Peddicord and Detective Craul.
11          * * *
12 BY ATTORNEY NERO:
13     Q. And turned over to you?
14     A. Excuse me?
15     Q. They were turned over to you?
16     A. They were shown to me, yes.
17     Q. Did he have among the cards a card with a
18 lawyer's number on it?
19     A. I don't know.
20     Q. How many cards were in the wallet in total?
21     A. Oh, there were a series of cards and papers.
22     Q. Twenty, twenty-five, thirty?
23     A. I couldn't tell you right offhand.
24     Q. But you focused on three cards?
25     A. It was brought to my attention that there

Case 1:01-cv-01644-YK Document 200-5 Filed 10/05/2004 Page 16 of 19

**Page 133**

1 were a number of Mailbox Etc.'s cards.
2    Q. How many?
3    A. For various locations in York, Pennsylvania, and in Maryland.
5    Q. How many cards?
6    A. I don't know how many exactly.
7    Q. Now, you then went, you testified, to the second location, and you spoke with the people there?
9    A. I did not testify to that.
10    Q. You never went to the second location?
11    A. I didn't testify to that.
12    Q. Well, tell me, did you go?
13    A. Did I go to a second location?
14    Q. Yes.
15    A. Yes.
16    Q. And when you went to that location, my client was already in custody?
18    A. That's correct.
19    Q. In fact, has never been released from custody from the time you arrested him?
21    A. That's correct.
22    Q. The package that you found in the second location, who was that addressed to?
24    * * *
25    ATTORNEY SINNETT: Your Honor, I believe

**Page 134**

1 this pouch we are outside the scope. I had indicated previously we are going to try to do it chronologically, and he is going to testify about the Shrewsbury location later.
5    THE COURT: It does seem beyond the scope.
7    ATTORNEY NERO: Court's indulgence.
8    * * *
9 BY ATTORNEY NERO:
10    Q. Now, earlier I asked you about information concerning the weight of the package, and you said it was told to you and you now remember it was nine and a half pounds.
14    A. That the contents weighed about nine and a half pounds. The total package -- I don't recall the exact weight of the total package.
17    Q. So, you had a conversation about the total package and the contents?
19    A. No. I just noted the contents. I was told they weighed about nine and a half pounds.
21    Q. I refer to the same preliminary hearing on March 28, 2001. Do you recall that? Do you recall that?
24    A. There were three preliminary hearings. The exact dates, I do not recall the date of the hearings.

**Page 135**

1    Q. Well, this one occurred on March 28th, 2001, before District Justice Harold D. Kessler.
3    A. Okay.
4    Q. Do you recall that?
5    A. I remember being at a preliminary hearing before District Justice Kessler.
7    Q. Do you remember me asking you questions?
8    A. Yes, you did ask me questions.
9    Q. Do you remember me asking you about the weight --
11    A. I don't recall if you did, but if you have a transcript on that, then you did.
13    Q. Let me read it then.
14    * * *
15    ATTORNEY SINNETT: Could you tell us what page and line you are on?
17    ATTORNEY NERO: I'll do that.
18    Actually, I begin on page 24, but I am going to direct him specifically to page 25. Page -- the bottom of page 24, he said, "So that we are clear then, the only thing you can -- you recall he said at the time was that it may have been a cardboard box? He didn't give you any dimensions?"
24    You said you don't recall.
25    I said, "No color, no weight, nothing at

**Page 136**

1 all?"
2    He said, "I don't recall."
3    Do you recall that?
4    THE WITNESS: I don't have the transcript before me, but if that's what you have written --
7    * * *
8 BY ATTORNEY NERO:
9    Q. But today you remember that he told you nine and a half pounds?
11    A. Right.
12    Q. You will admit that -- you will agree that February -- March 28 was closer in time to January than today?
15    A. Yes.
16    Q. You have, in fact, gone over all the notes for this case, correct?
18    A. I have reviewed paperwork.
19    Q. Do you recall at any time -- and when I say any time, talking about while he was in custody whether it was at York City Police Station or at the York County Prison, my client asking you to be allowed to make a phone call?
24    A. Yes.
25    Q. And did you allow him to do that?

