TYRONE P. JAMES V. YORK COUNTY POLICE DEPARTMENT, ET. AL.,

CASE ACTION NO. 01:01-CV-1015

EXHIBIT "5"

16

1    I'll start with Detective Richard Peddicord.

2    Now, what are you suing him for and what did he

3    do to you or what are you alleging he did to

4    you?

5    A.    Well, as stated in my complaint, and I

6    have a copy of the complaint right here, all of

7    the Defendants were part of this, the use of

8    excessive force against --- you know, by

9    trampling on me, stepping on me, tackling me,

10   and cuffing me.

11   Q.    Right.  But that's fine, and you get ---.

12   A.    And Richard Peddicord was part of that

13   arrest team.  And he took part and I stood ---

14   Richard Peddicord, he took part in the arrest,

15   he had his feet on me, he had a trampled me, he

16   took all of my possessions, my belongings from

17   my packets and searched me.

18   Q.    So Richard Peddicord, you're alleging,

19   tramped on you and did he do anything else, in

20   regard to the excessive force put on you,

21   besides tramp on you?

22   A.    Yeah.    Well, when I walked out of that

23   place, all I seen was ---.

24   Q.    What's the place you're talking about?

25   A.    Mail Boxes Etc.

17

1  Q.  Okay.

2  A.  I saw --- I couldn't tell if they was

3  police officers.  They was all in plain

4  clothes.

5  Q.  Okay.

6  A.  They did not have any firearms.

7  Q.  Okay.

8  A.  And they come running towards me.

9  Q.  How many men came running towards you?

10 A.  First I saw Defendant Morgan.

11 Q.  Okay.

12 A.  And Defendant Westmoreland.

13 Q.  Okay.

14 A.  And they come running towards me ---.

15 Q.  Was Detective Peddicord running toward

16 you?

17 A.  Well, I didn't see him.

18 Q.  Okay.

19 A.  Then ---

20 Q.  Okay.

21 A.  --- running towards me, but I guess he was

22 in the truck that hit me.

23 Q.  He was in the truck that hit you?  If he

24 was in the truck, how did he trample on you?

25 A.  Good question.  He was in the truck --- I

18

1  mean, what I'm saying is, when I walked out the

2  place, I saw --- I could remember, from my

3  recollection, 'cause it's been a long time, ---

4  Q.  Right.

5  A.  --- I saw Agent Morgan and Westmoreland

6  running towards me.

7  Q.  Okay.  Right.

8  A.  And being from the city that I'm from, and

9  if you seen two guys running towards you that

10  look like thugs or whatever ---

11  Q.  Right.

12  A.  --- you know, you assuming they may be

13  coming to attack you or something for some

14  reason.

15  Q.  All right.

16  A.  And for fear of bodily harm, bodily

17  injury.

18  Q.  All right.  What city are you from?

19  A.  From Los Angeles.

20  Q.  From Los Angeles.

21  A.  I mean, living in Los Angeles. You know

22  what I mean.

23  Q.  Right.

24  A.  New York --- whatever.  You know, large

25  cities, you see guys running towards you ---

19

1   you know what their intention is.

2   Q.   Right.

3   A.   You know, they're coming to harm you.

4   Q.   Right.

5   A.   So just from the honest opinion, I tend to

6   think that --- to the Mailboxes.  At the same

7   time the truck hit me.  It was coming toward me

8   and hit me.  I think Mr. Peddicord was in the

9   truck, came out, they was wrestling with me,

10  tackling me, and that's when I went to the

11  ground and I mean ---.  Before you --- the

12  truck hit me, and I went to the ground.  Trying

13  me --- by me trying to get up, but I'm on

14  unaware of what's going on.

15  Q.   Did you run into the truck, or did the

16  truck --- are you alleging that they drove the

17  truck into you?

18  A.   Yes.

19  Q.   To stop you?

20  A.   Yes.

21  Q.   And then at that point, after your contact

22  with the truck, is when Peddicord got out of

23  the truck and what happened then?

