TYRONE P. JAMES V. YORK COUNTY POLICE DEPARTMENT, ET. AL.,

CASE ACTION NO. 01:01-CV-1015

EXHIBIT "5"

76

1  there.

2  A.  Yeah.

3  Q.  I wasn't sure.

4  A.  Okay.

5  Q.  Okay.

6  A.  All right.

7  Q.  Now, we've got Morgan, Westmoreland,

8  Peddicord, you say, he was in on the

9  handcuffing, he handcuffed you.

10  A.  And one thing, it was Mr. Kessler's

11  handwriting on the package.

12  Q.  Okay.  Right.  Now, that's another claim.

13   I'm just going on the excessive force claim

14  right now.

15  A.  Yeah.

16  Q.  On the excessive force claim, Peddicord,

17  you have him handcuffing you.  Now, was he

18  putting his boots on you, or how did Peddicord,

19  you know, how was he using excessive force?

20  A.  He has his boots on me, the next thing I

21  know, he has my wallet in his hands going

22  through it.

23  Q.  Okay.

24  A.  You know.

25  Q.  And then again, that goes to your search

77

1  claim, not necessarily excessive force claim.

2  A.    Yeah.    But he was there, and for the

3  record, he participated.

4  Q.    In the excessive force?

5  A.    Yeah.

6  Q.    Tell me specifically how, other than his

7  boots were on you?

8  A.    He was part of the ones attacking me, too.

9  Q.    Okay.  So tackling we have Morgan,

10  Westmoreland, Craul, and Peddicord was in on

11  the tackling also?

12  A.    Yes.  And what's his name was driving the

13  van.  What's his name?

14  Q.    Morgan?

15  A.    Gowlezewski or something?

16  Q.    Oh, Glowczewski.

17  A.    Glowczewski.

18  Q.    Okay.  Now, Glowczewski was involved

19  because he was driving the van?  Okay.

20  A.    I have severe back injuries from that,

21  too.

22  Q.    Okay.  So to go over this one more time,

23  you have Glowczewski because he was driving the

24  van, for the cuffing --- you have for the

25  tackling cuff, if you will, you have Morgan,

78

1  Westmoreland, Craul, and Peddicord?

2  A.   Yeah.  I wasn't putting up a fight, he

3  was.

4  Q.   And for the excessive force claim, Fells

5  and Kessler, you've named them because they

6  were there, not Fells.

7  A.   I mean, Kessler was part of the arrest

8  team, but I can't remember if he was --- you

9  know, if he had his foot on me, you know.

10  Look, the only thing I remember is that he gave

11  me my glasses.

12  Q.   Right.  He handed you your glasses.  Okay.

13  A.   I guess that's --- he take a part in

14  getting me secure and picked my glasses up.

15  Q.   At any time, did these officers, after you

16  were handcuffed, you said they had their boots.

17  Did they hit you, did they smash you to the

18  ground, did they ---?

19  A.   No.

20  Q.   Okay.

21  A.   There was other federal agents there that

22  ---?

23  Q.   Well, you didn't name them as Defendants.

24  A.   I don't know their names.

25  Q.   And I wouldn't represent them anyhow.

79

1    A.   I don't know their name.  I don't know

2    nothing.

3    Q.   Okay.  Did these unknown federal agents,

4    did they take part, did they tackle you as

5    well, or ---?

6    A.   I don't --- I remember one time somebody

7    telling me that after Mr. Morgan presented me

8    in the van, he told me that I don't have to say

9    anything to Mr. Morgan, 'cause Mr. Morgan

10   presented himself.

11   Q.   What was in the package?

12   A.   I blurted out, I said from my

13   understanding, you know, I don't know what was

14   in the package.  So one of the federal agents

15   that was there, told me that I don't have to

16   say nothing to Mr. Morgan.

17   Q.   Okay.  Now, I do have a question, and I'm

18   sorry I'm jumping around just a bit.  At your

19   criminal trial for this, did you raise, or did

20   your attorney raise a defense at all?  Any of

21   the things you've raised here, the Fourth

22   Amendment, the Fifth Amendment, we know Miranda

23   Rights, illegal search and seizure.  Did your

24   attorney bring any of that up at the criminal

25   trial at all, at your criminal trial?

80

1    A.    Objection.

2    Q.    Okay.  That's fine.

3    A.    I don't remember.

4    Q.    You don't remember if they brought it up?

5    You sat through the whole trial, and you don't

6    remember at all?

7    A.    Maybe --- I'm not familiar.  This is the

8    first time I'm in trial.  I've never been to a

9    trial before, you know.

10   Q.    But you were convicted three other times.

11   A.    Yes, but, you know, every time I was, you

12   know, I was, you know.

13   Q.    Right.  You don't remember your attorney

14   ever bringing it up at all?

15   A.    I think he did a suppression motion.

16   Q.    Right.  That's how it happens at a

17   criminal trial.

18   A.    He did a suppression motion.

19   Q.    Okay.  Was he successful?

20   A.    No, he wasn't.

21   Q.    Okay.  And again, that would be for ---

22   that's fine.

23   A.    Yeah.

24   Q.    And that would be for the Fourth Amendment

25   and the Fifth Amendment.

81

1  A.   Right.

2  Q.   Pretty much your claims --- not the

3  excessive force, that's different.  I don't

4  know that that wouldn't be raised at trial, but

5  your other claims probably would've been raised

6  at trial.

7  A.   As for my objection, I just want to --- I

8  don't remember every --- I know he did a

9  suppression motion and he was not successful.

10 Q.   Okay.  Do you have any witnesses as to the

11 excessive force claim that you're aware of?

12 Any people who may have seen ---?

13 A.   Well, Mrs. McCoy, she witnessed the

14 suppression, not the excessive force.  She said

15 she saw ---.

16 Q.   Who's she?

17 A.   The Mail Boxes Etc. clerk.

18 Q.   She works at Mail Boxes Etc.?

19 A.   Yes, she was the one that they inside put

20 the mail --- put the mailbox, makeshift box in

21 my mailbox that day.  And ---.

22 Q.   And she saw the whole arrest happen?

23 A.   Yes, she saw it.  She saw it. And for my -

24 -- for the record, there was not no search

25 warrant.

82

1  Q.   How do you know that Mrs. McCoy saw the

2  excessive force arrest?

3  A.   She testified at my trial.

4  Q.   Oh, she testified at your trial?

5  A.   Yeah.   There was no search warrant.

6  Q.   Right.   We'll get to that.   But let's talk

7  about the excessive force now.   So Mrs. McCoy,

8  you remember her testifying in your trial?

9  A.   Yes.

10  Q.   And was she your witness or was she a

11  Prosecution witness?

12  A.   Prosecution witness.

13  Q.   Did she talk about the excessive force

14  assault in the trial? Do you remember?

15  A.   No.   The arrest she just said she saw

16  plain clothed men running towards me.

17  Q.   Okay.   So after you're down on the ground,

18  you're handcuffed, and people had their boots

19  on you, you know, what do you do --- what

20  happens after that?   Are you put in the van, or

21  are you --- what happens after that?