**137**
1   A. No, I didn't.
2   Q. How many times did he ask you to allow him to
3   make a phone call?
4   A. I think he asked me in City Hall, and I think
5   he may have asked me while we were en route to the
6   jail.
7   Q. So, you could remember twice?
8   A. At least twice, yeah.
9   Q. At least twice, could be more?
10   A. I don't know.
11   Q. You denied him both occasions?
12   A. That's correct.
13   Q. And he told you I want to call my lawyer, did
14   he not?
15   A. No, he never told me that.
16   Q. What did he say he wanted to call for?
17   A. He said he wanted to call his family.
18   Q. He said that both times?
19   A. Yeah, he wanted to make a phone call to his
20   family.
21   Q. And you denied him both times?
22   A. That's correct.
23         * * *
24   ATTORNEY NERO: I have no further
25   questions at this time, Your Honor.

**138**
1   THE COURT: Anything further, Mr.
2   Sinnett?
3   ATTORNEY SINNETT: Very briefly, Your
4   Honor, very briefly.
5         * * *
6   REDIRECT EXAMINATION
7   BY ATTORNEY SINNETT:
8   Q. Agent Morgan, you indicated on cross
9   examination you prepared both of those reports from
10   notes you had taken?
11   A. That's correct.
12   Q. Is that normally what you do?
13   A. Yes, it is.
14   Q. You interview somebody, you take notes, and
15   then you generate a report from those notes?
16   A. That's correct, unless the person is in a
17   very cooperative mode working as an agent for the
18   Commonwealth.
19        If he makes a statement, that statement is
20   signed by him and dated. In this case, it wasn't,
21   so --
22   Q. My question is though you generate a report
23   on notes that you take at an interview?
24   A. That's correct.
25   Q. And do you customarily destroy those notes in

**139**
1   all cases?
2   A. Yes.
3   Q. When the report is generated?
4   A. That's correct.
5   Q. What's the purpose of the supervisor review
6   of the report that you generate?
7   A. That the report contains necessary
8   information for the case and once given his approval is
9   signed off on.
10   Q. And is that again customary with all reports
11   you generate?
12   A. Yes, it is.
13   Q. Now, why do you have one report that's
14   indicated as an initial report and a different report
15   indicated as a supplemental report? Why are they --
16   why isn't it all one report?
17   A. Because you initiate the -- what is the
18   initial report? You put the general information in
19   there, and then as the investigation goes on or if
20   something else occurs, then you do a supplemental
21   report to it with that additional information included
22   in it.
23   Q. Even if the two events are only a day apart?
24   A. That's correct.
25   Q. Now, you indicated on cross examination as

**140**
1   well that you denied the Defendant this request to make
2   a phone call.
3        Is that customary, or do you generally give
4   people phone calls if they ask for them?
5   A. Normally people are permitted phone calls,
6   but depending on the nature of the investigation
7   whether or not a phone call would jeopardize the
8   furtherance of that investigation, it is at my
9   discretion.
10   Q. So, there is nowhere you are required to
11   allow somebody to make a phone call?
12   A. No.
13   Q. Now, can you tell us why you made the box the
14   way you did?
15   A. Because from my experience because I didn't
16   have a chance to observe the actual package that was to
17   be en route from my experience, I have known the
18   parcels to be packaged in this similar manner, so it
19   was placed together like that for that reason.
20   Q. And why didn't you wait till you actually
21   received the parcel from California before you did
22   that?
23   A. Because of time, time constraints, not
24   knowing how much time we had. Normally we don't have
25   much time to work with, so we try to do it as quickly