24  A.   I don't know if he came out of the truck

25  or whatever, but he came in with the --- with

20

1   the ---.

2   Q.   What?  I mean, keep in mind, you named

3   quite a few Defendants and you're going to have

4   to show that all of them hit you, not just

5   being there.  Do you know what I'm saying? So

6   it's not the small point that you're like, I

7   don't remember what happened, you know.   You

8   got to tell me what Peddicord hit.

9   A.   Well, You're naming specifically

10  Peddicord, I did not come in contact with

11  Peddicord, I came in contact with James Morgan.

12  Q.   Okay.  Well, that's what I'm asking you.

13  You sued all of these gentleman for excessive

14  force.

15  A.   Yeah.

16  Q.   I'm going to have to find out from you how

17  all of them touched you, not just being there

18  at the same place, they were not there.

19  A.   Okay.  So to get this straight, it was the

20  fact that after I was on the ground, you know,

21  shoes all over my face.  I'm sorry, but I can

22  remember like Mr. Peddicord with his shoes on

23  my face, taking my wallet.

24  Q.   Now, what were you doing on the ground?

25  Were they trying to handcuff you?

21

1    A.   No.   They was wrestling me down --- I

2    mean, they was all over me.

3    Q.   So is it your testimony then that at no

4    time did you have any idea that these were

5    police officers ---

6    A.   No.

7    Q.   --- when they were on the ground?

8    A.   No.

9    Q.   Because in your complaint, you said that

10   some of these alleged assaults took place when

11   they were trying to handcuff you from some of

12   these Defendants.   I mean, is it normal in Los

13   Angeles or the big city that even if you meet

14   some of these people that day and try to attack

15   you and handcuff you, you know, not police

16   officers.

17   A.   Well, I came in contact --- I mean, from

18   my experience, that --- you know, with police

19   before.

20   Q.   I know.

21   A.   I'm not quite acquainted with the laws and

22   procedures of the police force.

23   Q.   Right.

24   A.   But from my understanding, police officers

25   don't just abuse you the way these guys did.

22

1  Q.  Right.

2  A.  And by them coming on me and tackling me

3  as if I was on this football field was out of

4  sync, out of proportion.

5  Q.  Okay.  Well, let's start over from the

6  beginning.  January 10, 2001, the date this

7  arrest happened.

8  A.  Uh-huh (yes).

9  Q.  Where were you?

10  A.  I was at --- going to pick up my mail at

11  the Mail Boxes Etc.

12  Q.  Okay.  And what happened when you went to

13  go pick up your mail?

14  A.  Can I refer to my ---?

15  Q.  Sure.

16  A.  Because I'm not trying to be tied up what

17  I said, what I know what happened.  It's

18  exactly what happened in my complaint.

19  Q.  Here's the thing.  I understand you have

20  the complete --- and I read your complaint, but

21  we're not here to review or read your complaint

22  to me.  We're here for you to tell me more and

23  give me more information.  The purpose of the

24  deposition is to what's called go find the

25  pleadings, you know, and explain them more, so

23

1   you can't just read the entire ---.

2   A.   Yeah, but I'm just saying, you know, ---

3   Q.   Okay.  So I'm not speaking ---.

4   A.   --- I'm not trying to be --- I'm just

5   trying to explain.

6   Q.   Explain to me what happened then when you

7   left --- when you went to go pick up your mail

8   what happened?

9   A.   You talking about inside or coming out?

10   Q.   Just that day.  Before the arrest.  Tell

11   me what happened.

12   A.   Can I object to that, too?  Because as far

13   as the criminal case and that?

14   Q.   You can object to whatever you want.  Go

15   ahead, sorry.

16   A.   Yeah.  And the fact that when I went in

17   and come on out --- and as a matter of fact, I

18   went in, and usually you go in, and you got a

19   key, and you open the mailbox, see if any of

20   the mail is what you like, I was notified that

21   a package was there for me, so I went to the

22   clerk and I gave the clerk my --- the slip that

23   was left in my mailbox and he gave me the

24   package, you know, I had looked for this money

25   because I didn't know who it was from, you

24

1  know.