22  A.   I was lifted off the floor.

23  Q.   Okay.

24  A.   And I'm going to the van.   I was going

25  into the van there.   Mr. Morgan, Defendant

83

1  Morgan ---

2  Q.   Right.

3  A.   --- said, what was in the package.   I

4  said, I don't know, you know.   He never read me

5  no Miranda Rights or nothing, just what was in

6  the package.

7  Q.   Were you ever read your Miranda Rights at

8  all?

9  A.   Objection, but I don't remember what was

10  being read.   My Miranda Rights in the van

11  wasn't ---.

12  Q.   Were you given your Miranda Rights at all,

13  even after the van, at any time, anyone give

14  you Miranda rights when you were in jail, I

15  mean, up until now.   I mean, when did you ever

16  hear anyone read your Miranda Rights?

17  A.   I'm going to object to that.

18  Q.   Okay.

19  A.   And I do not recall.

20  Q.   You don't recall if you were read your

21  Miranda Rights or not?

22  A.   No.

23  Q.   Okay.   What happens after you're in the

24  van?

25  A.   I was escorted to York County Police

84

1    Department.

2    Q.   Okay.   You went to York County PD??

3    A.   Yes.

4    Q.   And what happened when you got to York

5    County PD?

6    A.   I was placed on a bench beside a girl, I

7    don't know who she was.   She was making a phone

8    call and came in at the time Mr. Craul and

9    Peddicord were over there going through my

10   rights.

11   Q.   Were you in a jail cell?

12   A.   No, I wasn't in a jail.   I was placed

13   beside another suspect.

14   Q.   Okay.   So you were just on the bench then?

15   A.   Yes.   She was using the phone.

16   Q.   Okay.

17   A.   I said, can I use the phone to make a

18   phone call to call my attorney.   And they

19   ignored me.

20   Q.   Okay.

21   A.   And at that time, Mr. Morgan came in.

22   Q.   Okay.   So that happened as soon as you got

23   to the police station after you were brought

24   out of the van?

25   A.   Yes.

85

1   Q.   Okay.  And what happened after that?  Just

2   walk me through it.

3   A.   I think Mr. Morgan --- I'm going to

4   object.

5   Q.   Okay.

6   A.   This is part of my --- I testified at my

7   trial.

8   Q.   Okay.

9   A.   I think he went to some other room where

10  other guys were walking in and out.  That was

11  one of the same federal agents, and, yeah, I

12  think he asked one of them if they wanted the

13  case and the guy said, I don't want this case.

14  That's when he started asking me questions.

15  Q.   Who did?

16  A.   Morgan.

17  Q.   Morgan started asking you questions?

18  A.   Yeah.

19  Q.   Did you answer his questions?

20  A.   No, I did not.

21  Q.   You didn't answer any of Morgan's

22  questions?

23  A.   No.

24  Q.   Okay.  And how long were you at the police

25  station, a ballpark time, if you remember?

86

1   A.   I was arrested about 10:30 and I was there

2   probably until about 6:30 or something.

3   Q.   Okay.

4   A.   I'm not sure.

5   Q.   That's 10:30 a.m.; right?

6   A.   10:30 a.m. 'til about 6:00 p.m. or 6:30

7   p.m.  Something like that.  6:30 p.m., quarter

8   to 7:00.  It was dark then when I walked out.

9   Q.   And what happened then at quarter to 7:00?

10  A.   Do you know, at that time I asked --- you

11  know, Mr. Morgan came up to me as they was

12  searching my mail.

13  Q.   Right.

14  A.   And my wallet.

15  Q.   Okay.

16  A.   And he came to the mailbox, and found my

17  lawyer's network card and asked me what was

18  this, you know.  I said it's a lawyer's network

19  card, I need it to speak to my attorney.

20  Q.   Right.

21  A.   Even when he was in --- even before that,

22  we keep going back and forth, I asked him to

23  speak to an attorney, I said I have to have a

24  phone call to call my attorney.  And he said,

25  no, I can't give you a phone call to your

87

1  attorney.

2  Q.   Uh-huh (yes).

3  A.   And he tried to elicit information from

4  me.  This is an objection.  On my complaint,

5  you know, he tried to elicit information from

6  me.

7  Q.   So that is ---?

8  A.   So listen, you know, ask me questions and

9  he told me it's going to be one for him.  It's

10 going to be a big one for him.  It's going to

11 come out in the papers.  He's going to frame it

12 on his wall.  He said it's going to be a long

13 time before I ever have an opportunity to have

14 sex with my wife because he's going to be

15 sending me up the river.

16 Q.   Did you answer any of his questions at

17 all?  Did you speak with him during that time?

18 A.   I don't recall speaking to him.  I raised

19 my --- I evoked my Miranda Rights.  I did not

20 intend to speak to him.  He started, you know,

21 based on probably McCarthy and stuff, and he

22 realized --- you know.

23 Q.   Right.

24 A.   And he said, ---.

25 Q.   At this point, you still hadn't been read

88

1    your Miranda Rights at all?

2    A.    I don't remember ever getting them.

3    Q.    Okay.

4    A.    I don't remember.

5    Q.    Okay.

6    A.    Now, he told me that he's going to go over

7    there, arrest my wife, and he's going to have

8    Children's Service take my kids.

9    Q.    Okay.  Did anybody else witness this at

10    all, or ---?

11    A.    That was it, guys was coming in and out.

12    Q.    Were there other officers in the police

13    station?

14    A.    I was placed in a cell, and Mr.

15    Westmoreland came in and he locked himself in

16    the cell with me, he wanted to talk to me.

17    Said, are you okay.  By the time, I wasn't, you

18    know, just --- I just, you know, yeah.  I just

19    say yeah.  I was lying down on the ---.

20    Q.    You're in a jail cell?

21    A.    Yeah, I was in a jail cell, lying down,

22    you know, from all this trauma.

23    Q.    Right.

24    A.    And then he said if I was okay, and, you

25    know, I just kind of shake it off.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

89

1  Q.  Yeah.

2  A.  And he said, okay.  So he says, officers

3  are okay.  He will see that it get released.

4  He would release me.

5  Q.  Westmoreland said he would release you?

6  A.  Yeah.

7  Q.  Why did he say he would do that?

8  A.  I don't know why he said that. He just

9  said his officer was okay.

10  Q.  Wait.  So you're alleging Westmoreland,

11  who was one of the people who tackled you,

12  comes in the cell after you're arrested and

13  says ---.

14  A.  He locked himself in the cell with me.

15  Q.  He locks himself in the cell with you and

16  says, I'm going to release you?

17  A.  I mean, he said, if everything is okay, he

18  would release me.  They didn't have the search

19  warrant to arrest me.

20  Q.  If everything was okay?

21  A.  Yeah, he said if I'm okay, then the

22  officers are okay, he would release me.  And

23  that's when --- God bless his soul.

24  Q.  Yeah.  Right.

25  A.  He said --- you know, at that point he

90

1   gave me back my belongings and marched me out

2   of the cell.

3   Q.   What were your belongings?

4   A.   My wallet and some personal items, bank

5   account cards, bank cards, and, you know,

6   personal items, car keys, the stuff I had on

7   me.

8   Q.   Did they let you out of your cell then?

9   A.   Yeah, they let me out, they gave me back

10   my belongings.

11   Q.   Okay.  And then what happened?

12   A.   Then Mr. Morgan was --- you know, he was

13   walking out and Mr. Morgan ---.