**141**

1  as possible.
2        * * *
3        ATTORNEY NERO: I object to this.
4        THE COURT: The objection is sustained.
5        * * *
6  BY ATTORNEY SINNETT:
7    Q. Okay.
8       Then when you indicated on cross examination
9  you were told the parcel was not going to be sent, what
10 did you mean by that?
11   A. That California held onto the package because
12 they hadn't made contact with any law enforcement.
13       * * *
14       ATTORNEY NERO: I'd object as to --
15       ATTORNEY SINNETT: Your Honor, he opened
16 this door on cross examination. I believe there is
17 some confusion.
18       ATTORNEY NERO: Not as to what was said.
19       ATTORNEY SINNETT: I believe he opened
20 this door on cross examination. I'm trying to
21 alleviate the confusion that was generated. This is
22 the last question I have.
23       THE COURT: Well, all right. Go ahead.
24       * * *
25 BY ATTORNEY SINNETT:

**142**

1    Q. What did you mean when you said the parcel
2  was not going to be sent? By whom did you mean?
3    A. The authorities in California were not going
4  to allow this package to follow the normal route
5  through UPS and arrive at its destination because they
6  hadn't made contact with any law enforcement agencies
7  on the other end to intercept or control that package
8  so that they didn't just make it through and make it to
9  the streets.
10       * * *
11       ATTORNEY SINNETT: That's all the
12 questions I have.
13       ATTORNEY NERO: Just briefly, Your
14 Honor, very, very brief.
15       * * *
16       RECROSS EXAMINATION
17 BY ATTORNEY NERO:
18   Q. Am I correct that you just stated the reason
19 for the supplemental report is if something else
20 happens after the initial report, you generate a
21 supplemental report?
22   A. Generate an initial report to put the initial
23 information, content of the investigation, and as stuff
24 occurred afterwards, any investigation, then you
25 include that stuff in a supplemental.

**143**

1    Q. So that we are clear then, it follows that
2  the stuff in the supplemental investigation would have
3  occurred after the initial --
4    A. It is at the discretion of the person
5  memorializing the report.
6       If you choose to do it chronologically like
7  that, you can, or you may choose to put the meat of the
8  investigation in the initial report and any substance
9  adding to it or complementing that information can be
10 added in a supplemental and so on.
11   Q. Let's look at the report you started January
12 9th.
13   A. The initial -- I don't have the initial. I
14 just have the supplemental.
15       * * *
16       THE COURT: Mr. Nero, you went over that
17 very precisely.
18       ATTORNEY NERO: But this one thing he
19 has January 12th and January 19th on the report, and
20 this is just something that came up. Judge, I don't
21 want to belabor the point.
22       THE COURT: You are. What's the
23 question?
24       * * *
25 BY ATTORNEY NERO:

**144**

1    Q. The question is if you took a report from him
2  on January 11th and then in your initial report you had
3  things that you said happened on January 12th and
4  January 19th, you don't tell us that supplemental
5  report is something generated after events that you
6  placed the initial report?
7       Do you understand my question? You could
8  have included in the initial report this information.
9    A. I understand what you are asking me, but what
10 I explained to you is it is at my discretion when I
11 write my report.
12       I felt that in the way that I report my
13 initial report putting the meat of the investigation,
14 everything that occurred and information that was
15 gathered and pertaining to the mailboxes and packages
16 that were received during a period of time, I felt that
17 was important to place in the initial.
18       Then the supplemental was done to include the
19 financial end of my interview with Mr. James is the
20 reason it was done, but it is at my discretion and how
21 I organize my report and the content of my report, and
22 I chose to do it like that.
23   Q. You don't think it would be important if
24 somebody gave you a statement to keep a signed copy or
25 have him sign a copy?

```
 1   This is your statement, you signed it, you
 2   read it. Come on.
 3      A.  If Mr. James was in a cooperative mode, then,
 4   yeah, it would have been done.
 5      Q.  Wasn't cooperating?
 6      A.  No, he wasn't cooperating.
 7      Q.  I thought you said you read him his Miranda.
 8      A.  That doesn't mean he was being truthful and
 9   cooperative.
10                      * * *
11            ATTORNEY NERO: Okay. I have no further
12   questions.
13            ATTORNEY SINNETT: I have no further
14   questions.
15            THE COURT: You may step down. Members
16   of the jury, we are going to take our mid-afternoon
17   break now. We will be in recess until 3:30.
18                      * * *
19            (Recess)
20                      * * *
21            ATTORNEY SINNETT: Call Agent
22   Westmoreland.
23                      * * *
24            BRIAN WESTMORELAND,
25   called as a witness on behalf of the Commonwealth,
                          145

 1   having been duly sworn according to law,
 2                   testified as follows:
 3                      * * *
 4                  DIRECT EXAMINATION
 5   BY ATTORNEY SINNETT:
 6      Q.  Sir, can you give us your full name and
 7   occupation, please?
 8      A.  My name is Agent Brian Keith Westmoreland. I
 9   work for the Pennsylvania State Attorney General's
10   Office, Bureau of Narcotics and Drug Control.
11      Q.  And how long have you worked there?
12      A.  Approximately 15 years, sir.
13      Q.  And what specifically are your assignments in
14   that agency in that capacity?
15      A.  I am a narcotics agent.
16      Q.  And have you been doing that for 15 years?
17      A.  Yes, sir.
18      Q.  And were you employed and working in that
19   capacity back on January 10th of this year?
20      A.  Yes, sir, I was.
21      Q.  And specifically, were you assigned to work
22   an investigation concerning the Defendant, Mr. James?
23      A.  Yes, sir, I was.
24      Q.  And what was your assignment or --
25      A.  My assignment on this particular date was to
                          146

 1   conduct surveillance and to participate in any arrests
 2   of the Defendant, Mr. James.
 3      Q.  Now, were you present at the Mailboxes Etc.
 4   location out on Eastern Boulevard in York?
 5      A.  Yes, sir, I was.
 6      Q.  And is that where you were conducting your
 7   surveillance from?
 8      A.  Yes, sir.
 9      Q.  And with whom were you conducting
10   surveillance?
11      A.  On this particular day, I was assigned with
12   Agent Morgan.
13      Q.  And particularly what do you recall taking
14   place, if anything, at that Mailboxes Etc.?
15      A.  Yes, sir.
16          On this particular date in question, myself
17   and Agent Morgan was parked just east of the Mailbox
18   Etc. conducting surveillance waiting for Mr. James to
19   arrive to pick up a box that contained marijuana at
20   Mailbox Etc.
21          Subsequently, Mr. James arrived. He parked
22   just west of Mailbox Etc., approximately 55 yards from
23   the Mailbox Etc. building and proceeded into Mailbox
24   Etc.
25          Within five to ten minutes, he exited; at
                          147

 1   which time I got out the vehicle, circled around
 2   towards his vehicle, and approached him.
 3          As I approached him, I said, excuse me, sir,
 4   can I talk to you, and I had my -- my badge on my
 5   chest, and I said, I'm Agent West -- no sooner I said
 6   that, he threw the box towards me, and he ran
 7   southbound towards the store area.
 8      Q.  Now, when you say you saw him arrive and go
 9   in, did you personally observe him pull in the parking
10   lot?
11      A.  Yes, sir.
12      Q.  And did you personally observe him walk into
13   the store?
14      A.  Yes, sir, I did.
15      Q.  At what point did you decide to leave the car
16   you were in to confront the Defendant?
17      A.  I believe Agent Morgan gave the signal to
18   take him down.
19      Q.  And did you walk by yourself to approach the
20   Defendant?
21      A.  Yes. We all had specific locations we were
22   to go once he exited the store.
23      Q.  And was your responsibility of your job to
24   confront him or what?
25      A.  My job was to get to his vehicle and confront
                          148
```