2  Q.   Did you have a mailbox --- you said that

3  Mail Boxes Etc. was in your name?

4  A.   No, it was in my business name.

5  Q.   Okay.  And do you remember the address of

6  that Mail Boxes Etc.?

7  A.   No, I don't remember it.

8  Q.   Do you remember the city where it was?

9  A.   No, I think it was York County, though.

10  Q.   York?

11  A.   When I'm trying to explain to you, you

12  asked me that question what happened when they

13  arrested me, will you let me answer that

14  please?

15  Q.   Sure.

16  A.   When I walk out, you know, I look at it

17  funny, but when I walk --- you know, I took it

18  anyway, but I said, hey, you know, it's coming

19  from a business, I never really looked at the

20  address, you know, I walked out and by me

21  walking out, I saw ---.

22  Q.   Was the box addressed to you, to your

23  business?

24  A.   Yeah, it was addressed to the business.

25  Q.   Okay.  Addressed to your business.

25

1    A.    Through Mailbox hand written, but I never

2    really looked at the label.

3    Q.    Mr. James, listen to my question.  Was the

4    package that you got addressed to either you or

5    your business?

6    A.    It was addressed to the box.  The business

7    pertaining to the box, not me.

8    Q.    What do you mean, it was addressed to the

9    box?

10    A.    It was addressed to the mailbox, 160 --- I

11    think is --- I don't remember what box it was,

12    but it was addressed to a box, which is

13    contracted to a business.

14    Q.    Addressed to what box?

15    A.    The mailbox.

16    Q.    Okay.  Now I'm just a little confused.

17    There's a package that came in and you're

18    alleging your name was not on the package?

19    A.    My name was not on the package.

20    Q.    Who was the package addressed to?  You're

21    alleging that the package was addressed to Mail

22    Boxes Etc.?

23    A.    No, it was not addressed to Mail Boxes

24    Etc.  But I want to object to that because

25    that's part of my ---

26

1  Q.   Right.

2  A.   --- criminal matter ---.

3  Q.   Right.  Keep in mind a lot of those facts

4  are pertinent here and will be relevant.  You

5  can object, but ---.

6  A.   Yeah, I'm just objecting because I'm

7  stating my case on the Fifth Amendment ---

8  Q.   Right.

9  A.   --- because I still have that right.

10  Q.   Right.  This isn't a criminal proceeding.

11  A.   Yeah, I know it's a civil one.

12  Q.   Well, yeah.  And you're your own

13  representative, I understand that, but a lot of

14  those facts that you think you don't have,

15  maybe because it's related to your criminal

16  case, are going to be important here because

17  everything you allege has to do with your

18  arrest, you know.  Every Fourth Amendment,

19  Fifth Amendment, and so forth, all has to do

20  with your arrest, so those facts will

21  necessarily be a part of this, so ---.

22  A.   I understand that.

23  Q.   Okay.  So who was the box addressed to?

24  You say the box was addressed to the box.

25  A.   Yeah.

27

1    Q.    That makes no sense.

2    A.    That's why I'm saying I do not recall and

3    objecting.

4    Q.    You don't recall who the box was addressed

5    to?

6    A.    No, because I was --- when I went into the

7    Mail Boxes Etc. there was a slip there waiting

8    for me, a slip in my mailbox, that a package

9    was there.

10    Q.    All right.

11    A.    So when I gave it to the clerk, she handed

12    me the package, or he handed me the package.

13    Q.    Uh-huh (yes).

14    A.    I looked at --- you know, I inspected it

15    but I didn't take notice of who, what was on

16    the package of the label.

17    Q.    Right.

18    A.    You know, I realized later that it was

19    handwritten by Kessler, Agent Kessler.