14   Q.   I'm sorry.  Speak up.  What did Mr. Morgan

15   do?

16   A.   Mr. Morgan called me back in and that's

17   when he locked me back in the cell.

18   Q.   Wait.  So you were walking out of the

19   police station ---

20   A.   Yeah.

21   Q.   --- and Mr. Morgan yells to you, hey, you

22   come back in.

23   A.   Yeah, I want to say at least, he called

24   back and said, I have something that I have to

25   say to you.

91

Q.   He said he had something else to say to
you, so you walk back into the police station?

A.   Yeah, I went to see what he had to say.

Q.   And then what did he say?  Go back to the
cell?

A.   Yeah.  He said, you're not going nowhere.
 He locked me in the cell.

Q.   Okay.  And what happened after that?

A.   I was in the cell until Mr.   --- the
Defendant --- Defendant Craul came and
processed me.

Q.   Okay.

A.   I said, what is my charge.  Because up
until this day and time, I didn't know what I
was charged with.

Q.   Yeah.

A.   You know, nobody told me what I was
charged with.

Q.   Right.

A.   You know.  And I've been asking for an
attorney and nobody has given me access to one.

Q.   At what time was it approximately that you
were allowed to leave the station and Morgan
called you back?  At what time was that
approximately?

92

1    A.   I don't remember.

2    Q.   Was it dark out?

3    A.   No, it wasn't dark out.  It was probably

4    about two or three hours after.  I'm not sure.

5    Hour and a half, I'm not sure exactly.  But at

6    the time I was in the cell, I could hear Mr.

7    Morgan calling around the various Mail Boxes

8    saying this is Tyrone James, did I get that

9    package there, blah, blah, blah, you know,

10   using my name.

11   Q.   Wait.  You said you were arrested around

12   10:30 a.m. ---

13   A.   That day.

14   Q.   --- on the 10th.  But you said you were in

15   the station until about 6:30.

16   A.   6:30.

17   Q.   And it was dark out.

18   A.   Well, when I walked out of that police

19   station, it was dark out.

20   Q.   Well, I asked you if it was just dark out,

21   and isn't that when Morgan called you back in?

22   A.   No, that was before.  That was way before.

23   Q.   Okay.  Okay.

24   A.   That was way before.  He had  --- he ---

25   when I was walking out with Mr. Westmoreland,

93

1    Morgan said, I have something else I have to

2    say to you now.

3    Q.  Okay.

4    A.  Mr. Westmoreland --- Defendant

5    Westmoreland walked --- I think he left, and

6    that's when Morgan ---.

7    Q.  And so this was before 6:30 then that this

8    happened?

9    A.  Yes.

10    Q.  Okay.

11    A.  The time I was released was in the

12    evening.

13    Q.  And they rearrested you then; is that what

14    happened or did they just put you back in the

15    jail cell?

16    A.  They just put me back in the jail cell.

17    Q.  Well, how did you get to leave again at

18    6:30?

19    A.  When Mr. Morgan escorted me.

20    Q.  Then they said you could leave yet again?

21    A.  No.  No, they didn't say I was leaving

22    then.  They escorted me to the District

23    Justice's office.

24    Q.  Okay.  And that was around 6:30?

25    A.  6:30.  I mean, between 6:30 and quarter to

94

1   7:00 approximately.  I'm not sure.

2   Q.   Yeah.  Approximately.

3   A.   You know, I didn't have my watch on and,

4   hey, I'm just approximating.

5   Q.   Okay.

6   A.   But at the time I was sitting in the cell

7   waiting, I could hear Mr. Morgan calling around

8   asking men about this, you know, saying this is

9   Tyrone James, yeah, I got the package here,

10  blah, blah, blah.

11  Q.   Okay.  Now ---.

12  A.   And I'm going to object 'cause this

13  is ---.

14  Q.   Sure.  Yeah.  Okay.

15  A.   --- coming into criminal matters.

16  Q.   Now.  What was the name of the District

17  Justice you went before?

18  A.   I think it was Leppo.  I'm not sure.

19  Q.   Leppo, okay, L-E-P-P-O.  What happened

20  when you went before the District Justice?  You

21  know, it was you and what officers went with

22  you to THE District Justice?

23  A.   I think it was Craul.

24  Q.   Okay.  Okay.  Were any of the other

25  officers along with Craul?

95

1    A.   I don't know.   I didn't see them.   I know

2    Mr. Morgan escorted me.

3    Q.   So was Mr. Morgan present with you in

4    front of the District Justice?

5    A.   Yes, sir.

6    Q.   And who else?   When you were standing in

7    front of the District Justice, what other

8    officers were with you or were in the room?

9    A.   I think it was Mr. Morgan, Mr. Craul, I

10   don't know who else.   I'm not sure.

11   Q.   Okay.   So it wasn't Kessler, Fells,

12   Glowczewski, Westmoreland ---?

13   A.   No.

14   Q.   Okay.   What happened at the District

15   Justice's office?   He set bail for you then; is

16   that what happened?

17   A.   (Indicates yes).

18   Q.   What kind of bail did he set; do you

19   remember?

20   A.   It was $500,000 but the Defendant --- the

21   Defendants told him that I had drugs.   You

22   know, which they know there was no drugs in the

23   State of Pennsylvania on the 10th of January.

24   Q.   Right.

25   A.   And that I told him that I was a flight

96

1    risk and I was --- even though I told him that

2    I --- my wife owned property, and she had a

3    business and I was here because she just had a

4    new baby, and she was going through trauma.

5    Q.   Wait.  Your wife has a business?

6    A.   Yes.

7    Q.   What's the name of your wife's business?

8    A.   I'm going to object.  But I don't remember

9    the name.

10   Q.   Okay.

11   A.   Laverne Hair Salon.

12   Q.   Okay.  Got it.  Does your wife use Mail

13   Boxes Etc. too for her business?

14   A.   No.

15   Q.   Okay.  So you're at the District Justice

16   office, and he set bail in the amount of half a

17   million dollars.

18   A.   Yeah.

19   Q.   Okay.  Did you appeal that at all?

20   A.   Did I appeal?

21   Q.   Yes.

22   A.   I never got a chance.  I was  --- he set

23   bail and I was on to York County Prison.

24   Q.   Okay.  Did you post bail at all?

25   A.   I never got a chance.

97

1    Q.    You never got a chance to post bail?

2    A.    Never got a chance to call the bonds man

3    or attorney or my family.

4    Q.    Okay.

5    A.    Mr. Morgan instructed not to give me no

6    phone calls pending their investigation.

7    Q.    Now, was that the only time you were

8    before a District Justice at all in regard to

9    this?

10   A.    Yes.

11   Q.    Because I think in your complaint, you

12   said something about more than half a million

13   dollars for bail.  You're alleging ----.

14   A.    Well, at that time, I was later removed

15   from the York County Prison.

16   Q.    Okay.

17   A.    And we charged Mr. Morgan and Peddicord,

18   I'm not sure of them, and I'm objecting on the

19   fact that this might be used in criminal and I

20   was recharged with two other charges.  I was

21   placed in segregation in York County Prison.  I

22   was moved from segregation to the District

23   Justice's office.  I'm not sure where it was, I

24   think on King Street, and charged with two

25   additional offences and bail was set at 2.5

98

1    million bond.