20    Q.    Well, so you're saying that the box wasn't

21    yours, you had no idea who the box was for, you

22    just walked into Mail Boxes Etc., they handed

23    you a slip for a box, you took the box and that

24    was it?

25    A.    I mean, it was addressed into my mailbox.

28

1    It was addressed to my mailbox, so I said if

2    it's addressed to my mailbox, more than likely

3    it's something from a business.

4    Q.    Did you have any account in any other Mail

5    Boxes Etc. besides that one?

6    A.    Objection.  Objection.

7    Q.    Okay.  That's fine.  You can object.  Did

8    you have any other mailboxes?

9    A.    Yes, I did.

10    Q.    And where were those located?

11    A.    I don't remember where they were.

12    Q.    Even if you don't remember the street,

13    that's fine; were they in York City, were they

14    in another town close to York, were they ---?

15    A.    In York City.

16    Q.    Was it ---?

17    A.    In York City.

18    Q.    Okay.  How many Mail Boxes Etc. accounts

19    did you have?

20    A.    I don't remember.  I don't recall.

21    Q.    Do you have a ballpark figure at all?

22    A.    I'm going ---.

23    Q.    Was it?  Was it?  Okay.  That's fine.  You

24    can object.  Was it more than ten?

25    A.    No, I don't recall.

29

Q.   You don't recall at all how many at Mail
Boxes Etc. you ---. And how many counts were
you charged with ---

A.   No.

Q.   --- you know, your drug possession.   The
charge that landed you in here?

A.   I don't know, about three counts or
something like that.

Q.   Three counts?  Were they all stemming from
the arrest on January 10?

A.   It was a stem from the illegal search and
seizure of my mailbox.

Q.   That does --- right.  We'll get to that.
That's not my question, though.  Listen to my
question.

A.   But to turn it --- you're not waiting for
me to respond.  You asked me a question way
back what happened exactly when I walked out of
the place --- when I went to the mailbox they
just went way off track, then I ---.

Q.   Now listen.  I'm the attorney. I can ask
you what I want right now.

A.   Yeah.

Q.   And just because I ask you one question
doesn't mean I can never ask you another

31

1   Q.   What I'm saying is, you said that you had

2   more than one account at different Mail Boxes

3   Etc.s.  When you were charged for drugs, were

4   they for any drugs other than the one Mail

5   Boxes Etc. where you were arrested on January

6   10?

7   A.   I really don't know because once I was

8   arrested at --- I think it was at the Kingston

9   Center, something like that, Kingston Street

10  Mall Center, something like that.

11  Q.   The first mailbox?

12  A.   Yeah.  I don't know what took place after

13  that 'cause I was locked away, wasn't able to

14  communicate with no family, phone calls,

15  nothing, so I didn't know what happened after

16  that.

17  Q.   So you're not aware of any drugs being

18  found at your other Mail Boxes Etc.?

19  A.   No.

20  Q.   So you don't know anything about that?

21  A.   No, I didn't know.  I was locked away.  I

22  was not provided no phone call, wasn't given an

23  attorney, I asked for an attorney, I was not

24  given an attorney.

25  Q.   Yeah.

32

1  A.   I was interrogated by James Morgan, so I

2  didn't know what happened after that.   I

3  mean ---.

4  Q.   The package sent to you --- well, that was

5  handed to you, let's say, on January 10, that

6  you don't know anything about, other than you

7  got it, did you know the sender of that

8  package?

9  A.   No, from my understanding --- I want to

10  object.

11  Q.   Sure.

12  A.   From my understanding, the package was

13  placed there by Detective Morgan and --- no,

14  Agent Morgan, Agent Kessler, Agent

15  Westmoreland, there was another one, as from my

16  understanding after, you know, the

17  investigation, before I --- there was one that

18  placed it --- what you call it makeshift

19  package at the Mailbox.

20  Q.   That's not what I meant by the sender.  By

21  the sender was the return address on that box?

22   You said you didn't see who the return address

23  was for on that box.

24  A.   No, I didn't.  I didn't see.  I didn't

25  notice it.