2    Q.    Because you got charged with two

3    additional offences?

4    A.    Yes.

5    Q.    So you were charged once on the 10th and

6    twice on the 12th?

7    A.    Yes.

8    Q.    That's January 12th, 2001?

9    A.    Yes.

10    Q.    So the total for the three charges was

11    $2.5 million?

12    A.    $2.5 million.

13    Q.    Were you given a chance to post that bail

14    at all?

15    A.    No.    I did not have that much money.

16    Q.    Now, you didn't post $2.5 million bail and

17    did you appeal that bail?  Did you have what's

18    called a bail hearing?  And that means, when

19    somebody gets bail they feel is excessive, they

20    have a right to appeal that decision.  Now, you

21    said you had an attorney; right?

22    A.    Yes.

23    Q.    Did you appeal that bail decision at all?

24     $2.5 million in bail?

25    A.    I'm going to object.

99

1  Q.  Okay.

2  A.  I think my attorney did, again, I'm not

3  sure.

4  Q.  You're not sure if there was appeal?  And

5  I'm just asking you, again, one of the other

6  claims you made was excessive bail.

7  A.  Yeah, I know that.

8  Q.  And so it's kind of important to remember

9  if you appealed them or not.

10  A.  Yeah, I think he did.

11  Q.  You think you did.

12  A.  I'm not sure.

13  Q.  You're not sure?

14  A.  I'll have to check the records.

15  Q.  Okay.  Since you're not sure if you

16  appealed them ---.

17  A.  Yeah, I think he did.  I'm not sure.

18  Q.  Okay.

19  A.  But I'm objecting.

20  Q.  All right.  So the only two people

21  involved in the excessive bail claim would be

22  Craul and Morgan.  And Peddicord did.  And none

23  of these other ---.

24  A.  Peddicord's dated on the 12th.

25  Q.  Okay.

100

1    A.    You know, I mean, that affidavit on

2    probable cause on January 10 stating that the

3    --- my warrant out on drugs was shipped to

4    Leonard, Pennsylvania at a crime lab.

5    Q.    Leonard, Pennsylvania?

6    A.    Yes.  And at trial it came out that there

7    was no drugs in the State of Pennsylvania on

8    January 10th.  You know, so they questioned me

9    about it.

10   Q.    So the ---.

11   A.    The interdiction, you know, these guys,

12   these Defendants, they got interdiction and

13   they presented affidavit of probable cause

14   stating that the drugs was transferred to

15   Leonard, and there was no drugs in the State of

16   Pennsylvania.

17   Q.    Okay.  Sorry, sir.  So then, you raised

18   the suit.  Your attorney then raised this issue

19   at trial because ---.

20   A.    No, he didn't raise it.

21   Q.    Well, then how did it come out that ---.

22   A.    Objection.

23   Q.    Then how did it come out at all then that

24   the drugs weren't in Pennsylvania, if this

25   wasn't raised by your attorney at all?

101

1    A.    I mean, it came out in the testimony.

2    Q.    At trial?

3    A.    Yeah.

4    Q.    Okay.  Let's ---.

5    A.    I mean, the investigation, I mean ---.

6    Q.    That's not what I asked you. I said, did

7    this come up in trial.  So it did.

8    A.    Oh, okay.  Now I understand, but I didn't

9    understand what you were saying.

10    Q.    Yes.  So you know this information that

11    the drugs weren't in Pennsylvania because your

12    attorney raised the issue at trial?

13    A.    It came out at trial --- I'm going to

14    object to it.

15    Q.    Okay.

16    A.    But it came out that there was no drugs in

17    the State of Pennsylvania.  Not even at trial,

18    but at the preliminary hearing I think.  I

19    think it was at preliminary hearing.

20    Q.    Was it a suppression hearing?

21    A.    No, it was just preliminary hearing.

22    Q.    So the bottom line is, your attorney

23    raised this issue, then, about the drugs not

24    being in Pennsylvania?

25    A.    He didn't raise the issue, it just came

102

1   out on the testimony.

2   Q.   So what happened, the law enforcement

3   officers just came out on their own and

4   said, ---

5   A.   I mean, ---.

6   Q.   --- Mr. James, the drugs were never in

7   Pennsylvania.  Your attorney didn't talk about

8   it at all?

9   A.   It came out in Defendant Morgan's

10  testimony that ---.

11  Q.   Why would he testify to that?

12  A.   Well, he stated one thing because he

13  stated in his report --- that he had the report

14  on page five or six or four, that the drugs was

15  in the State of Pennsylvania on the 10th.  And

16  if --- I mean, we're not talking about a drug

17  case, now, we're talking about a little civil

18  matter, and you're going into my criminal

19  matter.

20  Q.   Well, that's important because that's

21  connected to the civil matter.

22  A.   You see, you going into my criminal

23  matter, but I said he said the drugs was in the

24  State of Pennsylvania on the 10th in his

25  initial report, which you presented to me in

103

1  your production of documents.  But in

2  actuality, at the suppression hearing, he said

3  something different.  See, he wasn't being

4  consistent.

5  Q.  So it was at a suppression hearing now.

6  A.  I'm not familiar with the criminal system.

7  I'm not an attorney.

8  Q.  No.  You have to understand something.  As

9  pro se, ---

10  A.  Yeah.

11  Q.  --- you know, you're representing

12  yourself, so I understand you don't know

13  everything we do.  One of the inherent

14  assumptions of risk you take on is, is that ---

15  A.  I don't need to get into that, no.

16  Q.  Okay.  --- you have to know what you're

17  talking about.  And you can't mislead me, say,

18  oh, funny thing, I don't know.

19  A.  I'm not misleading you.

20  Q.  But was this at the ---  I need to know --

21  - I asked you if your attorney raised this, you

22  said no.  And then you said, well, maybe it

23  came up in testimony at the preliminary

24  hearing, then you said suppression hearing,

25  then it wasn't at the suppression hearing.

104

1   This came up in trial or not?

2   A.   It came out at the preliminary hearing

3   because ---.

4   Q.   Was your attorney at the preliminary

5   hearing?

6   A.   Yes.

7   Q.   Okay.

8   A.   On this date, the Defendant Morgan stated

9   that there was contraband in the State of

10  Pennsylvania on January the 10th.

11  Q.   Okay.   That's not the issue.

12  A.   Listen to me.   In the affidavit of

13  probable cause, he stated that there was

14  contraband in the State of Pennsylvania on

15  January 10.   Criminal complaint filed on

16  January 10 with District Justice Leppo.   There

17  was not no contraband in the State of

18  Pennsylvania, there was not no search warrant,

19  there was not no arrest warrant in the State of

20  Pennsylvania.

21  Q.   Okay.   Are you through so I can ask you

22  questions?   Did your attorney ask Agent Morgan

23  this?

24  A.   Yes, I think so.   I'm not sure.

25  Q.   Okay.   So then, follow me now.

105

1    A.    Yes.

2    Q.    Your attorney raised this issue?

3    A.    Yes.

4    Q.    Okay.  Thank you.

5    A.    I'm not sure.  You got to ask them.

6    Q.    Well, I'm asking you.  You told me that

7    Defendant Morgan said this stuff in preliminary

8    hearing.  Your attorney must have asked him

9    about it.