33

1   Q.   Okay.

2   A.   If I had noticed it, I probably would've

3   never paid for it. I don't know nobody from San

4   Diego, and that's who the sender --- that's

5   where, from my understanding, the

6   investigation, the sender was from San Diego.

7   I don't know nobody from San Diego.

8   Q.   What was the name of the business you said

9   you had?  You said you had a business.

10  A.   I don't know the name of it.  I don't

11  recall that.

12  Q.   You don't remember the name of your

13  business?

14  A.   No.  I don't remember.

15  Q.   Do you remember if, in the course of your

16  business, if you ever received packages from

17  other places outside of Pennsylvania?

18  A.   I don't understand your question.

19  Q.   Well, you said you had the Mail Boxes Etc.

20  accounts; correct?

21  A.   Yeah.

22  Q.   And you also said you had a business which

23  you can't remember the name of.

24  A.   I mean, the business for that particular

25  mailbox, or business for other mailboxes.  I

34

1   don't understand what you're saying.

2   Q.   Okay.  Was the Mail Boxes Etc. account in

3   your name?

4   A.   Yes, it was in my name.

5   Q.   Okay.  Were the other Mail Boxes Etc. ---?

6   A.   I'm going to object to that.

7   Q.   Okay.  Were the other Mail Boxes Etc. in

8   your name, the name of Tyrone James?

9   A.   I don't understand what you're saying.

10  Q.   Okay.  You said you had several Mail Boxes

11  Etc. accounts, you don't remember exactly how

12  many, but we got ---.

13  A.   Those were business accounts.

14  Q.   For what business?

15  A.   I don't understand what you're saying.

16  Q.   What was the name of the business.  What

17  do you mean business accounts?  They were in

18  the name of Tyrone James you just said.

19  A.   I mean, the name of Tyrone James, or if I

20  was or was I the contractor of the mailbox?  I

21  don't understand what you're saying.  That's

22  what I'm saying, I don't understand what you're

23  saying.  And I'm going to object ---

24  Q.   Okay.

25  A.   --- based on my Fifth Amendment.  I do

35

1   not ---.

2   Q.   Okay.  This isn't a criminal proceeding,

3   but okay.

4   A.   But it is still linked to a prior ---.

5   Q.   Right.  You're the one bringing this suit.

6   You can't bring a suit and then not say

7   anything.

8   A.   Listen to me, attorney, I'm bringing this

9   suit on excessive force for the illegal

10  seizures and that's a violation of my

11  constitutional rights.

12  Q.   Right.  And that's what these issues ---.

13  A.   And that's what I'm raising my objection

14  to, on the Fifth Amendment and that's my right.

15  I'm not trying to be stubborn.  I'm not trying

16  to be silly or nothing.  And if I raise my

17  objections for the Fifth Amendment, that's my

18  right.

19  OFF RECORD DISCUSSION

20  A.   And I don't mean to be discussing more

21  business.  I had a business.

22  BY ATTORNEY GIURINTANO:

23  Q.   But I just asked you if you had a business

24  there.  And you're playing hard to get with me,

25  but I'll get you.  Okay.  What are the names of

36

1   your businesses?

2   A.   Well, first one --- and I'm going to

3   object.

4   Q.   Okay.

5   A.   But the first one is First Impression

6   Enterprises.   TJ's Family Salon.   That's it.

7   Q.   Okay.   So had those two businesses?

8   A.   Right.

9   Q.   First Impression Enterprises and T ---.

10  A.   And that's a corporation.

11  Q.   First Impression, Inc., and TJ's Family

12  Salon, is that a corporation also?

13  A.   It's on there I think.   And the other

14  businesses I have.

15  Q.   Any other businesses?

16  A.   Yeah, I don't remember.

17  Q.   You don't remember if you have any other

18  businesses?

19  A.   No.   I lost.   I lost singularly with

20  whatever businesses I had as soon as I came in

21  jail because I've been stressing over this.