10   A.    I guess.

11   Q.    Okay.

12   A.    It came out somewhere.

13   Q.    Did your attorney raise the issue of the

14   Miranda Rights at trial at all?  I mean ---

15   Okay.  Let me ask you this, because I think you

16   have some selective memory right now with me,

17   Mr. James.  What was your Defense at trial?

18   A.    You got to explain it to me.  You're not

19   explaining to me.  What does that mean?

20   Q.    What was your criminal Defense at trial?

21   A.    As from my understanding, I don't even

22   know 'cause my ---

23   Q.    You don't know what your criminal ---?

24   A.    --- my attorney was ineffective on the

25   way.  I don't know.

106

1    Q.    We're not here for ineffective attorney.

2    A.    Yeah.

3    Q.    What was your criminal Defense trial?

4    A.    I don't even know if I had a Defense.

5    That's why I'm here sitting.    I don't know.

6    Q.    So you didn't raise the issue at trial of

7    the search and seizure at all, the Fourth

8    Amendment search and seizure?    You never raised

9    that at trial?

10   A.    He might have waited for the suppression

11   hearing.    I'm not sure.

12   Q.    All right.    I mean, that's a paperwork, I

13   can get that.    And I think he raised it.    I

14   think he raised it.

15   A.    Yeah, I guess.    Yeah.

16   Q.    But, hey, he ---.

17   A.    He might have raised that at the

18   suppression hearing.

19   Q.    So you can dodge it.    Either way, your

20   attorney raised these issues already in your

21   criminal Defense.

22   A.    Yes.    You have to consult my attorney.

23   I'm not sure.

24   Q.    All right.

25   A.    That's privileged information. Objection.

107

1

2   Q.   You just told me I have to consult with

3   your attorney.  I guess I can't now because

4   it's privileged information.

5   A.   I mean, I'm  trying to do my best here.

6   I ---.

7   Q.   I know you are.

8   A.   I didn't go to school.

9   Q.   Look, I understand you're trying to do

10  your best.

11  A.   Yeah.

12  Q.   But you're not going to be able to ---.

13              ATTORNEY GIURINTANO:

14              Well, look.  Go off the record

15          just for a second.

16  OFF RECORD DISCUSSION

17              ATTORNEY GIURINTANO:

18              Okay.

19  BY ATTORNEY GIURINTANO:

20  Q.   So you aren't aware of any drugs being

21  found in any of your Mail Boxes Etc. ---?

22  A.   No.

23  Q.   Okay.  Now let's go into your Miranda

24  Warnings claim.  You're saying, again, I know

25  we discussed some of this before, you don't

108

1  recall if you were read your Miranda Warnings?

2  A.   No.  I don't recall.

3  Q.   Okay.  Now, you also had an excessive bail

4  case.  We went into that and, again, is Morgan,

5  Craul, and Peddicord are the three Defendants

6  you think are responsible for the excessive

7  bail claim, but you don't remember if you ever

8  appealed it or not.  We talked about your

9  excessive force claim.  Now, let's talk about

10 your search and seizure claim.  Why do you feel

11 that there has been a violation of your Fourth

12 Amendment right to search and seizure?

13 A.   Well, first of all, when you have a

14 private mailbox, that's considered --- you have

15 a privacy issue.  I mean, for somebody to just

16 come and put a makeshift box in your mailbox

17 without a warrant or anything, I think that is

18 considered that as a --- you know, when you ---

19 in other words, when you rent a mailbox, you

20 consider --- you want it to be safe, you know,

21 away from the public.  And by them putting that

22 in there without a warrant, I think that's a

23 violation of my constitutional rights.  Then

24 you go to a Magistrate and get the federal

25 opinion or judgement, you know.

109

1    Q.   What makes you think there was no search

2    warrant at all in any of this?

3    A.   There was no search warrant to arrest me.

4    Q.   There was search warrant or arrest

5    warrant?

6    A.   Arrest warrant.  There wasn't no search

7    warrant to go through my paperwork --- whatever

8    --- documents at Mail Boxes Etc.  I'm not sure,

9    Eastern Boulevard --- it's on Eastern Boulevard

10   in York.  Let me see if I can remember.  Can I

11   go through this?

12   Q.   Yeah.  Go ahead.

13   A.   Yes, 2536 Eastern Boulevard, York, PA.

14   Okay.  There was no search warrant there.  They

15   planted something and ---.

16   Q.   Was that raised at your trial at all?

17   A.   Well, I think my attorney raised it.  I'm

18   not sure.  I don't   --- after they arrested

19   me, they seized all of my personal belongings.

20   went through all my personal belongings, went

21   through it, ransacked it, you know, took what

22   they wanted, destroyed my lawyer's network

23   card, took all my keys, to my car, my business.

24   You know, I take medication and I was out of

25   that ant I was not allowed to contact home.

110

1    Q.   Right.

2    A.   What kind of medication do I need, you

3    know.   I'm arrested I might need to know what

4    medication I'm taking and whatever.

5    Q.   Right.  In one of your pleadings to me,

6    you indicated that this may be a case of

7    inevitable discovery.  You know, that they may

8    have discovered it anyhow.  How is this a case

9    of inevitable discovery if it's a mailbox and

10   it's in plain view.  How would that be a ---

11   and I'm asking you, it's not a rhetorical

12   question.  You said, oh, this may be a case of

13   inevitable discovery.  How is that inevitable

14   discovery if they --- you know, how is

15   inevitable if they would have found drugs in

16   your mailbox or alleged drugs in a mailbox?

17   A.   I don't understand what you mean.  Can you

18   break that down for me?

19   Q.   Sure.

20   A.   I'm not ---.

21   Q.   Sure.  You said that --- well, of course,

22   you're claiming that there was never any drugs.

23   You weren't aware of any drugs?

24   A.   No.

25   Q.   In any of your mailboxes.  But then you

111

1  said that there may be some type of inevitable

2  discovery of those drugs, I mean, but now you

3  just said it's a private mailbox.  How is it

4  inevitable discovery if that's a private

5  mailbox if --- inevitable discovery.  If it's

6  inevitable it's going to be found.

7  A.   They would have found it regardless?

8  Q.   Yeah.  They would.

9  A.   I don't remember what that was, can you

10 recollect me?

11 Q.   Uh-huh (yes).  It was in response to

12 Defendants', to my motion for summary

13 judgement.

14 A.   Motion for summary.  I did not respond to

15 that ---

16 Q.   Okay.

17 A.   --- but, if you're waiting for ---.

18 Q.   Then that's fine.  Okay.  That's my fault.

19 A.   But I want to let you know that if it

20 wasn't for them invading my privacy in breaking

21 and planting that makeshift box --- Agent

22 Morgan    and ---.

23 Q.   Right.

24 A.   They wouldn't have discovered whatever,

25 you know.

112

1    Q.    Right.

2    A.    They wouldn't have an opportunity to even

3    --- I wouldn't be sitting here with you because

4    ---.

5    Q.    So you're saying, if it wasn't for that

6    bad search, you wouldn't have been convicted

7    anyhow?  You wouldn't have been convicted

8    anyhow?