22  Q.   Oh, do you still own First Impression and

23  TJ's Family Salon?

24  A.   No.   I have lost all of my businesses.

25  Q.   Okay.   How long did you have these

37

1  businesses, TJ's Family Salon ---.

2  A.   First Impression Enterprises doing

3  business as TJ's Family Salon, TJ's Beauty

4  Supplies.

5  Q.   How long?

6  A.   About '97.

7  Q.   Is that when you first became the owner of

8  these businesses, or first created them?

9  A.    It was created way before that but it was

10  doing business.

11  Q.   That's when you incorporated it?

12  A.   Yeah.

13  Q.   Okay.

14  A.   Incorporated, I'm not sure.  I don't

15  remember.

16  Q.   Okay.  And was that before incorporated in

17  Pennsylvania?

18  A.   It was incorporated in California.

19  Q.   In California, okay.

20  A.   It was supposed to be incorporated in

21  Pennsylvania under filing of corporation ---

22  Q.   Right.

23  A.   --- but for some reason I was arrested by

24  the police officers.

25  Q.   So is First Impression Enterprises and

38

1  TJ's Family Salon two different businesses?

2  A.   No, it's a corporation doing business as

3  TJ's Salon.

4  Q.   Okay.  Got it.  So it's actually one

5  entity then, just a different fictitious name.

6  Got it.

7  A.   Yeah.

8  Q.   Okay.

9  A.   Is something wrong with that?

10 Q.   Nope.  Nothing wrong with that at all.  I

11 was just confused, that was all.

12 A.   All right.

13 Q.   The Mail Boxes Etc. accounts that you

14 have, were the contracts signed on those

15 accounts the title of James or First Impression

16 or TJ's Family Salon?

17 A.   I'm going to object.

18 Q.   Okay.

19 A.   On the fact that I'm still litigating the

20 issue in court, but it was signed by the title

21 of James.  I was not --- I contracted Mail

22 Boxes Etc.

23 Q.   On the title of James.

24 A.   Because, in order to open a Mail Boxes

25 Etc. account, you have to have a car --- you

39

1  have to have a driver's license and two form of

2  IDs.

3  Q.   Okay.

4  A.   And that's basically, you know, your

5  business, personal, whatever, it goes to the

6  business accounts.

7  Q.   Did you ever receive mail or packages at

8  your Mail Boxes Etc. accounts addressed to

9  First Impression Enterprises or TJ's Family

10  Salon?

11  A.   Yeah, I received mail.  I received mail.

12  I know it's been awhile.

13  Q.   I don't mean now, before you got arrested,

14  did you ---?

15  A.   I received several mail.  I don't know

16  what, you know, I can't just come off the top

17  of my head and say such and such and such, but

18  more than likely it was a business and I

19  received the mail in my name, you know.

20  Q.   Okay.  So at your Mail Boxes Etc. account,

21  you received --- and I'm not asking you how

22  much or what.

23  A.   How many days it was in business, I don't

24  remember.  I don't have that paperwork on me

25  right now.

40

1    Q.   Right.  So you receive mail to both Tyrone

2    James, First Impression Enterprises, and TJ's

3    Family Salon, and TJ's Beauty Supply.

4    A.   My business has still got the mail.

5    Q.   Okay.

6    A.   And I just don't remember.

7    Q.   Okay.

8    A.   I don't want to get into that.

9    Q.   Right.  Why don't you want to get into

10   that?

11   A.   I mean, I don't remember the business.

12   Q.   Okay.

13   A.   I mean, I can't speak.  I mean, I'm not

14   even part of the business anymore, you

15   understand.

16   Q.   Are these businesses still in existence

17   or ---?

18   A.   I don't know.

19   Q.   You don't know.  Did you have any business

20   partners for these businesses?

21   A.   There was people that was working for the

22   business, I just don't know about it no more.

23   Q.   Did you own these businesses before you

24   got arrested?