9    A.    I wouldn't be sitting here, really.

10   Q.    Why wouldn't you be sitting here?

11   A.    Because it was --- I mean, there was no --

12   - you know what I mean, there was --- they

13   wouldn't --- they couldn't just go on in there

14   and just search it by --- search something

15   somebody ---.

16   Q.    Right.  Are you saying then that if it

17   wasn't for the search that you're suing about,

18   that you wouldn't have been convicted?

19   A.    I don't understand what you're saying.

20   Q.    You said, if it wasn't for that search I

21   wouldn't be sitting in here now.  Isn't that

22   what you just said?  I believe that's what you

23   just said.  I mean, it's on the record.  You

24   said, if it wasn't for that bad search, you

25   wouldn't be sitting here right now.

113

1    A.   No, you said --- you're trying to say, I

2    bring a suit because of the bad search.

3    Q.   Right.

4    A.   So I'm trying to say it's --- objection.

5    Well, the search would be --- I wouldn't be

6    sitting here.

7    Q.   No.  All I'm asking you --- you said, if

8    it wasn't for the search --- I don't know.  The

9    stenographer can read it back, but I --- you

10   said, if it wasn't for the search, I wouldn't

11   be sitting here right now.

12   A.   Look, you're talking about the search of

13   my personal belongings.

14   Q.   Okay.  Which search are you talking about?

15    Which search are you suing about?

16   A.   My search in my person.  My personal ---

17   Q.   Okay.

18   A.   --- belongings.

19   Q.   Uh-huh (yes).

20   A.   The mailbox where they put the makeshift

21   box.

22   Q.   And this is the search of the mailbox

23   where you were arrested on January 10, 2001?

24   A.   Yeah.

25   Q.   Now, what would've happened if that search

114

1  wouldn't have happened at that Mail Boxes Etc.?

2  A.   I don't know.

3  Q.   Okay.

4  A.   I don't know what would have happened.

5  Q.   Okay.  Let's talk about the search a

6  little bit more.  You're suing about the search

7  of the Mail Boxes Etc.?

8  A.   I'm suing for search of my person.  The

9  search on my property that was on my person.

10  Q.   Right.  Well, then that has nothing to do

11  with your initial arrest on January 10th

12  because that happened after your arrest?

13  A.   No, that happened on January 10th in

14  the ---.

15  Q.   After your arrest; right?

16  A.   After my arrest?

17  Q.   They didn't search your person before they

18  tackled you; did they?

19  A.   That was the seizure that they did.  A

20  seizure of me.

21  Q.   But you just said, you're now suing only

22  because of the search of your person.  Tell me

23  again why you're suing ---.

24  A.   Can I reference with this (indicating)?

25                    ATTORNEY GIURINTANO:

115

1           Let the record show he's looking

2              at his complaint.

3   A.   Using the complaint.

4   BY ATTORNEY GIURINTANO:

5   Q.   Okay.  That's fine.  I need to know

6   exactly why you're suing on this Fourth

7   Amendment complaint and who you're suing.

8   A.   It says, warrantless search and seizure,

9   illegal search and seizure, unlawful arrest,

10  wrongful arrest and detention, invasion of

11  privacy, whatever.

12  Q.   Now, Mr. James, --- sorry.

13  A.   Violation of due process and entrapment.

14  Q.   Okay.  Stop.  Okay.  Now, I don't want you

15  to read back to me what you've written.  I have

16  that.  I'm going to try to get behind the

17  pleadings.

18  A.   Okay.

19  Q.   I need to know why you're suing because of

20  this Fourth Amendment issue you raised, and

21  what instance you're suing about, and who

22  specifically you're suing.

23  A.   Search at my Mail Boxes Etc.

24  Q.   Okay.  So one, you're suing on this Fourth

25  Amendment claim because of the search of your

116

1  Mail Boxes Etc..  Which one?  You don't know

2  the address.  The one ---.

3  A.  It's 2536 Eastern Boulevard.

4  Q.  And that's the one where you were arrested

5  at on January 10, 2001?

6  A.  There was no search warrant to search my

7  box or place a makeshift box at the mailbox.

8  Q.  Okay.  Any other Fourth Amendment issues?

9  A.  Search and seizure of my person.  The

10  search of my property.

11  Q.  What property?

12  A.  Whatever was on me.

13  Q.  What specific property?

14  A.  Wallet, my car.

15  Q.  Okay.  So for the record, what is it?

16  This Fourth Amendment claim is not about any

17  searches that occurred at the other Mail Boxes

18  Etc.?

19  A.  No.

20  Q.  Okay.  Now, why do you feel that the

21  search and seizure of the mailbox at 2536

22  Eastern Boulevard and search of your wallet was

23  unlawful?

24  A.  They didn't have a search warrant.  And

25  they didn't have an arrest warrant.

117

1   Q.   You had mentioned in some of your

2   pleadings, and forgive me, I forget which ones,

3   reference to a poisonous drug.

4   A.   I don't remember.  I don't recall.  And I

5   will object to others based on the fact that

6   --- I mean, I'm in criminal proceedings and I'm

7   being, you know, asked questions that deal with

8   my criminal matters, and I'm going to object to

9   that and ask you to ask me another question.

10  Q.   Now, what would've happened if they hadn't

11  searched your wallet or your person on January

12  10th, the day you're suing about?

13  A.   I don't know.  I don't know what would've

14  happened.  You picking up the mail from a

15  mailbox, or me going to a mailbox to pick up my

16  mail, that doesn't lead to criminal activity.

17  Q.   And you don't remember if these were

18  raised in your trial or not --- suppression

19  hearing?

20  A.   My attorney did not raise the mailbox

21  search and seizures in my criminal trial.

22  Q.   Oh, so you don't remember anything, but

23  now you remember specifically that ---.

24  A.   Well, he did not raise the search and

25  seizure of the Mail Boxes Etc.

118

1    Q.   Did he raise the search and seizure of

2    your person or of your wallet?

3    A.   I don't remember that, but I do know we

4    did not raise that issue.

5    Q.   So ---.

6    A.   I'm telling you the truth.

7    Q.   So in selective memory, you remember only

8    what helps you out.  You haven't raised ---.

9    A.   No, I mean --- I mean, that was one of my

10   questions in the case regarding the issues of

11   that.

12   Q.   Right.

13   A.   And he served me with two warrants that

14   have nothing to do with 2536 Eastern Boulevard.

15    The warrant had to do with Mail Boxes Etc.

16   Q.   Oh, really?  What was the probable cause

17   in those warrants?

18   A.   I don't know.  I think it's on the arrest,

19   something like that.

20   Q.   Yeah, you're right.

21   A.   Yeah, I mean, I think it was for unlawful

22   arrest.  I'm not sure.

23   Q.   It was from the unlawful arrests and the

24   unlawful search and seizure.  Is that what

25   you're alleging?  That it's unlawful search and

119

1  seizure?

2  A.  I think so.

3            ATTORNEY GIURINTANO:

4            You can take a five-minute break.

5  SHORT BREAK TAKEN

6            ATTORNEY GIURINTANO:

7    Okay.  After I receive a copy of this

8  transcript from Sargent's Court Reporting

9  Service, I will forward a copy here to SCI at

10 Rockview for Mr. James to review and agree with

11 its contents.  But I will not be providing him

12 with a free copy of that transcript.  Okay.