25   A.   Yeah.

41

1    Q.   Okay.  And you don't remember if you had

2    any partners or ---?

3    A.   Yeah, there was people who did, you know,

4    and every corporation you have people there who

5    will ---.

6    Q.   You have employees, sure.

7    A.   Yes.

8    Q.   So you have employees.

9    A.   I mean, there was business partners.

10   Q.   You had business partners, also?

11   A.   Yes.

12   Q.   And you're not aware if these companies

13   are still in existence?

14   A.   No, I have no idea what's going on.

15   Q.   Do you remember the names of your business

16   partners?

17   A.   I have to object to that.

18   Q.   Okay.  That's fine, you can object.

19   A.   I don't remember.

20   Q.   You don't remember?

21   A.   No, I don't know.

22   Q.   Okay.  Look, Mr. James, I understand that

23   you don't want to talk about this because of

24   your criminal case, I mean, you're bringing up

25   --- all your allegations have to do with your

42

1  arrest, why you were arrested, could the police

2  have arrested you, and you don't want to talk

3  about any of this criminal stuff.  You are

4  going to have to in order for us to properly

5  defend this.  You just can't --- you can object

6  to this proceeding, that's fine, but you can't

7  refuse to not tell us.

8  A.    Yeah, I know.  But you asked me about

9  somebody that --- it was leading my friends of

10 mine used to --- I don't remember their names,

11 Sandra something.  I'm not sure.  I don't

12 remember her last name.

13 Q.    A Sandra Oter?

14 A.    And for stipulation purposes, I want to

15 put on the record that I'm stipulating my Fifth

16 Amendment right, you know.

17 Q.    We're not stipulating.  You're asserting

18 stipulation, which means I agree.

19 A.    Yeah, I just want to make it on the record

20 that ---.

21 Q.    You're claiming your Fifth Amendment

22 right.

23 A.    In the case of my criminal matters that's

24 pending in the State Court.

25 Q.    Where is your criminal matter in the State

43

1    Court?  I mean, clearly you were convicted in

2    the Court of Common Pleas; are you appealing

3    that motion, is that where it's at now?  Do you

4    know where it's at, the Superior Courts, the

5    Supreme Court?

6    A.    Well, it's in the Supreme Court because

7    there's been some delays.

8    Q.    Which is a ---.

9    A.    Obstruction of justice because I'm

10   pursuing this civil matter against state

11   Defendants.

12   Q.    Do you have a lawyer for your

13   criminal ---?

14   A.    Yes.  But it's been delayed, delayed in

15   many instances.  I have paperwork, which I

16   don't have with me, dealing with the

17   obstruction of justice, you know, for me to get

18   a direct appeal or go further with my case and

19   its delay, delay, delay, delay and ---.

20   Q.    What's the name of your lawyer, just ---?

21   A.    Frank Arcuri.

22   Q.    Frank Curry?

23   A.    Frank Arcuri.

24   Q.    Oh, Arcuri.

25   A.    R-I, something like that.    A-R-C-U-R-I.

44

1   Q.   Is he a public defender?

2   A.   No, I think he's a state attorney.   I'm

3   not sure.  He's not a public defender.

4   Q.   He's not a public defender?

5   A.   He does PSRA and those other issues.   I'm

6   not sure.

7   Q.   Did you have a public defender at your

8   criminal trial, or did you have Arcuri the

9   whole time out?

10  A.   No, Arcuri's only my PCR, or PCA.

11  Q.   Okay.  Did you have a public defender at

12  your criminal trial?

13  A.   At first.

14  Q.   At first, and then did you fire him

15  or ---?

16  A.   I don't know.  My family got me an

17  attorney.

18  Q.   Oh, okay.  So you got a private attorney.

19  Okay.

20  A.   I had it on --- have you ever heard of

21  lawyer's network?  You have a lawyer's plan

22  where you pay your annual fee, and you know,

23  they appoint you, you know, assign you an

24  attorney, if you ever anywhere in the United

25  States, you know, you get into drunk driving