13 That's good.  Thanks.

14 A.  It wasn't in my article for production of

15 documents.  Did you say transcript?

16           ATTORNEY GIURINTANO:

17           Let's go off the record.

18 OFF RECORD DISCUSSION

19           ATTORNEY GIURINTANO:

20           Go ahead.  You can give your

21 statement for the record.

22 A.  Yeah.  I want to state on the record that

23 at the time of my arrest I was on psych

24 medication.  I think it was Effexor and

25 Risperdal.  I was taking diet pills and seeing

120

1    a psychiatrist every month and I was --- I got

2    a mental stress and anguish.

3                    ATTORNEY GIURINTANO:

4            Okay.

5    BY ATTORNEY GIURINTANO:

6    Q.  Mr. James, do you have any  witnesses to

7    substantiate in your claim?  I got Mrs. McCoy,

8    I believe her name is.  Do you have any other

9    witnesses you plan on using to back up any of

10   your claims at all?

11   A.   I have it written down here.  I don't

12   remember his name.  I think I served that to

13   you in Interrogatories.  I'm going to have to

14   search for them to find it.  And I'm Mr. ---

15   what's his name.

16   Q.   Can't give you a witness if you don't even

17   remember his name.

18   A.   Yeah.  I mean, I have his name.  But I

19   think I served it to you.

20   Q.   It's your name here in the papers?

21   A.   I don't have it here.

22   Q.   And what --- is he going to be a witness

23   for the arrest, or for the bail, or which

24   claims would he be witness for?

25   A.   He'd be a witness for the denial of

121

1    Counsel of bail problem.  Objection.

2    Q.   There'll be a witness for the denial of

3    bail and Counsel?

4    A.   And I have a witness, it's Mr. --- the

5    other clerk that was at the Mail Boxes Etc.,

6    2536 Eastern Boulevard.  He --- I think his

7    name was --- I don't remember his name.  It's

8    in the Interrogatories that you --- you know,

9    this one (indicating) that you sent me?

10   Q.   You don't remember his name, though?

11   A.   No, it's in the list.  It's in the

12   response to your Interrogatories.

13   Q.   Is his address and phone number in there?

14    This stuff is relevant.  Is his full name

15   or ---?

16   A.   Yeah, his full name's in there.

17   Q.   Okay.

18   A.   He just ---.

19   Q.   And what would he be testifying about?

20   The excessive force?

21   A.   The excessive force.  I don't know if they

22   had a camera here.

23   Q.   Okay.  What documents do you plan on using

24   in support of your claims?

25   A.   I have to subpoena my medical records,

1    probably from the York County Prison.

2    Q.   Okay.

3    A.   I complained to them.  They said, listen,

4    you know, they don't write down everything.

5    Q.   You complained to the York County Medical

6    staff ---?

7    A.   I make complaints, here they don't write

8    it down nothing. Every time you see them you

9    got to pay $12.  I haven't seen a doctor in

10   over seven months except for controlling high

11   blood pressure.

12   Q.   So we have the medical records.  What

13   else?

14   A.   They psychological --- I used to go a

15   psych every month.  They won't see me here.

16   Q.   All right.  What else, besides the medical

17   records?

18   A.   Well, the --- I was trying to get my

19   business records of the losses due to the fact

20   that this occurred.  I have to get all of my

21   necessary medical records and business records.

22   Q.   Okay.  Business records, medical records,

23   your witnesses are going to be two clerks who

24   work at Mail Boxes Etc., and ---.

25   A.   I have a witness that was in County with

123

1 me, he was there.

2 Q.    Inmate?

3 A.    Yes.

4 Q.    And he's the one who's going to testify to

5 the excessive bail and denial of Counsel?

6 A.    Yeah.

7 Q.    Any other witnesses?

8 A.    I don't recall any right now. I have to

9 check my records with you. I think I submitted

10 that to you.  You know, it should all be there.

11 Q.    Okay.

12 A.    Again, I would say my wife, but she just

13 --- Laverne James, and I would say, you know,

14 she probably won't testify.

15 Q.    All right.

16 A.    Because that's privileged.

17 Q.    Was she there at the arrest or ---?

18 A.    No, she wasn't at the arrest, but she went

19 and she searched --- mentioned our house.

20 Q.    Right.

21 A.    And never helped her ---.

22 Q.    Right.  But you're not suing for that

23 stuff?

24 A.    No.  No.

25 Q.    Okay.  So --- okay ---.

124

1    A.   Well, first I was suing things that the

2    Judge said that I could sue on a third party,

3    she had to be a third party too because she

4    lived there.  You know, search a house without

5    her consent or a warrant and checked stuff to

6    lock her up.

7    Q.   So I have a question about the makeshift

8    package.  Are you alleging that you had no idea

9    what that package was at all, or just that you

10   knew that you had a package coming when you

11   thought that the police ---?

12   A.   I didn't know that I had a package coming.

13    I didn't know what the package was at all.

14   All I know, that there was a slip in my mailbox

15   stating that a package was there in the mailbox

16   for me.  I didn't know I had a package coming

17   or nothing.  And I'm objecting to that based on

18   my criminal ---.

19   Q.   Criminal --- okay.  So on the Fourth

20   Amendment claim, you're suing for the search of

21   your mailbox at 2536 Eastern Boulevard, the

22   search and seizure of your person, and search

23   of your property.  Now, you mentioned your

24   wallet.  Anything else besides your wallet?

25   A.   Yeah.  The car.  The car.  They searched

125

1    my car.

2    Q.    Your car?

3    A.    The car I was driving.

4    Q.    Oh, they searched your car.  I don't think

5    you mentioned anything about that in your

6    pleadings.

7    A.    No, I didn't.  I can finish it if you

8    want, you know, I'm not sure. Sometimes I have

9    a ---.

10   Q.    Was your car at Mail Boxes Etc.?

11   A.    It was parked outside.

12   Q.    All right.

13   A.    That's where --- I was walking to my car

14   when they arrived --- arrested me.

15   Q.    Right.  And in your wallet they found

16   other Mail Boxes Etc. business cards; correct?

17   A.    Correct.

18   Q.    Okay.  Were any of those the ones that

19   were ---?

20   A.    The cards --- they found two credit cards.

21   my lawyer's network cards, other business cards

22   that I did business with, plus I have a

23   business account with Nexus, certain business

24   establishments and distributors.  They had all

25   those cards and travelers cards, you know,

126

1    check, my lawyer's network card.

2    Q.   Now, the Mail Boxes Etc. cards that they

3    found, were those the addresses of  ---?

4    A.   One more thing would be the bank checks.

5    Q.   Okay.  Stop.  Okay.  I don't care about

6    anything else that was in the wallet.  The Mail

7    Boxes Etc. cards they found, were those the

8    ones that were --- were they from your Mail

9    Boxes Etc. accounts from your other mailboxes

10   and other Mail Boxes Etc.?

11   A.   Well, they knew exactly what's going down.

12   Q.   Okay.

13   A.   Objection.  I think so.

14   Q.   Okay.  You say they allege now ---.

15   A.   Objection.  No.  I don't remember.

16   Q.   I just said that now and --- you know ---.

17    Do you remember the addresses of the Mail

18   Boxes Etc. business cards that were in your

19   wallet?

20   A.   No, I don't recall.

21   Q.   You don't?

22   A.   No.  But I recall them.

23   Q.   Do you recall those coming up at your

24   trial at all, your criminal trial?

25   A.   Objection.  I do not remember, that I

127

1    recall.

2    Q.  Okay.

3    A.  And the fact that I found out that there

4    was other charges on the 12th which kind of

5    took me down and arraigned me --- I just

6    discovered --- 2.5 million and I told him 2,000

7    --- $2 million in cash ---.

8    Q.  Right.  Right.

9    A.  Because I didn't know there was even, you

10    know, lesser drug and he charged me to

11    additional charges.  That's when I

12    realized ---.  At that time, I felt that I

13    should have a chance to call my attorney or

14    call my family.

15    Q.  Okay.  Stop.  Do you recall, I know I

16    asked you this when we first started, let me

17    refresh your memory a little bit or the stir

18    some memory, exactly haw many other Mail Boxes

19    Etc. accounts you had besides the one at 2536

20    Eastern Boulevard?

21    A.  I know I had --- I had --- I think it's

22    --- I think it's 2810 on White Street, that's

23    in Carlisle.

24    Q.  Okay.

25    A.  I think it's White Street.  I'm not sure.

128

1      That's Carlisle Avenue.

2    Q.   So the Mail Boxes Etc. where it's alleged

3    that they found the drugs, you did own those

4    boxes; correct?

5    A.   I contracted it.

6    Q.   You contracted it?

7    A.   Objection.

8    Q.   Right.  You object to your contract?

9    A.   I mean, I had contracted with them, yes.

10   Q.   Right.  Okay.  Mr. James, I think that's

11   about it.  Is there anything else you'd like to

12   get on the record at all?

13   A.   I just wanted to make a statement that I

14   want a chance to review --- you know.

15   Q.   Yes.  Yes.  You will be given a chance to

16   review.  What I will do then is haul the

17   assistant superintendent here and find

18   somewhere where ---.

19   A.   Can this be filed with the Courts?

20   Q.   No, this --- I mean, you objected a lot.

21   So this isn't admitted into evidence at trial

22   yet because some of it may not be admissible

23   because you objected, so no, this isn't ---.

24   OFF RECORD DISCUSSION

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T I O N

I hereby certify that the proceedings and

evidence are contained fully and accurately in the notes

taken by me on the suppression hearing in the above

cause, and that this copy is a correct transcript of the

same.

Shana J. Langione, RPR
Official Court Reporter

# Sargent's Court Reporting

| Page | Line | Error | Correction | Reason |
|------|------|-------|------------|--------|
| 12 | 20 | They were '95, 96' | 83, 90 | prior Years of convictions. |
| 13 | 8 | It was like a. | 83 | Year of conviction |
| 13 | 12 | prior To the 93 conviction | prior To The 90 convictions | Year of conviction |
| 13 | 13 | Was paroled For probation Revocation | It was For a probation Revocation | My probation was revocated in 1985, prior To my 1990 convictions. |
| 14 | 5 | I was convicted in 99, For Possession Q | I was convicted in 90 For possession | Years of prior conviction. |
| 14 | 9 | And I did serve For Two years, Three years | I serve Time For a period of Three years. | Amount of Time served |
| 19 | 6 | Think That | moved back | I moved back Toward M.B.E. |
| 23 | 20 | is what you like | see if Any mail is in the mail box | Taken out of context. |
| 23 | 24 | I had looked For This money | I had looked at This package | Taken out of context |
| 24 | 16 | When I walk out. | When I recieved The package | Taken out of context. |
| 24 | 17 | but when I walk | I walked out. | Taken out of The context. |
| 27 | 14 | I inspected it | I looked at It. | I Never Inspect Inspected The Package. |
| 33 | 3 | Paid | acceptor receiver | Never paid For Anything. |
| 38 | 25 | you have To have a STOP the car | you have To have a Driver License | Need Driver License not CAR |
| 44 | 5 | PSRA | PCRA | Post-Conviction Relief Act. |

I have read the transcript of my testimony and certify that it is accurate with the above corrections.

_Tyrone James_

Deponent's Name: TYRONE JAMES
Deposition Date: MAY 25, 2004

_Dretta K Andrews_
NOTARY SIGNATURE subscribed before me this

NOTARIAL SEAL
DRETTA K. ANDREWS, Notary Public
Benner Township, Centre County, PA
My Commission Expires June 13, 2006

6th day of .... July .... 20. 04

_Dretta K Andrews_

# *Sargent's Court Reporting*

| Page | Line | Error | Correction | Reason |
|------|------|-------|-----------|--------|
| 44 | 10 | RCR, or RCA | PCRA | Correct Abbreviation |
| 47 | 20 | Testify To Social & Security | Receiving Supplemental Security Income. | I was receiving SSI. (Take out of context). |
| 50 | 3-4 | Knocked sown | Cocked Down | misspelled. |
| 3 | 5 | & Danville | Camp Hill | misspell. |
| 67 | 7 | Running From both | moving away From both officer | Never runs From These officers |
| 79 | 12 | I blurted out | He blurted out | Morgan Blurted out, not me. or I |
| 81 | 14 | suppression, Not the excessive Force. | She witnessed the excessive Force | She was a witness. |
| 85 | 6-7 | I Testified at my Trial | This is part of Testimony presented at my Trial. | I never Testified at my Trial. |
| 84 | 10 | Rights | personal Property Belongings | was searching my personal property |
| 86 | 12-16 | searching my mail | Searching my Property | Taken out of context. |
| 86 | 16 | mailbox | Wallet/card. | we was at the police station, where officers was going through property. |
| 87 | 21 | Mc Carthy | McCoy. | property name of witness |
| 100 | 4-15 | Leonard | Lemoyne | misspelled |
| 106 | 10 | waited | Raised | misspell. |
| 108 | 25 | opinion or Judgement | Search warrant | misspell Taken out of context. |

I have read the transcript of my testimony and certify that it is accurate with the above corrections.

*Tyrone James*

Deponent's Name: TYRONE JAMES
Deposition Date: MAY 25, 2004

*Dretta K Andrews*

NOTARY SIGNATURE

SUBSCRIBED before me this
....day of...July...20.04.

*Dretta K Andrews*

NOTARIAL SEAL
DRETTA K. ANDREWS, Notary Public
Spring Township, Centre County, PA
Commission Expires June 13, 2006

| page. | Line | Error |  |  |
|---|---|---|---|---|
| 109. | 25 | ant | dont | misspell |
| 119 | 25 | Diet pills | Psych Med | misspell Taken out of content. |
| 122 | 9 | $ 12.00 | $.2000 | wrong number. |
| 123 | 18 | but She when | He when | proper pronouns. |
| 126 | 22 | But I Recall Them | I don't Recall | Never Recall Any addresses |
| 127 | 10 | Lesser drug | other Drug | misspell Taken on of content. |
| 127 | 12 | AT That Time, I, Felt That I | I Request To call my Attorney. | Taken out of content. as if I. never Request Counsel Before. |

Tyrone James

EX 9451